JASON D. RUSSELL (SBN 169219)
jason.russell@skadden.com
ZACHARY M. FAIGEN (SBN 294716)
zack.faigen@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone: (213) 687-5000
Facsimile:  (213) 687-5600

SHAY DVORETZKY (*pro hac vice forthcoming*)
shay.dvoretzky@skadden.com
PARKER RIDER-LONGMAID (*pro hac vice forthcoming*)
parker.rider-longmaid@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 371-7000
Facsimile:  (202) 393-5760

Attorneys for Plaintiff
AIRLINES FOR AMERICA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AIRLINES FOR AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO; and SAN FRANCISCO OFFICE OF LABOR STANDARDS ENFORCEMENT,<br><br>Defendants. | CASE NO.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff Airlines For America ("A4A"), on behalf of its member air carriers, alleges as follows:

## INTRODUCTION

1. Since it first began barely more than a year ago, the COVID-19 pandemic has caused previously unthinkable devastation across the United States and throughout the world. The virus has infected more than 30 million people in this country alone, and over 120 million people worldwide. More than 500,000 Americans have lost their lives.

2. The virus has upended nearly every aspect of American life, from schools to business to the way we interact with each other. The resulting impact on the American economy has been staggering. Nearly 10 million Americans lost their jobs in 2020. GDP decreased by 3.5%—the largest one-year decline since 1946. Consumer spending, which accounts for more than two-thirds of economic output, fell 3.9%—the worst performance since 1932.

3. No industry has been hit harder than the airline industry. Airline passenger volumes are down more than 60% from pre-pandemic levels. Operating revenues fell 62.5% in 2020. The nine largest U.S. passenger airlines incurred pre-tax losses of *$46 billion* in 2020. At the same time, costs and expenses continued to rise. Total airline debt increased 56% in 2020, from $105 billion to $164 billion. Collectively, U.S. airlines are projected to lose $155 million *per day* in the first quarter of 2021, $92 million per day in the second quarter, and $70 million per day in the third quarter.

4. As a result, airlines have been forced to take drastic and unprecedented cost-cutting and capital-raising measures. Airlines have had to sell or mortgage their aircraft and other assets at huge losses and on unfavorable terms. They have deferred aircraft deliveries and reduced non-aircraft capital expenditures. They have cut back on flight schedules and in-flight services. They have renegotiated contracts with partners and vendors. They have slashed executive compensation and implemented voluntary leave and early retirement programs. They have shuttered airport lounges and halted real estate projects. Worst of all, airlines have been forced to trim their workforce. From March to December 2020, the airline industry endured losses amounting to more than 90,000 full-time jobs through voluntary departure programs, early retirement options, and other similar offerings. That is more job losses in eight months than job gains in the industry in the last ten years *combined*.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO.

5.      Against this backdrop of industry devastation, the City and County of San Francisco ("San Francisco" or "City") has decided that now is the time to impose hundreds of millions of dollars in additional expenses on America's struggling airlines—expenses the City has notably *not* passed on to other businesses, and that disrupt the uniform way airline workers are treated across the country. In November 2020, San Francisco passed the Healthy Airport Ordinance ("HAO"), which completely upends how airlines that operate at San Francisco International Airport ("SFO") provide healthcare benefits to their employees. A copy of the HAO is attached as Exhibit A to this Complaint.

6.      Most airlines that operate at SFO have collective bargaining agreements with their airline worker unions. These agreements spell out in great detail the negotiated healthcare benefits that airlines agreed to provide and that airline workers bargained to receive. These benefits, negotiated painstakingly and often over the course of years, reflect the studied judgment of the airlines, on the one hand, and airline workers, on the other hand, about the best and fairest means of providing quality healthcare benefits while allowing the airlines to continue to operate. The HAO overrides and nullifies those agreements. With the HAO, San Francisco seeks to force airlines and airline workers to adopt the healthcare benefits plans the City thinks they should have, regardless of what workers want, regardless of the benefits for which airlines and airline workers collectively bargained, regardless of what tradeoffs the parties have chosen at the negotiating table, regardless of the healthcare benefits plans that airlines provide to all of their non-unionized domestic employees each year, and regardless of the impact on flights and services to SFO.

7.      Under the HAO, airlines must (i) ***discontinue*** all health plans that do not meet the specific benefits structure that San Francisco has decided is best—which for most airlines means ***all*** of their current healthcare plans—regardless of whether airlines or airline workers agree; (ii) change all of the healthcare plans they offer going forward to provide the specific benefits and plan structure that San Francisco's legislators have dictated, no matter the benefits and plan structure for which airlines and their unions collectively bargained; (iii) expand the universe of employees who are entitled to receive such benefits, including by removing any minimum-hours requirement; (iv) extend all such healthcare plans to cover all dependents of employees, including spouses—a requirement that goes beyond the scope of the Patient Protection and Affordable Care Act ("Affordable Care Act" or "ACA"), Pub. L. No. 111-148, 124 Stat. 119; and (v) ***absorb 100% of the resulting costs***, with no cost-sharing whatsoever from SFO employees

1  or the City for the plans the HAO requires—an unheard-of requirement for employer-provided healthcare

2  plans that will have catastrophic consequences for both the airlines and their workers.

3          8.      Airlines and airline workers are permitted to keep their current bargained-for benefits plans

4  only if airlines agree to pay a penalty of $9.50 per hour per employee—an amount equal to 130% of the

5  federal minimum wage—into a City fund. But that "choice"—of paying into the City fund rather than

6  changing their healthcare plans—is no choice at all, because it is prohibitively expensive, costing

7  individual airlines as much as $100 million per year for just a single airport. For many airlines, this likely

8  ensures that they cannot operate at a profit at SFO now or in the foreseeable future. Thus, any airline that

9  chooses this "penalty" option will do so only temporarily until it can find a way to change its healthcare

10  plans in a way that complies with both the HAO and that airline's collective bargaining agreements with

11  its workers.

12          9.      It is difficult to overstate the impact and burden the HAO will have on the airlines that

13  operate at SFO. Even if airlines can somehow find a way to offer healthcare plans that comply with both

14  the HAO and their respective collective bargaining agreements, the cost of doing so will be substantial.

15  As a result, the HAO will necessitate significant increases in ticket prices, force the elimination of routes

16  into and out of SFO, and cause cutbacks to key services, from baggage handling to wheelchair assistance.

17  It will also cause additional job losses, thus exacerbating the cutbacks to airline services and harming the

18  very airport workers that San Francisco purports to be helping.

19         10.     San Francisco's attempt to unilaterally impose its normative views on a single airport in an

20  integrated federal air travel system flies in the face of Congress's clear direction that the airline industry

21  be regulated by market forces and a uniform federal regulatory regime, rather than a patchwork of state

22  and local laws and ordinances. That patchwork, in turn, would render air travel economically impossible

23  and impose a tangle of inconsistent and counter-productive local regulations that serve only a local interest

24  at the expense of the rest of the country. Commercial air travel is a uniquely interstate business. Unlike

25  other workplaces, airplanes do not stay in one place. Employees often spend their days traversing dozens

26  of cities and states. Thus, it is not only logical, but also imperative, for a uniform federal regime to regulate

27  the airline industry. When a flight takes off from Boston, stops in Chicago, moves on to San Francisco,

28  and then flies to Dallas, the airline should not have to worry about navigating crosswinds of local

1   regulations dictating different and conflicting rules for how it must treat its employees. The HAO
2   exemplifies the need for uniformity. It seeks to elevate certain California-based workers over similarly
3   situated workers in other states—even though airline workers are required to collectively bargain as a
4   national unit and many California workers provide their services almost exclusively outside of California.
5   The HAO will thus create precisely the unmanageable situation that Congress sought to prevent.

6       11.     Due to its unique status as an interstate market, federal law prohibits the type of local
7   regulation of the airline industry that San Francisco seeks to impose by governmental fiat through the
8   HAO. Indeed, the HAO is preempted by no fewer than three federal laws because it (i) forces airlines to
9   change the benefits plans they offer; (ii) significantly impacts airline prices, routes and services in
10  mandating those changes; and (iii) interferes with the collective bargaining process and agreements
11  between airlines and their unions by dictating critical terms and removing them from the bargaining table
12  altogether. Moreover, the Contracts Clause of the United States and California Constitutions prohibit the
13  HAO because the HAO substantially impairs and interferes with airlines' collective bargaining
14  agreements with their unions.

