JASON D. RUSSELL (SBN 169219)
jason.russell@skadden.com
ZACHARY M. FAIGEN (SBN 294716)
zack.faigen@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone: (213) 687-5000
Facsimile:  (213) 687-5600

SHAY DVORETZKY (*admitted pro hac vice*)
shay.dvoretzky@skadden.com
PARKER RIDER-LONGMAID (*admitted pro hac vice*)
parker.rider-longmaid@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 371-7000
Facsimile:  (202) 393-5760

Attorneys for Plaintiff
AIRLINES FOR AMERICA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AIRLINES FOR AMERICA, | CASE NO.: 3:21-cv-02341-EMC |
| Plaintiff, | Complaint Filed: March 31, 2021 |
| v. | **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT TO RESOLVE MARKET-PARTICIPANT DEFENSE; MEMORANDUM OF POINTS AND AUTHORITIES** |
| CITY AND COUNTY OF SAN FRANCISCO, | |
| Defendant. | |
| | Date:   March 17, 2022<br>Time:   1:30 p.m.<br>Place:  Courtroom 5 – 17th Floor<br>Judge:  Honorable Edward M. Chen |

1

**TABLE OF CONTENTS**

2  TABLE OF AUTHORITIES ................................................................................................... iii

3  MEMORANDUM OF POINTS AND AUTHORITIES ......................................................... 1

4      I.     INTRODUCTION ....................................................................................... 1

5      II.   FACTUAL BACKGROUND ...................................................................... 5

6           A.   The Board of Supervisors is San Francisco's legislative branch. ......................... 5

7           B.   The Airport Commission operates SFO and is the City's contracting party for
8               SFO. ............................................................................................................ 6

9           C.   After intense lobbying by unions representing Airport workers, the BOS enacts
             the HAO, imposing by legislative ordinance mandatory healthcare benefits
10             requirements on airlines and other private employers that operate at SFO. .......... 6

11           D.   In response to new union concerns, the BOS amends the HAO and clarifies that
             the HAO is designed "only to promote the general welfare." ............................ 10

12           E.   The Commission enters into two-year lease extensions with airlines, specifically
13               reserving the airlines' rights to challenge the HAO............................................. 10

14           F.   A4A sues because the HAO is preempted by three federal statutes and violates
             the U.S. and California Constitutions. ............................................................... 11

15      III.   STATEMENT OF THE ISSUE TO BE DECIDED ..................................... 11

16      IV.   ARGUMENT ............................................................................................ 11

17           A.   A government acts as a regulator—not a mere market participant—when it
18               threatens criminal or civil sanctions, or otherwise acts as only a government
             can. ............................................................................................................ 11

19           B.   The City exercised regulatory power—not market power—in enacting the
20               HAO............................................................................................................. 17

21               1.   The HAO threatens criminal and civil penalties...................................... 17

22               2.   Penalties aside, the HAO still has the force and effect of law. ................. 18

23           C.   San Francisco conceded that it acted in its regulatory capacity by invoking the
             legislative privilege during discovery. ............................................................... 24

24  CONCLUSION ..................................................................................................................... 25

25

26

27

28

## <u>TABLE OF AUTHORITIES</u>

**CASES**

Page(s)

*Air Evac EMS, Inc. v. Cheatham*,
  910 F.3d 751 (4th Cir. 2018) .................................................................................... 4, 13

*Airline Service Providers Ass'n v. Los Angeles World Airports*,
  873 F.3d 1074 (9th Cir. 2017) ................................................................................*passim*

*American Trucking Ass'ns, Inc. v. City of Los Angeles*,
  569 U.S. 641 (2013)..................................................................................................*passim*

*Building & Construction Trades Council v. Associated Builders & Contractors of
  Massachusetts/Rhode Island, Inc.*,
  507 U.S. 218 (1993).................................................................... 3, 12, 22, 23, 25

*Chamber of Commerce of United States v. Brown*,
  554 U.S. 60 (2008)....................................................................................................*passim*

*Chamber of Commerce of United States v. Lockyer*,
  463 F.3d 1076 (9th Cir. 2006) (en banc), *rev'd sub nom*,
  *Chamber of Commerce of United States v. Brown*, 554 U.S. 60 (2008). ................................... 14

*County of Los Angeles v. Superior Court*,
  13 Cal. 3d 721 (1975) ................................................................................................ 24, 25

*Dillingham Construction N.A., Inc. v. County of Sonoma*,
  190 F.3d 1034 (9th Cir. 1999) ................................................................................ 20

*Fort Halifax Packing Co. v. Coyne*,
  482 U.S. 1 (1987)........................................................................................................ 3

*GSW, Inc. v. Long County*,
  999 F.2d 1508 (11th Cir. 1993) ............................................................................ 15, 18, 22

*International Ass'n of Machinists & Aerospace Workers, AFL-CIO
  v. Wisconsin Employment Relations Commission*,
  427 U.S. 132 (1976)................................................................................................ 3

*Johnson v. Rancho Santiago Community College District*,
  623 F.3d 1011 (9th Cir. 2010) ..............................................................................*passim*

*Kaahumanu v. County of Maui*,
  315 F.3d 1215 (9th Cir. 2003) ................................................................................ 20, 25

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
  480 U.S. 470 (1987)................................................................................................ 19

*Marblehead Land Co. v. City of Los Angeles*,
  47 F.2d 528 (9th Cir. 1931) .................................................................................... 20

*Nebbia v. People of New York*,
  291 U.S. 502 (1934).................................................................................................. 20

iii

*Northwest, Inc. v. Ginsberg*,
    572 U.S. 273 (2014) .................................................................................. 15, 19

*Olympic Pipe Line Co. v. City of Seattle*,
    437 F.3d 872 (9th Cir. 2006) ............................................................... *passim*

*Rowe v. New Hampshire Motor Transport Ass'n*,
    552 U.S. 364 (2008) ......................................................................................... 3

*Selevan v. N.Y. Thruway Authority*,
    584 F.3d 82 (2d Cir. 2009) ...................................................................... 24, 25

*South-Central Timber Development, Inc. v. Wunnicke*,
    467 U.S. 82 (1984) ............................................................................. 3, 22, 23

*Tri-M Group, LLC v. Sharp*,
    638 F.3d 406 (3d Cir. 2011) ................................................................. *passim*

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Management Authority*,
    438 F.3d 150 (2d Cir. 2006) .......................................................................... 14

*United Healthcare Insurance Co. v. Davis*,
    602 F.3d 618 (5th Cir. 2010) ........................................................................ 22

**STATUTES**

29 U.S.C. § 1144 ...................................................................................... 3, 11

49 U.S.C. § 41713 .................................................................................... 3, 11

Cal. Gov't Code § 25132 ................................................................. 4, 6, 9, 17

Cal. Gov't Code § 36900 ................................................................. 4, 6, 9, 17

Cal. Penal Code § 16 ........................................................................... 4, 17

Cal. Penal Code § 19 ........................................................................ 4, 9, 17

**RULES AND CODES**

Fed. R. Civ. P. 56 ........................................................................................ 1, 5

S.F. Admin. Code § 12Q.2.16 ............................................................................ 8

S.F. Admin. Code § 12Q.5 ......................................................................... 4, 9, 18

S.F. Admin. Code § 12Q.5.1 ...................................................................... 4, 9, 18

S.F. Admin. Code § 14.2 .................................................................................. 8

**OTHER**

S.F. Charter art. II. ..................................................................................... 5, 6

Black's Law Dictionary (11th ed. 2019) ........................................................ 17

iv

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on March 17, 2022, at 1:30 p.m., in the courtroom of the Honorable Edward M. Chen, United States District Judge for the Northern District of California, located at 450 Golden Gate Ave., San Francisco, CA 94102, Plaintiff Airlines for America ("A4A" or "Plaintiff") will and hereby does move the Court (the "Motion"), pursuant to Federal Rule of Civil Procedure 56, for an order of partial summary judgment in Plaintiff's favor holding that Defendant City and County of San Francisco ("City" or "San Francisco") acted in its ordinary regulatory capacity, rather than as a so-called market participant, when it enacted the Healthy Airport Ordinance ("HAO").

Plaintiff's Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Joint Statement of Undisputed Facts ("Joint Facts"), the Declaration of Zachary M. Faigen and exhibits thereto, the Request for Judicial Notice, the pleadings and papers on file in this action, and such further argument and matters as may be presented at the time of the hearing on this Motion. Pursuant to Civil Local Rule 7-2(b)(3), Plaintiff requests that the Court enter an order of summary judgment that the City was acting in its regulatory capacity when it enacted the HAO.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

This Motion presents a narrow threshold question the Court must resolve before it can reach A4A's preemption arguments: Whether San Francisco's Healthy Airport Ordinance ("HAO") has the force and effect of law or whether the City instead acted as a market participant in enacting the HAO. The question matters because the federal statutes at issue preempt local *laws*, not a local government's market participation like that of any private proprietor.