15      12.     The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et
16  seq.*, preempts any state or local law or regulation that "relate[s] to any employee benefit plan." *Id.*
17  § 1144(a). ERISA thus preempts any state or local law that "requires an existing plan to pay certain
18  benefits," *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 13 (1987)—precisely what the HAO does.

19      13.     The Airline Deregulation Act of 1978 ("ADA"), Pub. L. No. 95-504, 92 Stat. 1705,
20  prohibits states and local governments from enacting any law or regulation that "relate[s] to a price, route,
21  or service of an air carrier." 49 U.S.C. § 41713(b). The Supreme Court has held that this provision
22  prohibits any state or local regulation that has "a 'significant impact' on carrier rates, routes, or services."
23  *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 375 (2008) (citation and emphasis omitted). That is
24  exactly the impermissible impact the HAO will have. The HAO will force airlines to increase ticket prices,
25  eliminate routes, and cut back on services.

26      14.     The Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, preempts state and local
27  regulations that frustrate its purpose of leaving collective bargaining in the railroad and airline industries
28  to market forces. *See id.* at §§ 151a, 152, 181; *Brotherhood of R.R. Trainmen v. Jacksonville Terminal*

1    *Co.*, 394 U.S. 369, 380 (1968); *Int'l Ass'n of Machinists v. Wis. Emp't Relations Comm'n*, 427 U.S. 132,

2    140 (1976). Under *Machinists*, state or local laws may not be enforced if they "attempt[] to influence the

3    substantive terms of collective-bargaining agreements." 427 U.S. at 153. The HAO does just that by

4    overriding the collective bargaining agreements between airlines and their unions. It substitutes the City's

5    required benefits scheme for the parties' bargained-for arrangement, while also changing the cost

6    allocation of premium payments by prohibiting airlines from sharing any of their healthcare costs with

7    SFO employees. Those requirements place "considerable" and impermissible "pressure on the [airlines]

8    and [their] employees to revise the labor agreement[s]" and their overall "benefit package[s]." *Chamber

9    of Commerce v. Bragdon*, 64 F.3d 497, 502 (9th Cir. 1995). Indeed, the HAO has already forced airlines

10   to begin renegotiating the terms of their labor agreements with their unions on threat of facing enforcement

11   actions that would levy potentially millions of dollars in punitive fines for non-compliance with this forced

12   requirement.

13            15.    Each of these federal laws preempts the HAO because the HAO intrudes upon airline

14   operations that Congress intended to be left to the free play of market forces and regulated only by a

15   uniform set of federal rules.

16            16.    As a government actor, San Francisco has wide latitude in shaping and enacting social and

17   economic policy for the City. But the HAO goes too far, violating not just one but two provisions of the

18   U.S. Constitution. First, the Constitution's Supremacy Clause, U.S. Const. art. VI, cl. 2, does not allow

19   the City to enact regulations that violate federal law, or that invade policy fields that Congress has reserved

20   for itself. Because San Francisco's HAO impermissibly invades three such areas—ERISA plans, airline

21   regulation, and collective bargaining—the HAO must give way. Second, the Constitution's Contracts

22   Clause, U.S. Const. art. I, § 10, cl. 1, does not allow San Francisco to pass a law "impairing the Obligation

23   of Contracts." The California Constitution prohibits such laws, too. Cal. Const., art. I, § 9. Yet the HAO

24   does just that by undermining airlines' collective bargaining agreements with their employees, disrupting

25   the parties' reasonable expectations, and forcing the airlines to expend substantial additional sums of

26   money to receive the benefit for which they already bargained.

27

28

**THE PARTIES**

17.     Plaintiff A4A is a nonprofit corporation organized under the laws of the District of Columbia, with its principal place of business in Washington, D.C. A4A is a trade organization that advocates on behalf of its member air carriers on a wide range of issues that are relevant to the airline industry, including safety, security, the environment and customer service. A4A's member airlines include Alaska Airlines, Inc.; American Airlines, Inc.; Delta Air Lines, Inc.; FedEx Corporation; Hawaiian Airlines, Inc.; JetBlue Airways Corp.; Southwest Airlines Co.; and United Airlines, Inc. Each of these A4A members operates at SFO. Each is also an "air carrier" covered by the ADA and the RLA. *See* 45 U.S.C. § 181. In addition, each offers to its employees one or more "employee benefit plan[s]" within the meaning of ERISA, 29 U.S.C. § 1003(a)(1).

18.     A4A brings this action under the doctrine of representational standing on behalf of its members who operate at SFO. An organization or association has standing to sue on behalf of its members when: (i) its members would otherwise have standing to sue in their own right; (ii) the interests the organization seeks to protect are germane to its purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 181 (2000); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342-43 (1977). A4A has an organizational interest in the consistent enforcement of federal regulation of the airline industry, and neither the claims here, nor the relief requested, require the participation of A4A's individual members.

19.     Defendant City and County of San Francisco is a municipal corporation organized and existing under the laws of the State of California. San Francisco owns and operates SFO.

20.     Defendant San Francisco Office of Labor Standards Enforcement ("OLSE") is an office of San Francisco's General Services Agency, an executive branch department of San Francisco. OLSE is responsible for enforcing San Francisco's labor laws, including the HAO.

**JURISDICTION AND VENUE**

21.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the case arises under (i) the Supremacy Clause and the Contracts Clause of the Constitution of the United States, U.S. Const. art. VI, cl. 2; and (ii) the laws of the United States, including ERISA, 29 U.S.C. § 1001 *et*

*seq.*; the ADA, 49 U.S.C. § 41713; and the RLA, 45 U.S.C. § 151 *et seq. See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983); *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 642 (2002).

22.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the claim that arises under the California Constitution because that claim is so related to the other claims in the action over which the Court has original jurisdiction that it forms part of the same case or controversy under Article III of the U.S. Constitution.

23.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and 1391(b)(2) because (i) both Defendants reside in this District and both reside in the state of California; and (ii) a substantial part of the events or omissions giving rise to the claims asserted in this case occurred in this District.

## FACTUAL ALLEGATIONS

## I.     CONGRESS PASSES THE RLA, ERISA, AND THE ADA, ALL OF WHICH PREEMPT STATE AND LOCAL LAWS THAT FRUSTRATE THEIR PURPOSES

### A.     Congress Passes The RLA And Extends It To Air Carriers, Preempting State And Local Regulation That Interferes With The Collective Bargaining Process

24.     Congress enacted the RLA in 1926 to "encourage collective bargaining by railroads and their employees." *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union*, 396 U.S. 142, 148 (1969). In 1936, Congress extended the RLA to air carriers and their employees. 45 U.S.C. § 181; *see Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 248 (1994). The RLA encourages collective bargaining by requiring air carriers and their "employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions." 45 U.S.C. § 152 First. To effectuate this objective, the statute provides a "comprehensive framework for resolving labor disputes" among parties involved in collective bargaining. *See Norris*, 512 U.S. at 252; 45 U.S.C. § 152 Fourth and Ninth.

25.     The Supreme Court has held that the RLA preempts state laws that "would frustrate effective implementation of the [RLA's] processes." *Brotherhood of R.R. Trainmen*, 394 U.S. at 380. One form of this preemption—known as *Machinists* preemption after *International Association of Machinists v. Wisconsin Employment Relations Commission*, 427 U.S. 132 (1976)—"is based on the premise that 'Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes.'" *Chamber of Commerce v. Brown*, 554 U.S. 60, 65 (2008) (quoting *Machinists*, 427 U.S. at 140 n.4). Under *Machinists*, "state attempts to influence the substantive

terms of collective-bargaining agreements are" forbidden because they are "inconsistent with the federal regulatory scheme." 427 U.S. at 153. Put differently, the RLA preempts state and local laws if they "interfere[] with the economic forces that labor or management can employ in reaching agreements." *Bragdon*, 64 F.3d at 501.