Here are the key facts: The HAO requires airlines and airline service providers at San Francisco International Airport ("SFO" or "Airport") to provide a specific package of healthcare benefits to their employees and their employees' families, all at no cost to the employee. Employers' only alternative is to pay a $9.50-per-hour-per-employee tax or penalty into a City fund—which the employee cannot access. If airlines or airline service providers do not comply, they face *criminal* liability as misdemeanants, as well as civil penalties. And the HAO applies regardless of any current lease agreements between the City and airlines or airline service providers, and regardless of any collective bargaining agreements or

contracts between airlines or airline service providers and their employees. The HAO's mandates are binding law that apply no matter the airlines' contractual arrangements with the City or airline employees.

Here is the key question: Is the HAO a regulatory action with the force and effect of law, or is it instead the type of action a private proprietor might take as a market participant? Supreme Court precedent dictates the answer: When the government backs its demands "by the threat of criminal punishment," it acts with the force and effect of law. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 569 U.S. 641, 650-51 (2013) ("*ATA*"). After all, "only a government can wield[] the hammer of the criminal law." *Id.* at 651.

The City raises the so-called market-participant defense anyway. But the City cannot carry its burden of establishing that defense. Even leaving criminal and civil penalties aside, the City has chosen a governmental tool—legislation—to impose requirements on airlines instead of trying to negotiate such provisions with airlines contractually. What's more, the City enacted the HAO because labor unions urged it, over the protest of the City's Airport Commission, which runs the Airport and contracts with airlines and airline service providers. While the Commission thought that the COVID-19 pandemic was not the right time to impose such labor policy, the City thought the opposite, declaring that it was using the HAO "to promote the general welfare." (Ex. S at 5.)[1] In short, the City enacted an ordinance with the force and effect of law, and it cannot avoid preemption by hiding behind a market participation defense.

**1.**     On November 20, 2021, San Francisco's Board of Supervisors ("BOS")—the City's legislative branch—enacted the HAO. The HAO requires airlines and airline service providers to provide free "platinum" healthcare benefits plans to employees and their families, or else pay a $9.50-per-employee-per-hour tax or penalty into a City fund—money the employee cannot access. If employers do not comply with the HAO and they do not pay the penalty, they face criminal and civil sanctions.

The HAO was the brainchild of labor unions whose members wanted free healthcare for themselves and their families. When the unions could not secure those benefits at the bargaining table, they went to the legislature, drafted the HAO, and got the BOS to enact it, along with its criminal and civil penalties, without regard for the Airport's contrary view. In fact, when A4A's member airlines and the

---

[1] Lettered exhibits are attached to the Declaration of Zachary M. Faigen. To avoid needless discovery expense and evidentiary disputes, the parties stipulated that they could freely rely on documents produced during discovery on summary judgment and would not make objections based on authenticity, foundation, hearsay, or unfair prejudice. (ECF 40 ¶ 1.) That stipulation is Exhibit A to the Faigen Declaration. All emphases herein are added and internal citations and quotations are omitted unless otherwise noted.

1   Airport Commission negotiated lease extensions earlier this year, they specifically reserved the airlines'
2   right to challenge the HAO.

3       Multiple federal statutes preempt the HAO. *First*, the Employee Retirement Income Security Act
4   of 1974 ("ERISA") preempts all state or local laws that "relate to any employee benefit plan." 29 U.S.C.
5   § 1144(a). ERISA thus preempts any state or local law that "requires an existing plan to pay certain
6   benefits," *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 13 (1987)—precisely what the HAO does.
7   *Second*, the Railway Labor Act ("RLA") preempts state and local laws if they "attempt[] to influence the
8   substantive terms of collective-bargaining agreements." *Int'l Ass'n of Machinists v. Wis. Emp. Relations*
9   *Comm'n*, 427 U.S. 132, 153 (1976). Here, the HAO not only "influences" airlines' collective bargaining
10  agreements with their employees, it rewrites them. *Third*, the Airline Deregulation Act of 1978 ("ADA")
11  prohibits state and local governments from enacting any law or regulation that "relate[s] to a price, route,
12  or service of an air carrier." 49 U.S.C. § 41713(b). This provision prohibits any state or local regulation
13  that has "a 'significant impact' on carrier rates, routes, or services." *Rowe v. N.H. Motor Transp. Ass'n*,
14  552 U.S. 364, 375 (2008). That is exactly the impact the HAO will have because it will force airlines to
15  increase ticket prices, eliminate routes, or cut back on services. So A4A sued, bringing claims under all
16  of these statutes, as well as the Contracts Clauses of the U.S. and California Constitutions.

17      **2.**   To avoid preemption, San Francisco now raises a threshold affirmative defense. It argues
18  that the HAO cannot be preempted because "the City acted as a 'market participant'"—rather than as a
19  regulator—"when it enacted the HAO." (ECF 24 at 12.) The parties have agreed to resolve this threshold
20  question before turning to the merits.

21      **a.**   San Francisco's market-participant defense fails as a matter of law under Supreme Court
22  precedent. It is true that "pre-emption doctrines apply only to state *regulation*," *Bldg. & Constr. Trades*
23  *Council v. Associated Builders & Contractors of Mass./R.I.*, 507 U.S. 218, 227 (1993) ("*Boston Harbor*")
24  (emphasis in original), so a state's actions "as a market participant, rather than as a market regulator" are
25  not preempted, *South-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 93 (1984) ("*Wunnicke*") (plurality
26  opinion). Put another way, federal law generally preempts state or local government action backed by "the
27  force and effect of law," but not government action like that of a private proprietor, like "enter[ing] into a
28  contract just as a private party would." *ATA*, 569 U.S. at 649-50. But a state or local government needs to

3

1   *prove* that it is acting as a mere market participant, *see Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623

2   F.3d 1011, 1024 (9th Cir. 2010), and San Francisco cannot carry that burden. Under binding Supreme

3   Court precedent, the "market-participant" exception does not apply because San Francisco was acting as

4   only a regulator can when it imposed inescapable, extracontractual obligations on airlines and airline

5   service providers, with civil and criminal sanctions for noncompliance. The City "chose a tool to fulfill

6   [its] goals which only a government can wield: the hammer of the criminal law." *ATA*, 569 U.S. at 651.

7   The Court thus should hold that San Francisco acted as a government regulator, not as a market participant,

8   in enacting the HAO, and grant summary judgment to A4A on the City's market-participant defense.

9       **b.**    The Ninth Circuit's separate two-prong test for the market-participant defense produces

10  the same result. To start, that two-prong test should not even apply where the challenged state or local

11  action, like the HAO, imposes civil or criminal sanctions. Supreme Court precedent says that criminal

12  sanctions automatically make state or local action regulatory, and Ninth Circuit caselaw does not purport

13  to say otherwise. But applying the Ninth Circuit's two-prong test produces the same result anyway,

14  because (1) civil and criminal sanctions are uniquely governmental tools, as is legislation, and (2) San

15  Francisco used such tools to pursue a general policy rather than a specific proprietary goal.

16      The first prong of the Ninth Circuit's test allows the government to prove that "the challenged

17  governmental action [was] undertaken in pursuit of the 'efficient procurement of needed goods and

18  services,' as one might expect of a private business in the same situation." *Airline Serv. Providers Ass'n

19  v. L.A. World Airports*, 873 F.3d 1074, 1080 (9th Cir. 2017) ("*LAX*"). But again, private businesses do not

20  wield the hammer of the criminal law, and they cannot impose civil penalties either. So San Francisco

21  fails the test. The City tied criminal *and* civil sanctions to the HAO. Because every violation of the HAO

22  is a misdemeanor, *see* Cal. Gov't Code §§ 25132(a), 36900(a), every violation "is punishable by

23  imprisonment in the county jail not exceeding six months, or by fine not exceeding one thousand dollars

24  ($1,000), or by both," Cal. Penal Code § 19; *see also id.* § 16. The City can also, among other things,

25  impose civil penalties of $100 per week per employee and institute civil proceedings against a

26  noncompliant employer. S.F. Admin. Code §§ 12Q.5(f), 12Q.5.1(4). Both sticks are weapons that "no

27  private party" holds. *ATA*, 569 U.S. at 651; *see also Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 769

28  (4th Cir. 2018) (criminal and civil sanctions); *Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 425 (3d Cir. 2011)

4

1    (civil sanctions). Penalties aside, private businesses also cannot enact legislation, period. They have to go

2    to the bargaining table to get what they want. The HAO is legislative command, pure and simple.