### B.   Congress Prohibits States And Local Governments From Enacting Regulations That "Relate To Any Employee Benefit Plan" Covered By ERISA

26.   Congress enacted ERISA in 1974 "to provide a uniform regulatory regime for employee benefit plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). Recognizing that "[u]niformity is impossible . . . if plans are subject to different legal obligations in different States," *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 148 (2001), Congress included in ERISA a "broad" preemption provision, *Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 943 (2016). That provision prohibits "any and all State laws" that "relate to any employee benefit plan" as defined by ERISA. 29 U.S.C. § 1144(a). The "term 'State law' includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." *Id.* § 1144(c)(1). The "term 'State' includes a State, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by" ERISA. *Id.* § 1144(c)(2). An "employee benefit plan" is one that "is established or maintained . . . by any employer engaged in commerce or in any industry or activity affecting commerce." *Id.* § 1003(a)(1).

27.   Given its "clearly expansive" scope, *Egelhoff*, 532 U.S. at 146 (citation omitted), ERISA's preemption provision prohibits "any state law that refers to or has a connection with covered benefit plans . . . even if the law is not specifically designed to affect such plans, or the effect is only indirect and even if the law is consistent with ERISA's substantive requirements." *District of Columbia v. Greater Wash. Bd. of Trade*, 506 U.S. 125, 129-30 (1992) (citations omitted).

28.   For example, ERISA preempts any state law that "requires an existing plan to pay certain benefits, or [that] requires the establishment of a separate plan where none existed before." *Fort Halifax*, 482 U.S. at 13. Similarly, ERISA preempts any state or local laws that "require providers to structure benefit plans in particular ways, such as by requiring payment of specific benefits," either directly or by imposing "'acute, albeit indirect, economic effects'" that "'force an ERISA plan to adopt a certain scheme

of substantive coverage.'" *Rutledge v. Pharm. Care Mgmt. Ass'n*, 141 S. Ct. 474, 480 (2020) (quoting *Gobeille*, 136 S. Ct. at 943). ERISA also preempts any state laws that require plans to calculate benefit levels differently in different locations. *See N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 657-58 (1995).

29.     The reason ERISA forecloses any state or local laws that require ERISA administrators to "pay benefits to the beneficiaries chosen by state law, rather than to those identified in the plan documents," is because such laws "run[] counter to ERISA's commands that a *plan*"—rather than individual states or cities—"shall 'specify the basis on which payments are made to and from the plan'" and who its beneficiaries are. *Egelhoff*, 532 U.S. at 147 (emphasis added; citation omitted).

## C.     **Congress Prohibits States And Local Governments From Enacting Regulations That Have A Significant Impact On Airlines' "Rates, Routes, Or Services"**

30.     Before Congress enacted the ADA, the Federal Aviation Act of 1958 empowered the Civil Aeronautics Board to regulate the interstate airline industry. That law did not preempt state regulation, and, in fact, preserved states' pre-existing statutory and common-law remedies. Consequently, air carriers were heavily regulated both federally—by the Civil Aeronautics Board, which closely controlled airlines' routes, rates, and services—and at the state level.

31.     In 1978, Congress enacted the ADA. In the ADA, Congress sought to curtail this onerous, multi-level regulatory scheme and replace it with a system designed to promote "efficiency, innovation, and low prices" in the airline industry through "maximum reliance on competitive market forces and on actual and potential competition." 49 U.S.C. §§ 40101(a)(6), (12)(A).

32.     To ensure that states would not undermine federal deregulation by imposing regulations of their own, Congress expressly provided that "a State [or] political subdivision of a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect law related to a price, route, or service of an air carrier." *Id.* § 41713(b). The Supreme Court has repeatedly explained that "the key phrase 'related to'" in that provision "expresses a 'broad pre-emptive purpose.'" *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 280 (2014) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992)). A regulation "relates to" rates, routes, or services—and is therefore preempted—if it has "a connection with, or reference to airline rates, routes, or services." *Morales*, 504 U.S. at 384. Importantly, a state law may

"relate to" an airline's rates, routes, or services "even if the law is not specifically designed to affect" rates, routes or services, "or the effect is only indirect." *Id.* at 386 (citation omitted). Thus, local laws are preempted if they have "a 'significant impact' on carrier rates routes, or services," even if that effect is only indirect. *Rowe*, 552 U.S. at 375 (citation and emphasis omitted).

## II.  COVID-19 DEVASTATES THE AIRLINE INDUSTRY

33.    In March 2020, political leaders in the United States started to comprehend the scope and severity of the fast-spreading COVID-19 virus. As that realization set in, the U.S. economy began to shut down. Non-essential stores shuttered. Schools closed. People were told to shelter in place, stay home if possible, and leave only if absolutely necessary.

34.    Air travel ground to a halt. The resulting effects on the airline industry have been devastating. More than one-third of all scheduled passenger flights have been canceled. Flights that were not canceled have flown at less than 20% capacity. As a consequence, airline operating revenues declined 62.5% in 2020. The nine largest U.S. passenger airlines incurred collective pre-tax losses of $46 billion.

35.    Meanwhile, costs continue to mount. Airlines' total debt increased from $105 billion at the end of 2019 to $164 billion at the end of 2020—a 56% rise. The net interest expense on that debt has already doubled and is expected to triple by the end of 2021.

36.    In response, and to simply keep their businesses solvent, airlines have taken unprecedented measures to cut costs and increase cash flow. A4A's member airlines have, among other things:

   a.    Made historic capacity cuts, parking or retiring older aircraft—including, in some cases, entire fleet types;

   b.    Sold or mortgaged aircraft, engines, and other assets;

   c.    Deferred aircraft deliveries and reduced non-aircraft capital expenditures;

   d.    Frozen hiring and non-essential spending, such as employee travel, marketing, training, and hiring consultants;

   e.    Slashed executive compensation and implemented voluntary leave and early retirement programs;

   f.    Shuttered lounges at airports and halted real estate projects;

   g.    Renegotiated contracts with partners and vendors;

h.      Reduced and simplified on-board services, such as food and beverage;

i.      Raised funds in the capital markets, through both debt and equity; and

j.      Suspended capital return programs, including share repurchases and dividend payments.

37.      But these measures have not been enough to avoid downsizing. From March to December 2020, the airline industry endured losses amounting to more than 90,000 full-time jobs through voluntary departure programs, early retirement options, and other similar offerings—a decline of more than 20% of the airline workforce. That figure amounts to more lost jobs in nine months than the total number of jobs the industry gained in the preceding decade.

38.      Nor has the turn of the calendar alleviated any of this suffering. Airline revenue declined 68% in January 2021 compared to January 2020. U.S. international air travel fell 78% over that same period. Passenger originations from California were down 76%. As of March 9, 2021, TSA checkpoint volumes at SFO were down 81.5% compared to 2019. For the sake of comparison, during the 2008 financial crisis, passenger traffic for U.S. carriers fell by *at most* 13% in year-over-year comparisons (in November 2008 and February 2009). Yet, it took more than seven years for passenger volumes to fully recover from that crisis. The recovery from the effects of the COVID-19 crisis will be long and uneven, particularly as the country continues to face new "waves" of the virus.

39.      The short-term outlook remains bleak, which is evident when looking at airlines' expected "burn" rate—an industry metric that reflects ticket and cargo sales, less cash operating expenses, cash refunds, capital expenditures, interest expense, and debt repayment (but does not include federal payroll support). Collectively, U.S. airlines are projected to "burn" $155 million *per day* in the first quarter of 2021, $92 million per day in the second quarter, and $70 million per day in the third quarter.

### III.      WITH AIRLINES REELING, SAN FRANCISCO PASSES AN ORDINANCE THAT UPENDS HEALTHCARE BENEFITS AGREEMENTS AND IMPOSES MASSIVE ADDITIONAL COSTS ON AIRLINES THAT OPERATE AT SFO

#### A.      General Overview Of San Francisco's Legislative Process

40.      The legislative branch of the San Francisco government is the Board of Supervisors ("Board"). The Board consists of 11 members, each of whom is elected on a non-partisan basis from each of San Francisco's 11 districts.

12

41.     The legislative process in San Francisco is somewhat unusual. Legislation can come in the form of (i) ordinances, which are municipal regulations or laws; (ii) resolutions, which are formal expressions of intention, opinion, or will; or (iii) formal motions, which are proposals for action.

42.     An ordinance is typically introduced by a member of the Board. After introduction, the President of the Board refers the legislation to one of the Board's standing committees for public hearing. Standing committees usually have three members. For legislation to pass out of committee and move back to the full Board for consideration, two of the three committee members must vote in favor of it.