3    The second prong gives the government another try: It can try to prove that "the narrow scope of

4    the challenged action defeat[s] an inference that its primary goal was to encourage a general policy rather

5    than [to] address a specific proprietary problem." *LAX*, 873 F.3d at 1080. But the City fails here, too,

6    because the civil and criminal penalties again answer the question. In *ATA*, the Port of Los Angeles'

7    placard-display requirements for drayage trucks were quite narrow, and the Court acknowledged both the

8    Port's argument and the Ninth Circuit's holding that those requirements were designed to address a

9    specific proprietary problem. 569 U.S. at 647. But wielding the hammer of the criminal law went too far.

10   Penalties aside, the City's "primary goal was to encourage a general policy rather than [to] address

11   a specific proprietary problem." *LAX*, 873 F.3d at 1080. The HAO itself says that its purpose is "to promote

12   the general welfare" by helping certain groups of people access healthcare and prevent the spread of

13   COVID. (Ex. S at 5.) Those may be laudable goals, but they are the goals of a government acting "pursuant

14   to its general duty to protect the public." *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 874, 881

15   (9th Cir. 2006).

16   Despite bearing the burden of proof, the City has adduced no evidence that it enacted the HAO to

17   address any proprietary concerns as owner and operator of SFO. And, given the HAO's clear terms, the

18   HAO has the force and effect of law and is regulatory action as a matter of law. The Court should grant

19   partial summary judgment for A4A and hold that the City was acting in its regulatory capacity when it

20   enacted the HAO, so the market-participant exception to preemption does not apply.

21   **II.   FACTUAL BACKGROUND**

22   This Motion implicates no genuine dispute of material fact. The market participant analysis turns

23   almost entirely on the HAO itself. Indeed, both parties are cross-moving for summary judgment, showing

24   their agreement that this Motion presents legal questions turning on undisputed facts. *See* Fed. R. Civ. P.

25   56(a). The facts set out below provide the relevant information for that legal analysis.

26   **A.   The Board of Supervisors is San Francisco's legislative branch.**

27   San Francisco is a chartered city and county under the California Constitution and its own

28   municipal charter. (ECF 24 ¶ 19.) The BOS is San Francisco's legislative branch. (S.F. Charter art. II.)

5

1   The BOS acts through written ordinances, written resolutions, and motions. (*Id.* § 2.105.) Under the City's

2   Charter, "All legislative acts shall be by ordinance." (*Id.*) And under California law, the violation of a city

3   or county ordinance is a misdemeanor, unless the ordinance specifically states that a violation constitutes

4   only an infraction. Cal. Gov't Code §§ 25132(a), 36900(a).

5       **B.      The Airport Commission operates SFO and is the City's contracting party for SFO.**

6           SFO is a quintessential public good. Like every other international airport in the United States, it

7   is publicly owned and provides federally regulated transportation services. (Joint Fact No. 1; ECF 24

8   ¶ 19.) SFO has its own dedicated San Francisco Police Department Airport Bureau, as well as its own San

9   Francisco Fire Department Airport Division. (*See* Ex. X at 2-3.) In addition, San Francisco has the unique

10  governmental power to use eminent domain proceedings to secure property for SFO—a power the City

11  has exercised. (Joint Fact No. 3; Ex. X at 4.)

12          In 1970, San Francisco created the San Francisco Airport Commission ("Commission") to operate

13  and oversee SFO. (ECF 1 ¶ 45; ECF 24 ¶ 45.) The Commission has "charge of the construction,

14  management, supervision, maintenance, extension, operation, use and control of all property, as well as the

15  real, personal and financial assets which are under the Commission's jurisdiction." (S.F. Charter § 4.115.)

16  Under this authority, the Commission enters into contracts on behalf of San Francisco with companies that

17  provide services at SFO. (ECF 24 ¶ 45.) These contracts include lease agreements with airlines that lease

18  airport and terminal space. (*Id.* ¶ 47.) In 2010, the Commission entered into two-dozen lease agreements

19  with different airlines, each for a ten-year term starting in 2011. (*Id.*) The lease agreements set out in great

20  detail the rights and obligations of the Commission and SFO, on the one hand, and the airlines, on the other.

21  (*See, e.g.*, Ex. Z at 11-199.) While the Commission can negotiate and enter into contracts with private parties,

22  it has "no authority" to act via legislation; that power belongs solely to the BOS. (*See* Ex. L at 1.)

23      **C.      After intense lobbying by unions representing Airport workers, the BOS enacts the
24                HAO, imposing by legislative ordinance mandatory healthcare benefits
                  requirements on airlines and other private employers that operate at SFO.**

25          **a.**     In July 2020, Mike Casey, a well-known San Francisco labor leader, along with multiple

26  labor unions representing Airport workers, lobbied for legislation that would require SFO employers to

27  provide no-cost health insurance to SFO workers and their families. (*See* Ex. Q at 1-2; Ex. T at 2.) They

28  found a willing partner in Supervisor Rafael Mandelman. (*See* Ex. M.) Throughout the summer, the labor

6

unions worked with Supervisor Mandelman's staff and the City Attorney's office to draft the HAO, ensuring that it fulfilled the unions' objective of securing free health insurance for their members. For example, the labor unions told the City Attorney that the "primary goal" is to ensure that Airport employers are required to provide free healthcare to "all workers" that are union members. (*See* Ex. P at 1.) Mike Casey, for his part, made the necessary political connections, introducing Supervisor Mandelman's legislative aide to a labor union "researcher" who would "work[] with" the Supervisor's staff on "the findings section of the legislation." (*See* Ex. O at 1.)

After the union finished writing the legislation, Supervisor Mandelman introduced it on September 29, 2020. (Ex. B at 1.) Notably, neither the Commission (which operates SFO and contracts with airlines on the City's behalf) nor the Airport played a role in drafting or introducing the HAO. That is because the legislation, which had "been drafted to apply to airlines and their service providers at SFO," would have "minimal impact" on the Airport itself. (*See* Ex. H at 1.) Indeed, because the HAO is "legislation," the Commission played "no role" in developing or enacting it. (*See id.*) As one Airport director put it: "We have no authority to [enact the HAO]; this is a legislative amendment led by the BOS," and it "is not something the Airport has control over." (*See* Ex. L at 1.)

That the Commission does not participate in the legislative process is important given that it *opposed* the HAO. The Airport Director believed "this is not the right time" to enact the HAO because it would impose significant additional costs on Airport employers during the COVID-19 pandemic. (Ex. J at 1.) The Airport Director explained his concerns in a letter to the BOS Budget and Finance Committee, highlighting that the HAO would lead to an "increased cost of doing business at SFO" and "have the potential to slow SFO's post-pandemic recovery relative to that of other airports." (Ex. C.)

**b.**     Despite these concerns, the BOS passed the HAO on November 10, 2020, and Mayor Breed approved it on November 20, 2020, meaning the ordinance would go into effect on March 21, 2021. (Ex. D at 15.) As originally passed, the HAO required certain SFO employers—airlines and airline services providers, but not the City (which employs certain SFO staff, firefighters, and police officers)—to:

- Offer at least one "Platinum" healthcare plan, meaning a plan that provides a level of coverage designed to provide benefits that are actuarially equivalent to at least 90% of the full actuarial value of the benefits provided;

- Cover all services described in the California Essential Health Benefit Benchmark Plan, including services like acupuncture and children's orthodontia;

- Offer these plans to all covered employees, no matter how many hours the employee works in a week;

- Extend these plans to cover each employee's spouse and dependents; and

- Absorb 100% of the plans' costs, with no cost-sharing between employer and employee.

(*Id.* at 9). The HAO required employers to eliminate existing, collectively-bargained-for healthcare plans that did not meet the ordinance's strict requirements. (*See id.* (employer "may offer additional health benefit plans, provided that each such health benefit plan" meets requirements).) Thus, the HAO also required employees to change their existing healthcare plans no matter why they selected those plans.

Employers that violate these requirements were required to pay $9.50 per employee per hour into a Health Access Program ("HAP") account established under Section 14.2 of the San Francisco Administrative Code. (*Id.* at 10.) That alternative is a tax or penalty, because the funds are unavailable to employees or their families, despite the HAO's statement that the payments are "contributions for that [e]mployee." (*Id.*) Under Section 14.2, the Department of Public Health can "establish and maintain Medical Reimbursement Accounts from which eligible Covered Employees may obtain reimbursement of Health Care Expenditures." S.F. Admin. Code § 14.2(g). But the "term 'Covered Employee' shall ***not*** include those persons who are 'Covered Employees' as defined in Section 12Q.2.9 of the Health Care Accountability Ordinance . . . if the Employer meets the requirements set forth in Section 12Q.3"—*i.e.*, the HAO—"for those employees." *Id.* § 14.1(b)(4). The HAO amends Section 12Q.2.9 to define "Covered Employee" as any "San Francisco Airport Service Employee who works any number of hours during any Week in such capacity." (Ex. D at 7.) The HAO then defines "San Francisco Airport Service Employee" as any airport employee covered by the Quality Standards Program. S.F. Admin. Code § 12Q.2.16.[2] Because the tax or penalty for not providing free healthcare is payment into HAP accounts, and because paying that tax or penalty satisfies "the requirements set forth in [the HAO]," *id.* § 14.1(b)(4), Airport

---

[2] The Commission adopted the Quality Standards Program by resolution in 1999. It applies to any firm, including any airline or services provider, that employs personnel who perform services that affect safety or security at SFO. The Program sets certain general standards for safety, health, hiring practices, training, equipment standards, and compensation and benefits. All employers covered by the Program must comply with its directives as a condition of receiving an SFO use permit.