43.     Most pieces of legislation require a simple majority vote of the Board. After the Board approves the legislation, it is sent to the Mayor, who then has ten calendar days to approve or veto it.

44.     California law makes violation of a city or county ordinance a misdemeanor unless the ordinance specifically states that a violation constitutes only an infraction. Cal. Gov't Code §§ 25132(a), 36900(a).

**B.      San Francisco, Through Its Airport Commission, Imposes Certain Requirements On Airlines That Operate At SFO**

45.     In 1970, San Francisco created the San Francisco Airport Commission ("Commission"). The Commission establishes the policies by which SFO operates. Pursuant to the San Francisco City Charter, the "Commission shall have charge of the construction, management, supervision, maintenance, extension, operation, use and control of all property, as well as the real, personal and financial assets which are under the Commission's jurisdiction." City Charter § 4.115. Under this authority, the Commission enters into contracts on behalf of San Francisco with entities that provide services at SFO, such as airlines.

46.     In 1999, the Commission adopted by resolution the Quality Standards Program ("QSP"), which it incorporated into its Airport Rules and Regulations. Comm'n Res. No. 99-04466. The QSP applies to any firm, including any airline or services provider, that employs personnel who perform services that affect safety or security at SFO ("QSP Employers"). The QSP sets certain general standards for QSP Employers with respect to safety, health, hiring practices, training, equipment standards, and compensation and benefits. All QSP Employers must comply with the QSP's directives as a condition of receiving an SFO use permit. Failure to do so can result in fines of $1,000 per employee per day.

47.     Beyond the QSP, the Commission also enters into individual lease agreements with airlines that lease airport and terminal space at SFO. In 2010, the Commission entered into two dozen such lease agreements with different airlines, each for a ten-year term. On March 16, 2010, the Commission adopted resolutions approving those leases. On May 11, 2010, by Resolution No. 0208-10, the Board approved those leases, which took effect July 1, 2011. Many of the airlines have entered into multi-year extensions of those leases.

48.     The lease agreements require each airline to comply with the San Francisco Health Care Accountability Ordinance ("HCAO"), a provision in San Francisco's Administrative Code that sets out certain minimum healthcare coverage standards for entities that enter into specified contracts with San Francisco. The Administrative Code is part of San Francisco's Municipal Code. Unless otherwise specified, a violation of the HCAO is a misdemeanor. *See* Cal. Gov't Code §§ 25132(a), 36900(a).

C.     **San Francisco, Through Its Airport Commission, Amends Certain Of Its Agreements With Airlines**

49.     Over the last two decades, San Francisco has from time to time amended the contractual terms that govern the conduct and obligations of employers at SFO. In each such instance, San Francisco has acted through the Commission because the Commission is the body that both oversees SFO policy for the City and enters into contracts on San Francisco's behalf.

50.     For example, in 2000, the Commission amended the QSP to extend its reach to employees of airlines and airline services providers who have access to airfield operations areas. Comm'n Res. No. 00-0002.

51.     In 2009, the Commission amended certain compensation and benefits requirements in the QSP. Comm'n Res. No. 09-0199. Among other things, the Commission required all QSP Employers to provide QSP-covered employees with individual healthcare benefits that satisfy the minimum standards set out in the HCAO. However, the requirement to satisfy the HCAO standards would not apply if a QSP Employer and its employees entered into a collective bargaining agreement ("CBA") that expressly waived compliance with the HCAO.

52.     In 2015, the Commission again expanded the reach of the QSP, this time to cover employees located on or near SFO property who prepare or transport food and beverage products delivered directly onto aircraft at SFO. Comm'n Res. No. 15-0216.

53.     In 2016, the Commission adopted additional health and safety standards at SFO, increased the training requirements for QSP-covered employees, and expanded the scope of the QSP to include custodial workers at SFO. Comm'n Res. No. 16-0035.

**D.     The San Francisco Board Of Supervisors Passes The HAO Through The City's Ordinary Legislative Process**

54.     In September 2020, San Francisco Supervisors Rafael Mandelman and Shamann Walton introduced Ordinance No. 235-20, known as the Healthy Airport Ordinance or HAO.

55.     The HAO purports to amend the HCAO's minimum healthcare coverage standards for entities that contract with San Francisco. In reality, however, the HAO singles out certain employers at SFO and applies only to them. It leaves untouched the minimum healthcare benefits that every other employer contracting with the City must provide to its employees under the HCAO.

56.     On information and belief, the reason the HAO applies only to SFO employers and not to any other employer that contracts with the City is that it was conceived and lobbied for by certain local San Francisco chapters of airport worker unions—but not *airline* workers—who were seeking specific healthcare benefit entitlements that they had failed to secure from their employers through their collective bargaining processes.

57.     The HAO is a significant departure from the way the City has previously sought to renegotiate and amend the healthcare benefit standards for SFO employers. As noted above, the QSP requires SFO employers to provide the same HCAO healthcare benefits that all employers who contract with the City must provide. However, when the City wanted to amend the substance or scope of the benefits requirements specific to SFO employers, it had the Commission make specific changes to the QSP itself. Here, in contrast, the HAO amended the City's Administrative Code instead, reflecting an entirely different legislative approach to regulating SFO employers.

58.     The Legislative Digest of the HAO states that the ordinance's goal is "to expand [SFO] employees' access to family health insurance benefits in order to protect those employees and their

15

1  families, protect the community and the traveling public from the spread of COVID-19, and restore public

2  confidence in the safety of air travel." The HAO itself says the same thing. *See* HAO sec. 2(k).

3      59.    Further, San Francisco has made clear that, "[i]n undertaking the adoption and enforcement

4  of this ordinance, the City is undertaking ***only to promote the general welfare.***" Proposed HAO amend.

5  sec. 5 (Mar. 2, 2021). As the legislative aide to HAO co-sponsor Supervisor Mandelman explained, San

6  Francisco views the HAO as "the right thing to do" and "the compassionate thing to do morally." The

7  HAO states that it is a response to findings from the Centers for Disease Control that "occupation;

8  healthcare access and utilization; discrimination; educational, wealth and income gaps; and substandard

9  housing" are "the contributing factors that may increase the risk that people form certain racial and ethnic

10 minorities contract, face serious illness, or die from COVID-19." HAO sec. 2(j). The HAO further finds

11 that "[t]he individual health benefits [already] provided to QSP-covered employees are critical to the

12 health, well-being, and financial security of those employees." HAO sec. 2(e).

13     60.    The process by which San Francisco enacted the HAO further confirms that the ordinance

14 is a regulatory measure intended "to promote the general welfare." As explained, when San Francisco

15 sought to alter or amend its contractual agreements with (or the requirements for) QSP Employers, it did

16 so through the Commission because the Commission is the entity charged with the "management,

17 supervision, . . . operation, use and control" of SFO. City Charter § 4.115. With the HAO, however, San

18 Francisco employed its ordinary process for passing general legislation pursuant to its regulatory and

19 police powers. After Supervisors Mandelman and Walton introduced the HAO, the legislation was

20 assigned to the Rules Committee and then transferred to the Budget and Finance Committee. It neither

21 originated from, nor was approved by, the Commission. Then, the Budget and Finance Committee

22 considered the HAO and approved it for the full Board's consideration alongside three other pieces of

23 legislation. One was an appropriation ordinance for general obligation bond proceeds; the other two were

24 resolutions authorizing retroactive grant applications by the Department of Public Health—all matters

25 related to the "general welfare" of the City.

26     61.    On October 28, 2020, the Budget and Finance Committee recommended the HAO to the

27 Board. On November 3, 2020, the Board passed the HAO on first reading, and on November 10, 2020,

28

finally passed it. Mayor London Breed approved the HAO on November 20, 2020, which meant that the ordinance would go into effect on March 21, 2021.

62.     Following the passage of the HAO, however, various airline unions realized that the HAO would decrease their members' benefits options because airlines would be forced to discontinue certain healthcare plans that did not comply with the HAO's inflexible requirements. As a result, certain union members and union representatives lobbied the San Francisco Board to amend the HAO to permit airlines to continue offering certain popular healthcare plans that the airlines would otherwise be required to discontinue. The Board acquiesced to the union demands. On March 2, 2021, Supervisor Mandelman introduced an Amendment to the HAO, altering the healthcare benefits requirements in the ordinance at the behest of the unions. Thus, for a second time, the unions secured by legislation that which they would ordinarily need to secure at the collective bargaining table.