1    employees cannot access money from the HAP accounts.

2    The HAO's findings—written by union lawyers—state that "[e]mployees working at the Airport

3    who perform services that directly impact safety and/or security at the Airport are at considerable risk of

4    contracting and spreading COVID-19 due to the nature of their work duties." (Ex. D at 5.) But the HAO

5    does nothing to address that purported "finding." The HAO contains no provisions that seek to limit the

6    spread of COVID-19, such as a mask-wearing, social-distancing, vaccine mandates, or any other COVID-

7    targeting measure. (*See generally id.*) Moreover, while the HAO states that SFO employees "who perform

8    services that directly impact safety and/or security at the Airport are at considerable risk of contracting

9    and spreading COVID-19" (*id.* at 5), the HAO does not even apply to all such employees. As noted, SFO

10   has its own bureau of the San Francisco Police Department and division of the San Francisco Fire

11   Department—workers who "perform services that directly impact safety and/or security at the Airport."

12   (*Id.*; Ex. X at 2-3.) But the City does not provide those officers or firefighters with the no-cost health

13   insurance that it requires certain private SFO employers to provide. (Ex. V at 3; Joint Fact No. 2.) The

14   HAO also does not apply to many SFO employees who have regular and sustained contact with passengers

15   and customers, such as concessionaires. (*See* Ex. T at 3.)

16   **c.**     Compliance with the HAO is mandatory. It is backed by the threat of both criminal and

17   civil sanctions. Under California law, violating a city or county ordinance is a misdemeanor—a crime—

18   unless the ordinance states that a violation is only an infraction. Cal. Gov't Code §§ 25132(a), 36900(a);

19   *see* Cal. Penal Code §§ 16, 19. The HAO does not make violations infractions. What's more, violating the

20   HAO also gives rise to civil penalties. Among other things, the City can, at its sole discretion, (i) charge

21   a violator for any amounts that should have been paid into a HAP account, plus an onerous interest rate;

22   (ii) assess penalties of $100 per week per employee; (iii) cancel any contract the City has with the

23   employer; (iv) bar the employer from entering into any future contracts with the City for three years; and

24   (v) institute a civil action against the employer, in which the prevailing party will be entitled to all costs

25   and expenses. S.F. Admin. Code §§ 12Q.5(f), 12Q.5.1(4).

26   The HAO's requirements and penalties for noncompliance apply regardless of any terms in the

27   airlines' leases with the Commission or the airlines' collective bargaining agreements or contracts with

28   their employees. Indeed, the HAO expressly *forbids* waiver of its requirements by collective bargaining

agreement, meaning that the contracting parties are powerless to change it. (Ex. D at 13.) The HAO is, in other words, just like any other law that imposes extracontractual requirements and burdens.

**D.    In response to new union concerns, the BOS amends the HAO and clarifies that the HAO is designed "only to promote the general welfare."**

After the City enacted the HAO, airlines and other affected SFO employers scrambled to find healthcare plans that complied with the HAO and to eliminate those that did not. Predictably, "employees ha[d] to change health plans" because the HAO did not allow airlines to keep offering plans that did not comply with the HAO's specific and rigid guidelines, even if workers wanted to keep those plans. (Ex. K.) Faced with this consequence of the legislation they wrote, the labor unions sprang back into action with Supervisor Mandelman to craft an amendment to the HAO. (*See id.* (email from SFO's Director of Social Responsibility: "Local 2 and the Teamsters have been working w/ Supervisor Mandelman on some amendments to the HAO.").) As one legislative aide told a union member whose healthcare plan the HAO eliminated: "We have heard similar issues arise among other employees covered by our amendment to the HCAO, and had a meeting with the City and labor partners who we drafted this legislation with earlier this week. We are working on a legislative fix to address these issues." (Ex. N at 1.)

On March 2, 2021, Supervisor Mandelman introduced the union-generated amendments to the HAO, and the BOS passed them on April 6, 2021. (*See* Ex. F at 1; Ex. S at 6.) The amendments permit employers to offer specified, additional—though still highly restrictive—healthcare plans. (*See* Ex. S.)

The amendments also reiterate the HAO's purpose. Section 5, which is titled "City Undertaking Limited to Promotion of the General Welfare," states: "In undertaking the adoption and enforcement of this ordinance, the City is undertaking only to promote the general welfare." (*Id.* at 5.)

**E.    The Commission enters into two-year lease extensions with airlines, specifically reserving the airlines' rights to challenge the HAO.**

While the BOS was imposing healthcare requirements on airlines by fiat, the Commission—the entity that actually operates SFO—was negotiating lease extensions with SFO's airlines. Given the many complications caused by the COVID-19 pandemic, however, the Commission and the airlines chose not to execute new 10-year lease agreements. Rather, the parties agreed to "modifications" of their prior 2011 Lease and Use Agreements that extended those prior agreements for another two years under the same terms. (Ex. I at 1.) The modifications contained one express carve-out: they reserved the rights of "the

10

Signatory Airlines with respect to any legal challenges involving the Healthy Airport Ordinance." (*Id.*)

Thus, not only is the HAO not part of any contract between the City and SFO's airlines, but the contract that governs their relationship explicitly *excludes* the HAO and makes clear that the airlines believe the HAO is unlawful.

### F. A4A sues because the HAO is preempted by three federal statutes and violates the U.S. and California Constitutions.

On March 31, 2021, A4A sued San Francisco, explaining that three federal statutes preempt the HAO and that the HAO also violates the Contracts Clauses of both the U.S. and California Constitutions. (ECF 1.) After the City filed its Answer (ECF 24), the parties agreed to bifurcate the case and first litigate the threshold issue whether the City acted as a "market participant" when it enacted the HAO. (ECF 34.)

## III.   STATEMENT OF THE ISSUE TO BE DECIDED

Whether San Francisco, in enacting the HAO—a legislative ordinance that overrides private parties' negotiated collective bargaining agreements and threatens civil and criminal penalties—acted in its regulatory capacity, or instead as a mere "market participant," the same way a private business could.

## IV.   ARGUMENT

The City acted in its regulatory capacity, and not as a mere market participant, in enacting the HAO, and it cannot carry its burden of proving otherwise. The HAO is *legislation*, and it imposes *criminal and civil penalties* for noncompliance. No private proprietor can wield those tools. Under clear Supreme Court precedent, the HAO thus has "the force and effect of law." *ATA*, 569 U.S. at 648-50. Beyond that, by the City's own admission, the HAO is designed to further general welfare policies rather than propriety airport interests. What's more, the airport itself is a public good. These features dictate only one answer as a matter of law under Supreme Court and Ninth Circuit precedent. The City acted as a regulator in enacting the HAO, so the HAO is subject to federal preemption.

### A. A government acts as a regulator—not a mere market participant—when it threatens criminal or civil sanctions, or otherwise acts as only a government can.

The issue here is whether the HAO has the force and effect of law or whether it is instead like the action of a nongovernmental private proprietor. That is a threshold question, because federal law preempts only government action backed by "the force and effect of law." *ATA*, 569 U.S. at 649-50; *see* 49 U.S.C. § 41713(b); 29 U.S.C. § 1144(a). Such "quintessential regulatory action" includes "government-imposed

11

policies prescribing binding standards of conduct." *ATA*, 569 U.S. at 649; *see also Boston Harbor*, 507 U.S. at 227. Federal law does not preempt government action like that of an ordinary market participant, like entering "into a contract just as a private party would." *ATA*, 569 U.S. at 649-50. In other words, federal preemption "targets the State acting as a State, not as any market actor—or otherwise said, the State acting in a regulatory rather than proprietary mode." *Id.* at 650; *accord Johnson*, 623 F.3d at 1022.

When the government seeks to escape preemption as a market participant, it bears the burden of showing the exception applies. *Johnson*, 623 F.3d at 1024. Supreme Court precedent forecloses the exception where the government coerces compliance with civil or criminal penalties. The Ninth Circuit's two-part test provides additional hurdles the government must clear to show it did not act as a regulator.