63.     The HAO went into effect on March 21, 2021. As of the filing of this Complaint, the HAO amendment introduced on March 2, 2021 is not yet effective.

## IV.    THE HAO UPENDS THE BENEFITS REQUIREMENTS FOR AIRLINES AT SFO AND WILL FORCE EVERY SFO AIRLINE TO CHANGE ITS HEALTHCARE PLANS, NO MATTER HOW IT "CHOOSES" TO COMPLY WITH THE HAO

### A.    Before The HAO, Airlines Offer Numerous Bargained-For Healthcare Benefits Plans Reflecting Their Employees' Preferences For Maximum Choice

64.     Through collective bargaining and the prevailing forces of the competitive marketplace, airlines offer a number of robust healthcare benefits options to their employees, including PPOs,[1] EPOs,[2] and HMOs.[3] They sometimes even offer multiple different plan options within a given plan type. The

---

[1] PPO stands for Preferred Provider Organization. It describes a type of medical plan that contracts with a "network" of medical providers, such as hospitals and doctors, to provide services to plan members. PPO plans tend to cost more, but they also generally offer a larger network of healthcare providers. Depending on the specific structure of a given PPO plan, its cost allocations, and the types of services sought, plan members may incur little or no out-of-pocket costs when they seek medical care from an in-network provider. PPO plans will also reimburse members when they seek medical care from doctors and hospitals outside of the network, but they do so at a lower rate, and subject to different deductibles.

[2] EPO stands for Exclusive Provider Organization. It is a medical plan that reimburses members' healthcare costs only if members use in-network healthcare providers. An EPO generally will not reimburse members who seek medical care outside of the EPO's network, except in cases of emergency. As a result of this restriction, EPOs tend to have lower premiums than PPOs.

[3] HMO stands for Health Maintenance Organization. Like EPOs, HMO members will be reimbursed only where they receive medical care from in-network providers, except in cases of emergency. HMOs typically require members to have an in-network primary care physician ("PCP"), and require a referral *(cont'd)*

reason airlines offer so many options—and the reason airline workers bargain for those options—is that different benefits plans may have different networks of doctors, cover different healthcare services, use a different benefits structure, or involve different cost allocations between insurer and insured with respect to deductibles, co-pays and coinsurance. The availability of different plan options gives airline employees, many of whom commute to SFO from other cities across the country, meaningful choices in deciding how to meet their needs and their families' needs.

65.     For example, a young, healthy worker may decide that she is unlikely to require many healthcare services during the year, and therefore decide to enroll in a less comprehensive plan, but one which provides sufficient protection should that employee have an accident or suffer an unexpected health event. Similarly, an employee who takes daily prescription medicine may choose a plan that has more generous prescription drug benefits, or a plan that will subsidize and reimburse for name-brand drugs rather than only generic alternatives. A parent may decide to enroll in a particular PPO because the pediatrician he likes is in that PPO network, but not in-network for the EPO that is offered.

66.     One popular plan among airline workers is a high-deductible PPO with a Health Savings Account ("HSA"). An HSA is a tax-advantaged account in which employees or their employers can set aside money **_on a pre-tax basis_** that the employee can then use to pay deductibles, co-pays, coinsurance, prescription drug costs, and other specified medical expenses. Airlines will often contribute extra money to the HSA account of an employee who chooses such a high-deductible PPO plan. Airline workers like this plan because they get the benefits of a PPO and, essentially, additional free money from their employers that can be used to cover medical expenses.

67.     For many health insurance plans, airlines will cover 100% of the cost of the premiums for the employee. However, some employees who are married or have children may want to obtain health insurance for their families. Airlines offer that coverage option, too. If an employee elects spouse or family coverage, the airline and the employee will share responsibility for those additional premiums.

---

from the PCP before a member can seek care from an in-network specialist. Due to these more restrictive rules, HMOs tend to have lower premiums and deductibles than other plan types.

68.     Airlines also offer dental insurance and vision insurance plans. Those offerings are typically additional, optional plans, because many employees prefer a lower-cost medical plan that allows them to decline the cost of this supplemental insurance.

**B.     The HAO Upends The Agreements Airlines And Their Employees Reached By Imposing Strict Requirements For Healthcare Benefits Plans And Rendering Employee Choice And The Collective Bargaining Process Irrelevant**

69.     The HAO takes all of those bargained-for options away from employees, regardless of what they (or the airlines) would like left on the table. The HAO mandates that airlines offer *only* those healthcare plans that meet the extremely specific requirements that San Francisco has dictated for coverage, services, benefits structure, and cost allocations. *None* of the airlines' current healthcare plans meets all of the City's requirements. Therefore, to comply, airlines will be forced to either discontinue *all* of their current healthcare benefits options and replace them with one or more plans that satisfy the HAO, or amend their existing plans to comply with the HAO's benefits and cost-sharing mandates. This required overhaul will impose massive new costs on airlines that conduct business at SFO. Whether these new plans make sense for airlines, airline workers, and their families plays no role whatsoever under the HAO's rigid regime.

70.     Airlines can comply with the HAO in one of two ways. Both options will require airlines to change all of the benefits plans they currently offer, either now or in the near future.

71.     First, airlines may alter the healthcare benefits plans that they offer—or create entirely new plans—to comply with the HAO's specific plan requirements. Under this first option, airlines must do *all* of the following:

> a.     Offer at least one "Platinum" plan—*i.e.*, a healthcare benefits plan that provides a level of coverage designed to provide benefits that are actuarially equivalent to at least 90% of the full actuarial value of the benefits provided;[4]

---

[4] This requirement means that, on average, the insurer will pay for 90% of the healthcare costs that a plan member incurs, such that the member's out-of-pocket costs, including deductibles, co-pays and coinsurance, will amount to 10% of the cost of care. Premiums are excluded from this calculation. This 90/10 breakdown is an expected average across the plan for all members in the aggregate. Any given individual member may pay significantly more or less than 10% out of pocket.

b.     Ensure that the Platinum plan provides coverage for each of the specific services described in the California Essential Health Benefit Benchmark Plan, which breaks down coverage requirements in painstaking detail, including by specifying precisely what services must be covered (such as acupuncture and weight loss programs), as well as what services need not be covered (nutritional counseling and "routine foot care");

c.     Alter the structure of, and benefits provided by, any additional healthcare plans they offer so that the plans provide a level of coverage designed to provide benefits that are actuarially equivalent to at least 80% of the full actuarial value of the benefits provided under the plan (thereby making each such plan a qualifying "Gold" plan);

d.     Ensure that each such additional Gold plan provides coverage for all services as described in the California Essential Health Benefit Benchmark Plan;

e.     Offer these health insurance plans to all covered employees, regardless of the number of hours an employee works in a week, abrogating the prior HCAO rule (which remains the HCAO rule for all other industries and employers) that required employers to offer healthcare benefits plans only to workers who work 20 hours per week;

f.     Extend the healthcare benefits offered in each of the employers' plans to cover the employee's entire family, contrasting with the HCAO rule for employers in all other fields, and to do so at no cost to the employee; and

g.     ***Absorb 100% of the cost of the required Platinum health plans***, forbidding any cost-sharing between employers and SFO employees—an unheard-of requirement for employer-provided healthcare in any field under any circumstance.

72.     Airlines are forbidden from offering "Silver" or "Bronze" plans, even if employees desire those plans, and even if airlines are obligated to offer them pursuant to their CBAs.

73.     In addition, the HAO removes the ability of airlines and unions to waive its requirements in their CBAs, as they were previously permitted to do (and every other employer who contracts with the City is still permitted to do).

74.     As noted above, before the passage of the HAO, the airlines did not offer a single plan that fit all of the detailed and specific plan requirements that San Francisco has dictated. Thus, to comply with

1    the HAO, airlines must discontinue all of their plan offerings and replace them with entirely new ones, or

2    amend their amend their existing plans to conform with the HAO.

3         75.    But airlines may not even be permitted to do that. Most airlines have collective bargaining

4    agreements with their unions that specify the benefits plans the airlines must provide to their workers.