1.      The government acts with the force of law when it threatens civil or criminal penalties. The Supreme Court has made clear that whenever a government seeks to ensure compliance with "a coercive mechanism" that is unavailable to private parties, it exercises "classic regulatory authority." *ATA*, 569 U.S. at 650-51. The "hammer of the criminal law"—a tool no private party can wield—is a paradigmatic example. *Id.* at 651. Forcing private parties "to alter their conduct" or else face "criminal sanctions" is a "distinctively governmental" function. *Id.* at 651-52.

a.      *ATA* is instructive. There, the Supreme Court held that the Port of Los Angeles, a division of the City of Los Angeles, acted with the force of law where it backed contractual provisions with criminal sanctions. *Id.* at 650-51. The Port leased its marine terminal facilities to terminal operators that load and unload cargo on docking ships. *Id.* at 644. Trucking companies moved cargo into and out of the port. *Id.* To address traffic and environmental concerns about the trucks, the Port required the trucking companies to enter into "concession agreements" with terminal operators agreeing to "affix a placard on each truck with a phone number for reporting environmental or safety concerns" and "submit a plan listing off-street parking locations for each truck when not in service." *Id.* at 644-45. The Port made any violation of those provisions a misdemeanor. *Id.* at 645.

The plaintiff sued, arguing that the Federal Aviation Administration Authorization Act preempted those requirements. *Id.* at 644. The Supreme Court agreed unanimously. It explained:

> [T]he contract here functions as part and parcel of a governmental program wielding coercive power over private parties, backed by the threat of criminal punishment. That

counts as action "having the force and effect of law" if anything does. The Port here has not acted as a private party, contracting in a way that the owner of an ordinary commercial enterprise could mimic. Rather, it has forced terminal operators—and through them, trucking companies—to alter their conduct by implementing a criminal prohibition punishable by time in prison. In some cases, the question whether governmental action has the force of law may pose difficulties; the line between regulatory and proprietary conduct has soft edges. But this case takes us nowhere near those uncertain boundaries. Contractual commitments resulting not from ordinary bargaining (as in *Wolens*), but instead from the threat of criminal sanctions manifest the government *qua* government, performing its prototypical regulatory role.

*Id.* at 650-51.

The Court considered and rejected the Port's arguments. First, it did not matter that the Port's concession agreements with terminal operators allegedly "responded to perceived business necessity." *Id.* at 651. "[W]hen the government employs such a coercive mechanism, available to no private party, it acts with the force and effect of law, whether or not it does so to turn a profit." *Id.* at 651-52. Second, it did not matter that "the criminal sanctions here fall on terminal operators alone, not on the trucking companies subject to the agreement's requirements." *Id.* at 652. The critical point was that "[t]he Port made its regulation of drayage trucks mandatory by imposing criminal penalties on the entities hiring all such trucks at the facility." *Id.* "Slice it or dice it any which way, the Port thus acted with the 'force of law.'" *Id.*

    **b.**    The same rule applies for civil sanctions, because unless the government "forgoes the (distinctively governmental) exercise of legal authority," it cannot escape federal preemption. *Id.* Several court of appeals decisions confirm the point. In *Air Evac*, the Fourth Circuit held that the government's use of "civil and criminal sanctions" proved that it was "acting in its regulatory, not proprietary, capacity." 910 F.3d at 769. West Virginia sought to limit how much money air ambulance companies could recover from patients, insurers, and the state itself. *Id.* at 757-58. If an air ambulance company violated the state regulations, it would be subject "to criminal and civil enforcement actions by the state." *Id.* at 758. The court rejected West Virginia's argument that the applicable regulations "reflect nothing more than the state's participation in the health insurance market," because the civil and criminal penalties were exercises of the state's "unique coercive authority" to reach its preferred outcome. *Id.* at 768-69.

Another example is *Tri-M*, 638 F.3d 406. There, "Delaware's regulatory scheme for the training and compensation of apprentices on construction projects" imposed on noncompliant employers "a civil

1  penalty of not less than $1,000 nor more than $5,000 for each violation." *Id.* at 412, 425. The Third Circuit

2  held that Delaware acted as a regulator mainly because "the potential civil penalty threatened by the State"

3  does not "reflect mere market participation by private actors." *Id.* at 425. The Third Circuit looked to

4  Second Circuit precedent holding that "[a] governmental entity acts as a market regulator when it employs

5  tools in pursuit of compliance that no private actor could wield, such as the threat of civil fines." *Id.*

6  (emphasis omitted) (quoting *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 438

7  F.3d 150, 157 (2d Cir. 2006)). The Third Circuit also relied on a Ninth Circuit decision for the same

8  proposition. *See id.* Although the Ninth Circuit later withdrew its decision and granted rehearing, the en

9  banc court reached the same conclusion on the market-participation issue: California did not act as a

10  market participant when it enacted regulations that included "a provision for civil penalties." *Chamber of*

11  *Com. of U.S. v. Lockyer*, 463 F.3d 1076, 1085 (9th Cir. 2006) (en banc). (The Supreme Court then

12  reversed, because while the Ninth Circuit correctly held that California acted as a regulator, it incorrectly

13  found the challenged statute not preempted. *Chamber of Com. of U.S. v. Brown*, 554 U.S. 60 (2008).)

14      **2.**    Even when a state or local government does not use criminal or civil sanctions, it still bears

15  the burden of showing that its "action constitutes non-regulatory market participation." *Johnson*, 623 F.3d

16  at 1024. The Ninth Circuit has articulated a two-part test for determining whether the "government is

17  acting as a market participant or instead as a regulator." *LAX*, 873 F.3d at 1080.

18      "First, is the challenged governmental action undertaken in pursuit of the 'efficient procurement

19  of needed goods and services,' as one might expect of a private business in the same situation?" *Id.*

20  "Second, 'does the narrow scope of the challenged action defeat an inference that its primary goal was to

21  encourage a general policy rather than [to] address a specific proprietary problem'?" *Id.* If the government

22  fails to prove that the answer to one of those questions is "yes"—in other words, the government acts in a

23  way that "no private party" could—then a court must conclude that the government acted in its

24  "prototypical regulatory role." *ATA*, 569 U.S. at 651. Of course, given clear Supreme Court precedent, the

25  Ninth Circuit's test is cumulative where the challenged scheme provides for criminal or civil penalties,

26  because such a scheme always has the force and effect of law. But the Ninth Circuit has not yet made clear

27  as a conceptual matter whether its two-prong framework simply does not apply in that circumstance or

28  whether the penalties answer both inquiries on their own terms.

1   Although the Ninth Circuit has yet to clearly delineate the contours of either prong, a few general

2   guideposts lead the way. The purpose of the two-prong test is "to isolate a class of government interactions

3   with the market that are so narrowly focused, and so in keeping with the ordinary behavior of private

4   parties, that a regulatory impulse can be safely ruled out." *Johnson*, 623 F.3d at 1024. Civil or criminal

5   penalties defeat the government on the first prong precisely because they are not "in keeping with the

6   ordinary behavior of private parties." *Id.* But the government may lose on the first prong for other reasons,

7   too. After all, even absent penalties, legislation alone is a tool available only to the government, *see GSW,

8   Inc. v. Long County*, 999 F.2d 1508, 1515 (11th Cir. 1993), especially when it purports to "enlarge the

9   contractual obligations that the parties voluntarily adopt." *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 276

10   (2014). The same question can be answered from a different perspective: if private parties can do exactly

11   what the government did, then that is a good indication the government acted as a market participant. *See

12   Johnson*, 623 F.3d at 1027.

13   As for the second inquiry, the driving question is whether the government's "primary goal was to

14   encourage a general policy," as opposed to solving "a specific proprietary problem." *LAX*, 873 F.3d at

15   1080; *see also Brown*, 554 U.S. at 70 (explaining that purported proprietary goal "is not the objective" of

16   the challenged state law). Exercising police power—a "distinctively governmental" move, *ATA*, 569 U.S.

17   at 652—fails the Ninth Circuit's second prong. In *Olympic Pipe Line*, for example, the Ninth Circuit held

18   that Seattle "was acting as a regulator rather than as a municipal proprietor" when it contractually required

19   "safety oversight of a hazardous liquid pipeline within Seattle's city boundaries." 437 F.3d at 874, 881.

20   "Seattle made the safety demands," the Ninth Circuit said, "pursuant to its general duty to protect the

21   public health and safety—a duty grounded in the City's regulatory, police power—rather than in an

22   attempt to protect its role in the real estate market." *Id.* at 881. Seattle's correspondence proved the point;

23   in various letters "Seattle repeatedly invoked its police and regulatory powers." *Id.* at 881-82. Thus,

24   "Seattle was acting as a regulator when it imposed safety standards." *Id.* at 882.