5    Airlines thus may not be able to discontinue or "amend" the benefits plans for which the unions have

6    collectively bargained. And although annual open enrollment periods typically occur in the fall—thus the

7    time at which employees may think about changing their selections—San Francisco now insists that

8    airlines make these benefits plan changes immediately, out-of-cycle, and without regard to airlines' CBA

9    obligations. Thus, to comply with the HAO, airlines may be required to violate or renegotiate their CBAs

10   under extreme time pressure, and under threat of enforcement actions and potentially crippling monetary

11   penalties.

12        76.    The second way airlines may comply with the HAO is to pay a per-employee penalty into

13   an account established under San Francisco's Health Access Program ("HAP"). *See* S.F. Admin. Code

14   § 14.2. Under this option, employers must pay $9.50 per hour per employee—30% more than the federal

15   minimum wage—into these accounts. The hourly rate will be adjusted upwardly even further every year.

16        77.    The HAO states that these per-employee penalty payments are healthcare "contributions

17   for that employee." S.F. Admin. Code § 12Q.3(d)(2). But that is false, because airport employees are not

18   in fact permitted to receive money from accounts that are set up "for [them]" under the HAP. Under § 14.2

19   of the Administrative Code, the Department of Public Health can "establish and maintain Medical

20   Reimbursements Accounts from which eligible Covered Employees may obtain reimbursement of Health

21   Care Expenditures." But the Administrative Code further provides that the "term 'Covered Employee'

22   ***shall not include*** those persons who are 'Covered Employees' as defined in Section 12Q.2.9 of the Health

23   Care Accountability Ordinance, Chapter 12Q of the Administrative Code, if the Employer meets the

24   requirements set forth in Section 12Q.3"—*i.e.*, the HAO—"for those employees." S.F. Admin. Code

25   § 14.1(b)(4) (emphasis added). The HAO amends Section 12Q.2.9 to define "Covered Employee" as any

26   "San Francisco Airport Service Employee who works any number of hours during any Week in such

27   capacity." And the HAO then defines "San Francisco Airport Service Employee" as any airport employee

28   covered by the QSP. S.F. Admin. Code § 12Q.2.16. In other words, airport employees fall outside the

HAP's coverage for the very reason that, by paying into the HAP, the airlines "meet[] the requirements set forth in [the HAO]." S.F. Admin. Code § 14.1(b)(4). The result is that the HAO prevents airline employees from obtaining reimbursement from the very accounts into which airlines are required to pay their per-employee penalties. This second option thus does nothing to help airline workers secure more or better healthcare. It is not a realistic or meaningful choice for either workers or the airlines. It forces airlines to spend an additional sum—30% more than the federal minimum wage—for their employees' services, without even conferring any benefits on those employees.[5]

78.     Moreover, this second option is not a realistic option for airlines, even if airline workers could obtain health benefits or reimbursement under the HAP. That is because complying with the HAO by choosing this second option would require airlines to eventually scrap their existing healthcare benefits plans. Airlines do not get "credit" for offering healthcare plans that, while robust and compliant with the airlines' CBAs, nonetheless do not satisfy the HAO's alternate requirements. For example, if an airline offers a high-deductible PPO plan with an HSA, pursuant to which the airline makes additional contributions into the employee's HSA account on the employee's behalf, but that PPO plan does not cover every benefit that the HAO mandates (such as pediatric orthodontic care), the airline must pay the full $9.50 per employee per hour. The airline would not get any "credit" for offering the high-deductible PPO plan with an HSA, even though an airline worker might prefer that plan over a "Platinum" HMO. In other words, airlines cannot simply "top off" their current plans by paying into the HAP account the difference in "value" (in the City's view) between the Platinum plan that the HAO requires and the high-deductible PPO with HSA contributions plan that the airline worker prefers.

79.     Because of this rule, it is not realistic over the long term for airlines to pay $9.50 per employee per hour and **also** continue offering a non-HAO-compliant plan to its employees. The airline's

---

[5] Option 2 is not viable for the additional reason that it violates federal law. "[R]evenues generated by an airport that is the subject of Federal assistance may not be expended for any purpose other than the capital or operating costs of—(1) the airport; (2) the local airport system; or (3) any other local facility that is owned or operated by the person or entity that owns or operates the airport that is directly and substantially related to the air transportation of passengers or property." 49 U.S.C. § 47133(a). And "revenues" are defined broadly to include "[a]ll fees, charges, rents, or other payments received by or accruing to the [airport owner or operator] . . . from air carriers." *Policy and Procedures Concerning the Use of Airport Revenue*, 64 Fed. Reg. 7,696, 7,716 (Feb. 16, 1999). Contrary to § 47133(a), option 2 requires fees from air carriers to be paid into a City fund not used for any of the enumerated purposes.

1   healthcare costs would skyrocket. It is estimated that the cost of paying into a HAP account is anywhere

2   from four to ten times more expensive than the cost of altering an airline's healthcare plans. Thus, while

3   airlines may have no meaningful choice but to "choose" to pay into a HAP account in the short term while

4   they negotiate with their unions and health insurers to identify new HAO-compliant plans and figure out

5   a sustainable path forward, no airline will choose over the long term to pay tens or hundreds of millions

6   of dollars into a HAP account while also maintaining their non-HAO-compliant healthcare plans. Thus,

7   under every circumstance, each airline will necessarily be forced to modify or eliminate its existing

8   benefits plans, either now in the near future.

9       80.     But airlines also cannot comply by simply dropping their benefits plans, offering no health

10  insurance coverage at all, and simply paying into the HAP. Most airlines are contractually obligated by

11  their CBAs to offer the health plans and benefit packages that the airlines and their unions negotiated. In

12  addition, the ACA imposes massive tax penalties on certain employers (airlines included) who do not

13  provide healthcare plans for their workers, precluding this option for an additional reason. And beyond

14  that, it is irrational for airlines to pay penalties to the City that provide no benefit to their workers, *see*

15  *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 193 (4th Cir. 2007), **especially** where those penalties

16  cost more than the benefits themselves.

17      81.     It is also not an option for airlines to simply ignore the HAO and pay the fines resulting

18  from violating it. The consequences of noncompliance are far too steep. A violation of the HAO—a City

19  ordinance—is a misdemeanor. Moreover, the City's Administrative Code authorizes civil fines of up to

20  $100 per week per employee for whom any employer fails to provide a compliant health benefits plan,

21  and the City can also impose additional fines of $1,000 per violation **per employee per day** under the QSP.

22  Those fines are on top of any other remedies San Francisco may pursue.  And this is no idle threat as the

23  City has already threatened to commence enforcement actions immediately after the HAO takes effect.

24      **C.**     **The HAO Does Nothing To Achieve Its Stated Goals, In Any Event**

25      82.     While the HAO aims to expand healthcare access for SFO workers' families "to promote

26  the general welfare," it does nothing to accomplish its objectives of protecting SFO workers or the

27  traveling public from the spread of COVID-19, or of restoring public confidence in the safety of air travel.

28  The HAO states that SFO workers face an increased risk of contracting COVID-19 because, among other

things: (i) SFO has "[i]nconsistent policies for enforcing compliance with face covering requirements"; (ii) workers come into "frequent, close contact with passengers, often in areas where passengers are likely to congregate together"; (iii) airline catering employees "often work in climate-controlled spaces with little ventilation"; and (iv) "[e]mployees who disinfect and clean airplane cabins in between flights must come into contact with surfaces and areas used by large groups of air travelers." HAO sec. 2(h)(1)–(3).

83.     Nothing in the HAO prevents, minimizes, or addresses even one of those risks to SFO employees. It contains no requirements about mask-wearing, no rules about social distancing, no regulations regarding airflow and circulation, and no provisions to require cleaning or disinfecting common areas. The airlines themselves already provide extensive COVID-19 testing, healthcare, support and flexibility. The HAO adds nothing to what the airlines already provide. Instead, it requires airlines to offer healthcare plans that contravene their collective bargaining agreements, or to otherwise pay hundreds of millions of dollars in penalties at a time when the airline industry can least afford it.