25   A local government's failure to pursue its purported proprietary interest "uniformly" is persuasive

26   evidence that the action's true purpose is regulatory. *See Brown*, 554 U.S. at 71. In that situation, the logical

27   inference is that the government is not seeking to "address a specific proprietary problem." *LAX*, 873 F.3d

28   at 1080. *Brown* is a good example. That case involved a California law that prohibited employers from using

1    state funds "to assist, promote, or deter union organizing." 554 U.S. at 62. The Supreme Court held "that

2    California enacted [that law] in its capacity as a regulator rather than a market participant," because although

3    the state law "impose[d] a *targeted* negative restriction on employer speech about unionization . . . the statute

4    [did] not even apply this constraint *uniformly*." *Id.* at 70-71. "Instead of forbidding the use of state funds

5    for *all* employer advocacy regarding unionization, [the law] permits use of state funds for *select* employer

6    advocacy activities that promote unions." *Id.* The law's inconsistent (albeit narrow) pursuit of its policy

7    objective rendered the market-participant question "beyond dispute." *Id.* at 70.

8    As noted, a government's use of civil or criminal penalties to pursue its purpose defeats any inquiry

9    that may remain on the second prong as well. The Supreme Court could not have been clearer in reversing

10   the Ninth Circuit in *ATA* and holding that criminal penalties ended the inquiry, even though the challenged

11   placard-display requirements were quite narrow in scope. *See* 569 U.S. at 649-51. The criminal penalties

12   simply went too far, despite the Ninth Circuit's conclusion that the narrow requests were "designed to

13   address [a] specific proprietary problem[]," *id.* at 647 (quoting Ninth Circuit; brackets in original), and

14   the Port's argument that its concession agreements "responded to perceived business necessity," *id.* at 651

15   (alteration adopted). Given the imposition of criminal penalties, the Supreme Court stressed, "the Port's

16   intentions are not what matters." *Id.* at 651. Consistent with this point, *LAX* recognizes that the second

17   inquiry must account for the *way* the law pursues any goal. *See* 873 F.3d at 1083 (discussing *Brown* and

18   noting that the law there was preempted because, among other things, it "imposed onerous requirements"

19   and "created a right of action for any private taxpayer to sue suspected violators").[3]

20   ―――――――――――

[3] To the extent the two-part test that *LAX* articulates allows the government another bite at the apple despite

21   civil or criminal penalties, that test is wrong and contravenes binding Supreme Court precedent. As

22   explained, government action backed by criminal or civil penalties has the force and effect of law and is

     subject to preemption, so further inquiry is unnecessary. In any event, the Ninth Circuit's test is flawed

23   for another reason. As the United States (through the Solicitor General) argued in its certiorari-stage

     amicus brief in *LAX*, the Ninth Circuit "misframed the [market-participant] test," and "the court's

24   approach—both here and in other cases—could allow state and local governments to escape preemption

     of what are regulatory measures." (Ex. Y at 23.) As the United States explained, the test is "flawed"

25   because it permits a government to invoke the market participation exception if it proves that its actions

     had a "'narrow scope'" that "defeats 'an inference that its primary goal was to encourage a general policy

26   rather than to address a specific proprietary problem.'" (*Id.* at 18 (quoting *LAX*, 873 F.3d at 1080).)

     "Although the narrow scope of governmental action can be an important consideration, that is not the only

27   relevant factor in determining whether the government's conduct is proprietary or regulatory, which

     remains the ultimate inquiry." (*Id.*) Assuming civil and criminal penalties do not resolve the issue in a

28   particular case, Ninth Circuit precedent wrongly makes scope important while dismissing important

     considerations, like the public nature of airports, as irrelevant. (*See infra* at pp. 23-24; Ex. Y at 19-23.)

                                                                                                *(cont'd)*

**B.      The City exercised regulatory power—not market power—in enacting the HAO.**

The HAO has the force and effect of law because it uses coercive mechanisms unavailable to private parties: criminal and civil sanctions. That alone is dispositive. The Ninth Circuit's dual inquiries under *LAX* reinforce the point. In using legislation backed by the threat of civil and criminal penalties, the City acted like no private actor could. And by the City's own admission, the HAO pursues the regulatory general welfare goals of protecting certain employees and the public, rather than any purported proprietary goals. The City flexed its regulatory muscle, so the HAO is subject to federal preemption.

**1.      The HAO threatens criminal and civil penalties.**

One simple point resolves this case: The City backs its healthcare-benefits demands with "the hammer of the criminal law." *ATA*, 569 U.S. at 651. Every violation of the HAO is a misdemeanor, and thus a crime. *See* Cal. Gov't Code §§ 25132(a), 36900(a); Cal. Penal Code § 16; Black's Law Dictionary (11th ed. 2019). Violations are thus "punishable by imprisonment in the county jail not exceeding six months, or by fine not exceeding one thousand dollars ($1,000), or by both." Cal. Penal Code § 19. Just like Los Angeles in *ATA*, San Francisco is coercing compliance by "threat of criminal sanctions." 569 U.S. at 651. "Slice it or dice it any which way, [San Francisco] acted with the 'force of law.'" *Id.* at 652.

Beyond criminal sanctions, the HAO also coerces compliance through civil penalties. If an airport employer violates the HAO, the City can (i) charge a violator for any amounts that should have been paid into a HAP account, together with an onerous interest rate; (ii) assess penalties of $100 per week per employee; (iii) cancel any contract the City has with the employer; (iv) bar the employer from entering into any future contracts with the City for three years; and (v) institute a civil action against the employer, in which the prevailing party will be entitled to all costs and expenses. S.F. Admin. Code §§ 12Q.5(f), 12Q.5.1(4). These civil penalties do not "reflect mere market participation by private actors." *Tri-M*, 638 F.3d at 425. They reflect "classic regulatory authority." *ATA*, 569 U.S. at 650. Unlike a private proprietor, the City does not "rely on contractual remedies," but instead "impose[s] civil penalties" available only to a governmental actor. *Tri-M*, 638 F.3d at 426. Under binding Supreme Court precedent, this Court's market-participant analysis can and should end with the HAO's penalties. The City acted as a regulator.

---

Although A4A wins under Supreme Court precedent and the *LAX* standard, as discussed below, A4A raises these additional points to preserve them for appeal.

2.      **Penalties aside, the HAO still has the force and effect of law.**

Even beyond imposing civil and criminal sanctions, the HAO still has the force and effect of law and so the City cannot carry its burden on the market-participant exception. *First*, by enacting the HAO, the City did not keep with "the ordinary behavior of private parties." *Johnson*, 623 F.3d at 1024. *Second*, the City did not narrowly pursue a proprietary objective. Instead, it sought to promote the general welfare and, in doing so, it also failed to apply its requirements "uniformly." *Brown*, 554 U.S. at 71.

(a)     **The City fails prong 1 of the *LAX* test because it imposed the HAO through legislation—a mechanism available to no private party.**

The City fails to meet its burden under the first prong of the *LAX* test because the HAO does not pursue "the 'efficient procurement of needed goods and services,' as one might expect of a private business in the same situation." *LAX*, 873 F.3d at 1080. With the HAO, the City "has not acted as a private party, contracting in a way that the owner of an ordinary commercial enterprise could mimic." *ATA*, 569 U.S. at 651. To the contrary, the City used "a form of municipal ordinance," *id.* at 650, rather than contractual negotiations. The City enacted the HAO by legislative ordinance, through the City's legislative branch, using the typical legislative process. No private party could have used legislation, much less threatened criminal or civil sanctions. While a private party might have *negotiated* healthcare requirements as part of a contract, a private party could not have *enacted* such requirements into law. That end run around the market is available only to government regulators. *See GSW*, 999 F.2d at 1515.

The Airports' directors' own statements confirm this analysis. The Director of Government Affairs explained that the Commission—the entity that actually operates SFO—had "no role" in developing or enacting the HAO because the law had "minimal impact on the airport specifically." (Ex. H at 1.) Rather, the legislation was "drafted to apply to airlines and their service providers at SFO." (*Id.*) The Director of Social Responsibility went even farther, saying that the Airport had "no authority" to approve the HAO; "this requirement is not something the Airport has control over." (Ex. L at 1.) If the Airport had any meaningful involvement, the HAO likely would not have passed, because Airport personnel, including the Airport Director, pushed back against the law, noting the substantial costs it would impose on the Airport and SFO employers (Ex. C), and questioning whether it was "the right time" for the HAO, given the ongoing COVID-19 pandemic (Ex. J at 1).