## V.     THE HAO WILL LEAD TO INCREASED TICKET PRICES, FEWER ROUTES IN AND OUT OF SFO, AND SUBSTANTIAL CUTBACKS IN SERVICES

84.     Given the staggering costs it will impose on the airlines at SFO, the HAO will necessarily and directly impact ticket prices, routes, and services at SFO.

85.     Though the full scope and cost of the HAO cannot be calculated with precision given how hastily the City passed and then decided to implement and enforce it, it is clear that the impacts and burdens will be significant. Based on early estimates, airline ticket prices for flights into and out of SFO will increase by over 6%.

86.     Higher ticket prices mean fewer passengers flying in and out of SFO, thus forcing airlines to route fewer connections through SFO. Airlines will instead route flights through different cities, avoiding SFO where possible.

87.     The HAO will also lead to a substantial reduction in services. It is estimated that the HAO will cause nearly 2,000 job losses among airlines and airline contractors and suppliers alone. That will force airlines to provide fewer services across the board, from baggage handlers to gate agents to

wheelchair assistants and more. Current estimates peg the reduction in services at 5-7%, though the ultimate effect could be even more substantial.[6]

88.  The job losses caused by the HAO will lead to over $300 million in lost income for Bay Area residents. The long-term job losses could be far higher, particularly if the HAO survives and airlines cannot successfully renegotiate their collective bargaining agreements.

## VI.  IN ENACTING THE HAO, SAN FRANCISCO ACTED IN ITS REGULATORY CAPACITY, NOT AS A "MARKET PARTICIPANT"

89.  "[P]re-emption doctrines apply only to state *regulation*." *Building & Constr. Trades Council v. Assoc. Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 226 (1993). Thus, if a state or local government owns or manages property just "as a private party would," and it acts in its capacity as a property owner rather than through its police powers as a regulator, its actions are not preempted. *Airline Serv. Providers Assoc. v. L.A. World Airports*, 873 F.3d 1074, 1079-80 (9th Cir. 2017) (*LAX*).

90.  Here, San Francisco will undoubtedly argue that the HAO is not subject to federal preemption because the City enacted the HAO as a "market participant" rather than as a regulator. That argument would be meritless.

91.  The Ninth Circuit in *LAX* set out a two-part test for determining whether a state or local government is acting as a regulator or as a market participant. As the United States explained in a filing before the Supreme Court, however, the Ninth Circuit in *LAX* "did not properly state or analyze the general test for [the market participant] exception" to preemption. Br. for the United States as Amicus Curiae at 18, No. 17-1183 (U.S. May 21, 2019). The Ninth Circuit's test misapplies Supreme Court precedent and has the potential to produce anomalous results. As the United States explained, "the United

---

[6] Under the ADA, the term "services" carries its natural and ordinary meaning—"the provision or anticipated provision of labor from the airline to its passengers"—and therefore "encompasses matters such as boarding procedures, baggage handling, and food and drink—matters incidental to and distinct from the actual transportation of passengers." *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 223 (2d Cir. 2008); *see also, e.g.*, *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336-38 (5th Cir. 1995) (en banc). The Ninth Circuit has somehow read "services" to mean only "the provision of air transportation to and from various markets at various times," and thus not to include "the various amenities provided by airlines, such as 'in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities.'" *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 726 (9th Cir. 2016) (quoting *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1261, 1266 (9th Cir. 1998) (en banc)). Thus, the Ninth Circuit defines "services" to have the same meaning as "routes." That outlier view is inconsistent with Supreme Court precedent and the considered views of other courts of appeals. *See, e.g.*, *Air Transp. Ass'n of Am.*, 520 F.3d at 223 (noting the disagreement). It should be overruled.

States is concerned that the court of appeals misframed the test . . . , and that the court's approach—both [in *LAX*] and in other cases—could allow state and local governments to escape preemption of what are regulatory measures." *Id.* at 23.

92.     Yet, the propriety or validity of the test articulated in *LAX* does not dictate the result here. Even accepting the *LAX* standard, the HAO is still preempted because San Francisco was acting as a regulator rather than a "market participant" under any definition or test.

93.     To start, San Francisco itself has admitted that it acted as a regulator and under its general police powers when it enacted the HAO. The City stated: "In undertaking the adoption and enforcement of this ordinance, the City is undertaking ***only to promote the general welfare***." The City thus disclaimed acting as a property owner or for the purpose of benefiting itself as a contracting landlord.

94.     If the City's own concession were not enough, the HAO's role, design, and features certainly are. Start with the HAO's target. The HAO does not address any contract or contractual terms between the City and the airlines. Rather, it addresses and alters the collectively bargained contractual agreements between airlines and airline workers. Moreover, it does so through the coercive governmental power of an ordinance—local legislation—with no opportunity between the City and the airlines for negotiation, and without respecting the terms of existing contracts, as any private property owner would need to do. Any connection to San Francisco's interests as a property owner is tenuous and remote.

95.     Nor does the HAO even arguably serve any interests the City might have as the owner of SFO. The HAO states that one of its goals is to "protect[] the community and the traveling public from the spread of COVID-19, and restor[e] public confidence in the safety of air travel." HAO § 2(k). Even if those goals address legitimate interests that the owner of an airport might have, mandating specific healthcare benefits plans with detailed requirements about what specific medical procedures must be covered—especially for employees' family members—does nothing to further those interests. The HAO does not help protect the community or the traveling public, or in any way prevent the spread of COVID-19. As noted above, the HAO contains no requirements about mask-wearing, no rules about social distancing, no regulations regarding airflow and circulation, and no provisions to require cleaning or disinfecting common areas. The rote recitations in the HAO about "protecting" workers and the traveling public are mere pretext designed to camouflage the City's regulatory purpose of imposing certain

1   healthcare requirements for a specific population of airport workers and their families who may or may

2   not live in the City and County of San Francisco. On that last point, it is worth noting that SFO is not even

3   in San Francisco; it is in San Mateo County. Moreover, many SFO employees who are covered by the

4   HAO do not live in the Bay Area at all. They (and their families) live across the country and commute to

5   San Francisco for part of the week to work their shifts, and then return home.

6        96.    The City's regulatory purpose is also clear, given the burdensome requirements the HAO

7   imposes. No private party, acting as a property owner, would ever force its contracting counterparty to

8   offer healthcare plans with such detailed specificity that have nothing to do with the work being performed

9   at the property (even leaving aside that no private party would have the power to impose such a term by

10  fiat rather than by negotiation at the bargaining table). Perhaps a property owner would insist that its

11  contracting counterparties offer ***some*** minimum medical insurance, either to help ensure that workers

12  would miss less time from work due to illness, or to provide additional comfort that workers would have

13  healthcare coverage if they suffered a workplace accident. But it defies common sense to believe that San

14  Francisco acted as a "market participant" "***as a private party would***" when it insisted that the healthcare

15  plans that airlines offer to airline workers cover pediatric orthodontia—which has no even arguable

16  connection to the work being done at SFO. And given the negative effects the HAO's costly requirements

17  will have on airlines and, thus, airlines prices, routes, and services, no rational private proprietor would

18  think the HAO is warranted from a cost-benefit perspective.

19       97.    Myriad other facts also support the conclusion that San Francisco was acting as a regulator

20  rather than a "market participant." In enacting the HAO, San Francisco used its ordinary legislative

21  process for general welfare measures, rather than airport-specific management mechanisms. As explained

22  above, it is the Commission that manages, supervises, and operates SFO. The Commission is the

23  contracting party for the airlines' SFO leases. Previously, when the City wanted to alter the requirements

24  for SFO in its capacity as property owner, it acted through the Commission. Here, San Francisco

25  introduced the HAO, considered the HAO, and passed the HAO in the manner in which the City

26  introduces, considers, and passes general welfare legislation.

27       98.    The HAO also contains enforcement mechanisms available to no private party. The HAO

28  is a City and County ordinance forming part of San Francisco's Municipal Code. A violation of the HAO

is a misdemeanor. No private party could enforce its contractual rights by threat of a misdemeanor violation—and that alone is enough to rule out the market-participant doctrine. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 569 U.S. 641, 651-52 (2013). Moreover, violating the HAO can give rise to onerous civil fines of over $1,000 per employee per day. No private party could ever secure for itself such a coercive enforcement provision.