The HAO is merely a unilateral attempt by the City to expand the contractual obligations of private parties. *See Ginsberg*, 572 U.S. at 276. When the Commission and airlines agreed to two-year lease extensions in 2021, the extensions specifically excluded the HAO from those contracts and reserved airlines' rights to bring legal challenges against it. (*See* Ex. I at 1.) Thus, the HAO was in no way a "contractual commitment[] voluntarily undertaken." *ATA*, 569 U.S. at 649. Rather, the City unilaterally imposed the healthcare requirements on employers extra-contractually, separate from any bargaining process. Indeed, the HAO applies despite any existing or future contracts between airlines and the Commission or any existing or future collective bargaining agreements, which cannot waive the HAO's requirements. In short, the HAO does not reflect "the ordinary behavior of private parties," *Johnson*, 623 F.3d at 1024, "as one might expect of a private business in the same situation," *LAX*, 873 F.3d at 1080.

> **(b)    The City cannot satisfy prong 2 of the *LAX* test because it did not narrowly pursue a proprietary objective.**

Nothing about the HAO defeats the "inference that its primary goal was to encourage a general policy rather than [to] address a specific proprietary problem." *Id.* Although civil and criminal penalties again irrefutably answer the question (*see supra* pp. 16, 17), several other considerations likewise show that the HAO is designed to further a general policy, not address a specific proprietary problem. *See Olympic Pipe Line*, 437 F.3d at 881. Moreover, the HAO "does not even apply . . . uniformly," undermining any inference one could glean from its supposedly "targeted" scope. *Brown*, 554 U.S. at 71. The City acted as a regulator, not a market participant.

*First*, the City "acted pursuant to its general duty to protect the public" rather than to address a specific proprietary issue as owner of SFO. *Olympic Pipe Line*, 437 F.3d at 881. The HAO itself declares: "In undertaking the adoption and enforcement of this ordinance, the City is undertaking only to promote the *general welfare*." (Ex. S at 5.) The HAO also states that it seeks to address "escalating health care costs" and to ensure that "people of color" and those from certain "racial and ethnic minority groups" who have been "disproportionately impacted by COVID-19" can access affordable healthcare. (Ex. D at 4, 6.) A measure designed to promote the "general welfare" is by its very nature "a duty grounded in the [government's] regulatory, police power," *Olympic Pipe Line*, 437 F.3d at 881, not a narrow action taken to address a specific proprietary problem. *See Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S.

1   470, 503 (1987) (describing "the police power" as "an exercise of the sovereign right of the Government

2   to protect the lives, health, morals, comfort and *general welfare* of the people"); *see also Nebbia v. People*

3   *of New York*, 291 U.S. 502, 523-24 (1934) (same); *Marblehead Land Co. v. City of Los Angeles*, 47 F.2d

4   528, 532 (9th Cir. 1931) (same).

5   　　　The City's actions reinforce the point. As discussed below (pp. 24-25), the City invoked the

6   legislative privilege when responding to discovery requests. (Ex. X at 4-5.) But the legislative privilege

7   applies when the government acts to "formulat[e] . . . policy" as "to the public at large" rather than when

8   it acts narrowly as "to a few individuals." *Kaahumanu v. County Of Maui*, 315 F.3d 1215, 1220 (9th Cir.

9   2003). Thus, by affirmatively claiming the legislative privilege applies, the City implicitly admits that the

10   HAO furthers a broad "general policy" and not a "specific proprietary problem" unique to a select group

11   of individuals. *LAX*, 873 F.3d at 1080. This is more than enough to fail the Ninth Circuit's second prong.

12   *See Olympic Pipe Line*, 437 F.3d at 881.

13   　　　The City has also adduced no *evidence* to carry its burden that it enacted the HAO to address a

14   specific proprietary problem. *See Johnson*, 623 F.3d at 1024; *see also Dillingham Constr. N.A., Inc. v.*

15   *County of Sonoma*, 190 F.3d 1034, 1038 (9th Cir. 1999) (rejecting market-participation argument because

16   "the State . . . did not establish the [challenged] law specifically for the detention facility project and the

17   State was not motivated by management concerns when it adopted the [challenged] law"). The HAO's

18   Findings—which, as explained above, were written by labor unions and their lawyers (*see* Ex. O)—state

19   that "[p]rotecting the health of employees and their families is important to the City's proprietary interests

20   as owner and operator of the Airport." (Ex. D at 6.) Similarly, in response to an interrogatory asking the

21   City to state all of its purposes and motivations for enacting the HAO, the City identified these purposes:

22   "enhancing Airport safety and security"; "assisting in the recruitment of high-quality airport employees,

23   reducing employee turnover, and improving worker performance"; "improving Airport efficiency and

24   customer service"; "protect[ing] the community and traveling public from the spread of COVID-19"; and

25   "restor[ing] public confidence in the safety of air travel." (Ex. X at 5.) But those purported motivations,

26   penned by attorneys either with an eye toward litigation or while in the midst of it, find zero support in

27   the record. A4A propounded one document request in this case: "All documents and communications

28   concerning the HAO." (Ex. AA at 4.) A4A then asked the City in an interrogatory to identify by Bates

1  number every document the City produced that the City contends "evidences or supports any of the

2  purposes of or motivations" underlying the HAO that the City identified. (Ex. X at 5.) The only two

3  documents the City could identify were the HAO and the HAO amendment. (*Id.*) The City produced no

4  internal communications discussing these motivations. No memorandums. No emails. The after-the-fact

5  arguments the City's attorneys conjured for purposes of this litigation were not the actual motivations that

6  led the City to enact the HAO.

7       In reality, the HAO was never intended to benefit the Airport as proprietor; it was politically

8  expedient legislation designed to benefit a certain class of employees and further the general welfare. And

9  "where the 'legislative purpose is not the efficient procurement of goods and services, but the furtherance

10  of a labor policy,' a state actor is behaving 'in its capacity as a regulator rather than a market participant.'"

11  *Tri-M*, 638 F.3d at 422 (quoting *Brown*, 554 U.S. at 70). As explained, in July 2020, labor leaders and

12  Airport-worker unions sought to introduce legislation that would provide no-cost health insurance to SFO

13  workers and their families. (*See* Ex. Q at 1-2; Ex. T at 1.) They found a willing partner in Supervisor

14  Mandelman, who moved the HAO through the ordinary legislative process. But Supervisor Mandelman's

15  political decision to pass a public health ordinance and impose it on airlines and airline service providers

16  from the legislative chamber rather than by negotiation at the bargaining table cannot now be transformed

17  into proprietary conduct on the part of SFO to save the HAO from preemption. As noted, the Airport's

18  actual proprietor and party that enters into contracts with airlines—the Commission—played no role in

19  drafting the HAO. Indeed, the Airport *opposed* the HAO. (*See supra* pp. 7, 18.) Thus, not only did the

20  City enact the HAO for a public policy reason, it enacted the HAO *despite* proprietary *opposition*.

21       *Second,* the HAO's scope makes clear that it does not address any proffered proprietary goal. The

22  City claims that the HAO serves its proprietary interests in "protecting the community and the traveling

23  public from the spread of COVID-19, and restoring public confidence in the safety of air travel." (Ex. D

24  at 6.) To begin, that argument is as good as a concession, because protecting the public is a general welfare

25  measure, not a proprietary goal. "Protect[ing] the public health and safety" is "a duty grounded in the

26  City's regulatory, police power," not a proprietary duty. *Olympic Pipe Line Co.*, 437 F.3d at 881. Again,

27  taking the City at its word, the City loses.

28       In any event, the HAO does little, if anything, to protect the traveling public. The public wants to

1    know that the people they interact with are vaccinated, will wear masks, and will keep spaces clean and

2    air purified. They do not want to know about employees' health benefits, much less whether those benefits

3    cover acupuncture and pediatric orthodontia for employees' dependents. Providing no-cost health

4    insurance to airport workers and their dependents may be a laudable policy goal, but it does not protect or

5    restore the confidence of the traveling public. The HAO does not require vaccination, mask-wearing, or

6    any kind of cleaning or air purification—*i.e.*, the "other means" of advancing the claimed interest, *LAX*,

7    873 F.3d at 1083, in protecting the public from COVID-19. The only logical inference is that preventing

8    the spread of COVID "is not the objective" of the HAO. *Brown*, 554 U.S. at 70.

9          The City's failure to apply the HAO's requirements "uniformly" likewise shows that the HAO

10   pursues a regulatory rather than a proprietary goal. *See Brown*, 554 U.S. at 71. Although the HAO requires

11   airlines and airline service providers to extend no-cost health benefits to many employees, it does not

12   apply to concessionaries, police officers, or firefighters. (*See* Ex. T at 3; Joint Fact No. 2.) Yet those

13   employees surely are at risk of contracting COVID-19 given how closely they work with travelers, and

14   travelers would therefore be concerned about *those* employees' health status, if they are concerned about

15   *any* employees' status. At the same time, the HAO applies to various categories of workers who have *no*

16   *interaction* with the "traveling public," such as mechanics and baggage handlers. (*See* Ex. U at 1; Ex. T

17   at 3.) That is not poor business judgment. *Cf. LAX*, 873 F.3d at 1084. That is pursuit of regulatory policy.