99.     It is also important to remember the "property" at issue here. Airports are a classic public good and perhaps the quintessential example of public infrastructure. Every international airport in the United States is publicly owned (and nearly every domestic airport is, too). Thus, private parties do not even *exist* as "market participant" owners of airports. Airports are also publicly financed, with governments frequently tapping the municipal bond market to raise revenue. When governments want to build new airports or expand existing ones, they use eminent domain proceedings to force private citizens to sell. Private parties cannot do that. Airports also employ special police and fire units belonging to the government. The San Francisco Police Department has its own Airport Bureau that employs nearly 200 workers dedicated to SFO. Again, no private party acting as a "market participant" could do that, at least not absent governmental authorization. Finally, if private parties did own international airports like SFO, they would be subject to serious challenges of anti-competitiveness and monopolization—something that San Francisco, as a government entity, does not have to face.

## CAUSES OF ACTION

### COUNT I
### Violation of the Airline Deregulation Act of 1978 (Preemption)

100.     Plaintiff A4A repeats and realleges the allegations in paragraphs 1 through 98 as if fully set forth herein.

101.     In passing the ADA, Congress sought to curtail the onerous regulatory scheme that governed the airline industry, and to instead promote "efficiency, innovation, and low prices" through "maximum reliance on competitive market forces and on actual and potential competition." 49 U.S.C. § 40101(a)(6), (12)(A). To ensure that states would not undermine this objective by imposing their own regulations, Congress included an express preemption provision in the ADA, under which "a State [or] political subdivision of a State . . . may not enact or enforce a law, regulation, or other provision having

the force and effect law related to a price, route, or service of an air carrier." *Id.* § 41713(b). The "state laws whose effect is forbidden under federal law are those with a significant impact on carrier rates, routes, or services." *Rowe*, 552 U.S. at 375 (citation and emphasis omitted).

102.    The HAO violates the ADA's preemption provision because it will significantly impact the rates, routes, and services of the airlines that operate at SFO. As a result, it violates the Supremacy Clause of the United States Constitution.

**COUNT II**
**Violation of the Employee Retirement Income Security Act of 1974 (Preemption)**

103.    Plaintiff A4A repeats and realleges the allegations in paragraphs 1 through 101 as if fully set forth herein.

104.    Congress enacted ERISA in 1974 "to provide a uniform regulatory regime for employee benefit plans." *Aetna Health*, 542 U.S. at 208. To accomplish this objective, Congress included an expansive preemption provision in ERISA. That provision prohibits any state or local law that "relate[s] to any employee benefit plan" under ERISA. 29 U.S.C. § 1144(a). Under this rule, ERISA preempts any state or local law that governs "'a central matter of plan administration' or 'interferes with nationally uniform plan administration.'" *Gobeille*, 136 S. Ct. at 943 (quoting *Egelhoff*, 532 U.S. at 148). ERISA therefore supersedes any law that "requires an existing plan to pay certain benefits, or [that] requires the establishment of a separate plan where none existed before," *Fort Halifax*, 482 U.S. at 13, or that "force[s] an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers," *Gobeille*, 136 S. Ct. at 943 (quoting *Travelers*, 514 U.S. at 668).

105.    The HAO violates ERISA's preemption provision because it will force airlines that operate at SFO to establish new ERISA plans, or to alter or terminate existing ERISA plans to separately pay certain benefits that the HAO requires. As a result, the HAO violates the Supremacy Clause of the United States Constitution.

**COUNT III**
**Violation of the Railway Labor Act (Preemption)**

106.    Plaintiff A4A repeats and realleges the allegations in paragraphs 1 through 104 as if fully set forth herein.

29

107.     Congress enacted the RLA "to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the [law's] purposes," including "the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions." 45 U.S.C. § 151a. To that end, the RLA obligates carriers and their employees "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions." *Id.* § 152 First. It also provides a comprehensive framework for resolving disputes. *See Norris*, 512 U.S. at 252. The Supreme Court has held that this scheme prohibits state or local regulation that "would frustrate effective implementation of the Act's processes." *Brotherhood of R.R. Trainmen*, 394 U.S. at 380. Consequently, the RLA preempts "attempts to influence the substantive terms of collective bargaining agreements," *Machinists*, 427 U.S. at 153, that "interfere[] with the economic forces that labor or management can employ in reaching agreements," *Bragdon*, 64 F.3d at 501.

108.     The RLA preempts the HAO because the HAO regulates within the zone that Congress intended to be left to market forces by impermissibly imposing on airlines and their unions contractual terms that those parties did not negotiate or agree to include in their collective bargaining agreements.

**COUNT IV**
**Violation of the Contracts Clause of the U.S. Constitution**

109.     Plaintiff A4A repeats and realleges the allegations in paragraphs 1 through 107 as if fully set forth herein.

110.     The Contracts Clause of the U.S. Constitution provides that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1.

111.     The Framers "intended to establish a great principle, that contracts should be inviolable," and the Supreme Court concluded in an early decision that courts "should give these words their full and obvious meaning." *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 205-06 (1819) (Marshall, C.J.). "Contracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978).

112.     The HAO substantially impairs A4A's members' collective bargaining agreements with their employees. It undermines the parties' bargain, interferes with the parties' reasonable expectations,

and requires A4A's members to expend substantial sums to comply with regulatory terms they did not bargain for and could not have reasonably anticipated. It obligates A4A's members either to make costly changes to the healthcare benefits plans they offer employees or to pay an exorbitant $9.50 per employee per hour to continue receiving the employees' bargained-for services—more than the federal minimum wage for hiring an employee in the first place.

113.    The HAO "nullifies express terms of the [airlines'] contractual obligations and imposes a completely unexpected liability." *Allied Structural Steel*, 438 U.S. at 247. Among other things, the HAO requires each of A4A's members "to pay for a right it already possesses" under the CBAs, resulting in an adjustment in "financial terms" that "constitute[s] substantial impairment." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 890-91 (9th Cir. 2003).

114.    The HAO is not drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose. It is a "redistributive law[]" that violates the Contracts Clause. *Ass'n of Equip. Mfrs. v. Burgum*, 932 F.3d 727, 732 (8th Cir. 2019).

115.    Accordingly, the HAO violates the Contracts Clause, Article I, Section 10, Clause 1, of the U.S. Constitution.

### COUNT V
### Violation of the Contracts Clause of the California Constitution

116.    Plaintiff A4A repeats and realleges the allegations in paragraphs 1 through 114 as if fully set forth herein.

117.    The Contracts Clause of the California Constitution provides that a "law impairing the obligation of contracts may not be passed." Cal. Const. art. I, § 9.

118.    Courts interpret the Contracts Clause of the California Constitution similarly to the Contracts Clause of the U.S. Constitution, because the two are "[t]he same provision, in substance." *Robinson v. Magee*, 9 Cal. 81, 82-83 (1858); *see also, e.g.*, *Sonoma Cty. Org. of Pub. Emps. v. County of Sonoma*, 23 Cal. 3d 296, 303-14 (1979) (performing one analysis to find that a California statute violated the federal and state Contracts Clauses). Thus, like its federal counterpart, the Contracts Clause of the California Constitution prohibits laws that substantially interfere with private contract rights.

119.    Accordingly, for the reasons alleged in paragraphs 109 through 114 and throughout this Complaint, the HAO violates the Contracts Clause, Article I, Section 9, of the California Constitution.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff A4A, on behalf of its air carrier members who operate at SFO, respectfully requests that the Court grant the following relief:

120.    Declare that the HAO is preempted by ERISA, the ADA, and the RLA, and is therefore unenforceable by virtue of the Supremacy Clause of the United States Constitution.

121.    Declare that the HAO violates the Contracts Clause of the United States and California Constitutions and is therefore unenforceable.

122.    Permanently enjoin Defendants, and all persons acting under their direction and control, from enforcing the HAO.

123.    Order that Defendants disgorge to A4A or A4A's member airlines any fees, contributions, fines, penalties, or other monetary payments which Defendants have collected or received from A4A's members pursuant to the HAO.

124.    Award A4A its costs, expenses, and reasonable attorney's fees; and

125.    Award such other relief as the Court may deem just and proper.

DATED: March 31, 2021                     Respectfully Submitted,

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____ */s/ Jason D. Russell* _____
                        Jason D. Russell
                        Attorneys for Plaintiff
                        Airlines For America