18         *Third,* the HAO exceeds the City's proprietary interests because it targets private contracts, rather

19   than any City contract. The Supreme Court rejected a market-participant argument where the challenged

20   state action "addressed employer conduct unrelated to the employer's performance of contractual

21   obligations to the State." *Boston Harbor*, 507 U.S. at 228-29. The market-participant "doctrine is not carte

22   blanche to impose any conditions that the State has the economic power to dictate, and does not validate

23   any requirement merely because the State imposes it upon someone with whom it is in contractual privity."

24   *Wunnicke*, 467 U.S. at 97. As the Fifth Circuit put it, "a state does not act within the market participant

25   exception when its actions significantly affect markets other than the market in which it is a participant

26   by *imposing conditions on parties with whom it contracts*." *United Healthcare Ins. Co. v. Davis*, 602 F.3d

27   618, 625 (5th Cir. 2010); *see also Tri-M*, 638 F.3d at 422; *GSW*, 999 F.2d at 1513.

28         Here, while the City (through the Commission) has terminal lease agreements with SFO's airlines,

1    the HAO does not apply to, or alter, those contracts. Instead, the HAO imposes conditions on SFO's

2    airlines relating only to the airlines' private contracts with their workers. And the HAO's requirements—

3    the precise benefits airlines must provide to their employees, the family members those benefits must

4    cover, and the cost-sharing allowed—have, at most, a strained and attenuated connection to airlines'

5    "performance of contractual obligations" to the City. *Boston Harbor*, 507 U.S. at 229. "If the market-

6    participant exception allowed a state to impose conditions in any market tangentially related to the one in

7    which the state participated . . . the exception would have 'the potential of swallowing up the rule.'" *United*

8    *Healthcare*, 602 F.3d at 62 (quoting *Wunnicke*, 467 U.S. at 98).

9         **(c)    Neither *LAX* nor *Johnson* saves the City's market-participant defense.**

10         *LAX* and *Johnson* do not support the City. Neither case involved challenged government action

11   backed by criminal or civil penalties. Neither case even involved *legislation*. In both cases, the challenged

12   actions arose in the contracting context. In *LAX*, the plaintiffs challenged a provision in a license

13   agreement between Los Angeles and service providers at Los Angeles International Airport. *See* 873 F.3d

14   at 1077. And in *Johnson*, the plaintiffs challenged a provision in a project labor agreement between a

15   community-college district and a trade council. *See* 623 F.3d at 1016. Based on these features, the Ninth

16   Circuit concluded under the first prong of its test that the challenged government actions were "sufficiently

17   analogous to private market behavior." *Id.* at 1026; *see LAX*, 873 F.3d at 1081-82. As for the second

18   question, the evidence in those cases did not show that the governments' primary goal was to promote the

19   general welfare, or some other general police power. *See LAX*, 873 F.3d at 1082-84; *Johnson*, 623 F.3d

20   1028-29. But this case is much different. As explained, here there are allegations that accomplishing the

21   City's alleged proprietary purposes *required* "other means" than what the HAO provides. *LAX*, 873 F.3d

22   at 1083. In short, as in *Olympic Pipe Line*, the evidence here shows that the City "acted pursuant to its

23   general duty to protect the public health and safety—a duty grounded in the City's regulatory, police

24   power—rather than in an attempt to protect" any proprietary interest. 437 F.3d at 881.

25         **(d)    The City also cannot bear its burden to show it acted like any private**
           **actor could because *no* private actors own public international airports.**
26

27         There is yet another, independent reason why the City could not have acted as a market-participant

28   here: To borrow the Solicitor General's point in *LAX*, SFO "is not an ordinary commercial enterprise in

                                                    23

an open market, just as the port in *ATA* was not. Rather, [SFO] is more akin to publicly managed transportation infrastructure." (Ex Y at 22.) The City owns SFO, an international airport. The parties have stipulated that *all* international airports in the United States are publicly owned. (Joint Fact No. 1.) Thus, in taking actions affecting the Airport, the City necessarily acts in a way no private party ever could. San Francisco also operates SFO in ways that no private actor ever could. For one thing, the City has the power to use eminent domain proceedings to secure land for SFO, and has exercised that authority in the past. (Joint Fact No. 3; Ex. X at 4); *see, e.g.*, *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 93-94 (2d Cir. 2009) (rejecting government's market participant argument because, "[u]nlike a private actor, NYTA may . . . avoid holdouts by resorting to eminent domain to amass the property necessary to build roads"). SFO also has at its disposal Airport divisions of both the San Francisco Police Department and San Francisco Fire Department. Thus, the City acted in distinctively governmental ways in enacting the HAO.[4]

### C.   San Francisco conceded that it acted in its regulatory capacity by invoking the legislative privilege during discovery.

Beyond civil and criminal sanctions, and beyond the City's failure to carry its burden under the Ninth Circuit's two-prong test, the City has conceded by its discovery conduct that it was "performing its prototypical regulatory role" when it enacted the HAO. *ATA*, 569 U.S. at 651. In responding to interrogatory requests during discovery, the City objected and invoked legislative privilege. (Ex. X at 4-5 (citing *County of Los Angeles v. Superior Court*, 13 Cal. 3d 721, 726 (1975)).) That is something no private party could ever do, and by claiming it has satisfied the grounds for invoking the privilege, the City has conceded that it acted in its regulatory capacity when it enacted the HAO.

Under Ninth Circuit precedent, four factors determine whether the government can assert legislative privilege: "(1) whether the act involves ad hoc decision-making, or the formulation of policy; (2) whether the act applies to a few individuals or to the public at large; (3) whether the act is formally

---

[4] The Ninth Circuit in *LAX* rejected the argument that Los Angeles could not be acting as a market participant just because all airports are publicly owned, reasoning that there is a "'trend toward private participation in airport ownership and operation in most other parts of the world.'" *LAX*, 873 F.3d at 1081 (citing article from Air & Space Lawyer). But the fact that SFO is an airport is surely part of the equation, and A4A preserves its arguments here. Whether private parties own airports in other countries is irrelevant, and *LAX* did not explain why a "trend toward" private ownership in other countries means that a California city, in operating a public airport, acts in the way a private actor could in a country where all international airports are publicly owned. Notably, the United States disagreed with the Ninth Circuit's position on this issue in the Solicitor General's amicus brief in connection with the *LAX* cert. petition. (*See* Ex. Y at 22.)

legislative in character; and (4) whether it bears all the hallmarks of traditional legislation." *Kaahumanu*, 315 F.3d at 1220. Under the first two prongs, courts are more likely to find that legislative privilege applies when the legislative act (a) involves a formulation of policy, rather than an ad-hoc decision, and (b) applies to the public at large, rather than a few individuals. *Id.* at 1220-23.

Here, by affirmatively invoking the legislative privilege, the City has necessarily claimed that the HAO (i) involves a "formulation of policy"; (ii) applies to a broad swath of the "public at large"; (iii) "is formally legislative in character"; and (iv) "bears all the hallmarks of traditional legislation." *Id.* at 1220. That position precludes (or, at the very least, severely undercuts) a finding that the City acted as a market participant rather than a regulator. *Compare id.* at 1220-22 (legislative privilege applies when state action involves a "formulation of policy"), *with Boston Harbor*, 507 U.S. at 229 ("interest in setting policy" cuts against market participation), *and Tri-M*, 638 F.3d at 422 (state acting in "furtherance of a labor policy" acts as a regulator). That concession matters; courts take seriously the government's own acknowledgment of what it is doing. *See, e.g.*, *Selevan*, 584 F.3d at 93 (noting that statute acknowledged that the Thruway Authority "shall be regarded as performing a governmental function in carrying out its corporate purpose and in exercising the powers granted by this title"). What's more, no private party can invoke the legislative privilege. *See County of Los Angeles*, 13 Cal. 3d at 726 (describing legislative privilege as a "rule barring . . . probing of *lawmakers'* motivations"). Thus, the City's own conduct makes clear that it acted in its traditional regulatory capacity when it enacted the HAO.

## CONCLUSION

The Court should enter an order of summary judgment holding that San Francisco was acting in its regulatory capacity when it enacted the HAO, which has the force and effect of law, and thus that the market-participant exception to preemption does not apply.

DATED: December 31, 2021

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Jason D. Russell*
JASON D. RUSSELL
Attorneys for Plaintiff
AIRLINES FOR AMERICA