UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AIRLINES FOR AMERICA,<br><br>          Plaintiff,<br><br>     v.<br><br>CITY AND COUNTY OF SAN<br>FRANCISCO,<br><br>          Defendant. | Case No.  21-cv-02341-EMC<br><br>**ORDER GRANTING DEFENDANT'S<br>MOTION FOR SUMMARY<br>JUDGMENT, AND DENYING<br>PLAINTIFF'S MOTION FOR PARTIAL<br>SUMMARY JUDGMENT**<br><br>Docket Nos. 41-42 |

Plaintiff Airlines for America ("A4A") filed this action against Defendant City and County of San Francisco (the "City") alleging that San Francisco's Healthy Airport Ordinance ("HAO") is preempted by multiple federal statutes.  Docket No. 1 ("Complaint" or "Compl.").  The HAO requires certain airline employers to, among other things, provide adequate healthcare access for its employees.  The parties agree that the Court must resolve the following threshold question before it can reach A4A's preemption arguments:  Whether the City acted as a market participant in enacting the HAO.  The City asserts that its market participant defense precludes A4A's preemption claims A4A contends that the City's market participant defense fails.

Pending before the Court are the City's motion for summary judgment and A4A's motion for partial summary judgment to resolve the market-participant defense.  Docket Nos. 41 ("MSJ"); 42 ("MPSJ").  For the following reasons, the Court **GRANTS** the City's motion for summary judgment and **DENIES** A4A's motion for partial summary judgment.

## I.      BACKGROUND

A.      Factual History

The City owns and operates San Francisco International Airport ("SFO" or the "Airport").

1     In 1970, San Francisco created the San Francisco Airport Commission ("Commission") to operate

2     and oversee SFO.  Compl. ¶ 45; Docket No. 24 ("Answer") ¶ 45.  The Commission is in "charge

3     of the construction, management, supervision, maintenance, extension, operation, use and control

4     of all property, as well as the real, personal and financial assets which are under the Commission's

5     jurisdiction."  S.F. Charter § 4.115.  The City manages SFO as a self-sustaining enterprise fund

6     department and the City's taxpayers do not fund the airport.  Docket No. 41-4 ("Kone Decl.") ¶ 9.[1]

7     SFO competes with Oakland International Airport and San Jose International Airport for domestic

8     service in the Bay Area.  Docket No. 41-3 ("Bumen Decl.") ¶ 5.

9         In 1999, the City introduced the Quality Standards Program ("QSP") at SFO, which

10     establishes contractual requirements for employers at the Airport, including minimum hiring and

11     compensation standards for certain covered employees providing services to the Airport.  Docket

12     No. 41-5 ("Ogletree Decl.") ¶ 3 & Ex. 1.  Under the QSP, "Covered Employees" are defined as

13     employees who:  (1) "require the issuance of an Airport badge with Airfield Operations Area

14     ("AOA") access and work in and around the AOA in the performance of their duties"; or (2) "are

15     directly involved in passenger and facility security and/or safety, including but not limited to

16     checkpoint screening, passenger check-in, skycap and baggage check-in and handling services,

17     custodial services, and AOA perimeter control."  *Id.*, Ex. 5 at 82.  Since 1999, the QSP has

18     expanded to cover various airline employees and its requirements have also expanded to include

19     specified standards for safety, health, hiring, training, equipment, compensation, and benefits for

20     Covered Employees.  *See id.*, Exs. 2, 4, & 5.  In 2009, the City amended the QSP to incorporate

21     the City's Health Care Accountability Ordinance ("HCAO"), set forth in San Francisco

22     administrative Code Chapter 12Q, which requires employers to offer to their Covered Employees

23     certain minimum medical insurance coverage.  *Id.*, Ex. 3 at 54.

24

25     [1] A4A asserts that the Court should exclude the declarations of Stella Cao, Kevin Kone, Kantrice Ogletree, Ralf Ruckelshausen, and Lisa Powell because the City failed to disclose them in its

26     FRCP 26(a) disclosures.  Opp. MSJ at 18 n.4; Opp. MPSJ at 14.  The Court **DENIES** A4A's request because the lack of disclosure is harmless as A4A does not claim that it was prejudiced by

27     the City's failure to disclose.  *See* Fed. R. Civ. P. 37(c) (a party who fails to make the required initial disclosure "is not allowed to use that information or witness to supply evidence on a

28     motion, at a hearing, or at trial," except where the failure to comply was "substantially justified" or "harmless.").

United States District Court
Northern District of California

In 2010, the City, through the Commission, entered into two-dozen Lease and Use Agreements ("LUAs") for ten-year terms starting in 2011 ("2011 LUAs") with different airlines, including all of the members of A4A. Answer ¶ 47. These LUAs obligate each signatory airline to pay substantial amounts to SFO for their use of terminal and airfield facilities and in turn it obligates the City to manage and operate the Airport to use "commercially reasonable efforts" to maximize non-airline revenues. Kone Decl. ¶¶ 5, 6. When each of the member airlines entered into their new LUAs effective July 1, 2011, they agreed to comply with SFO's Rules and Regulations, which included the QSP and the HCAO. Bumen Decl. ¶ 13 & Ex. 1 § 1001. Importantly, the member airlines agreed to "comply fully with and be bound by all of the provisions" of the HCAO, "as set forth in San Francisco Administrative Code Chapter 12Q, including the remedies provided, and implementing regulations, as the same may be amended from time to time." *Id.*, Ex. 1 § 1813A. Neither A4A nor any of its member airlines have ever challenged the QSP or HCAO until A4A commenced this action. *Id.* ¶ 13.

In November 2020, the City's legislative branch, the Board of Supervisors (the "Board") enacted the Healthy Airport Ordinance ("HAO" or the "Ordinance"), which amends the HCAO, Chapter 12Q of the Administrative Code, to create additional standards for minimum medical insurance coverage to be offered to Covered Employees under the QSP. Docket No. 41-6 ("Powell Decl.") at 4–18 ("HAO"). Specifically, the HAO requires certain SFO employers to (1) offer at least one "platinum" healthcare plan, meaning a plan that provides a level of coverage designed to provide benefits that are actuarially equivalent to at least 90% of the full actuarial value of the benefits provided, HAO § 1(a); (2) cover all services described in the California Essential Health Benefit Benchmark Plan, HAO § 3 (amending S.F. Admin. Code § 12Q.3(d)(1)(A)); (3) offer these plans to all Covered Employees as well as each employee's spouse and dependents, HAO § 3 (amending S.F. Admin. Code § 12Q.3(d)(1)); and (4) absorb 100% of the plans' costs, with no cost-sharing between employer and employee, HAO § 3 (amending S.F. Admin. Code § 12Q.3(d)(1)(A)).

The City amended the HAO in 2021 and it went into effect on March 21, 2021. Powell Decl. at 20–25 ("Amended HAO") § 1(c). The Amended HAO permits employers to offer

1  additional, specified healthcare plans.  *Id.* § 2 (amending S.F. Admin. Code § 12Q.3(d)).

2  Section 5 of the Amended HAO also states that "[i]n undertaking the adoption and enforcement of

3  this ordinance, the City is undertaking only to promote the general welfare." *Id.* § 5.

4       The HAO's findings acknowledge that an "average of nearly 58 million people normally

5  travel through the Airport each year."  HAO § 2(a).  It also states that the implementation of the

6  QSP successfully assisted in the recruitment of high-quality employees and the reduction of

7  employee turnover" by 34% thereby improving the safety and security at the Airport.  *Id.* § 2(c).

8  The HAO explains that the "individual health benefits provided to QSP-covered employees are

9  critical to the health, well-being, and financial security of those employees," and that "health

10  benefits not only enhance QSP employee recruitment and retention and reduce employee

11  absences; employee access to health care also reduces the spread of infectious disease." *Id.* § 2(e).

12  The HAO notes that "some QSP-covered employees do not receive health benefits because their

13  CBA [collective bargaining agreement] waives the health benefit requirement" and "escalating

14  health care costs are undermining the effectiveness of these health benefits for QSP-covered

15  employees." *Id.* § 2(g).  Because the Airport employees are an essential workforce during the

16  COVID-19 pandemic, the HAO states that employees "working at the Airport who perform

17  services that directly impact safety and/or security at the Airport are at considerable risk of

18  contracting and spreading COVID-19 due to the nature of their work duties." *Id.* § 2(h).  The

19  findings also acknowledge that "[m]any Airport workers are people of color, who may be

20  especially vulnerable to contracting COVID-19 and to suffering greater health consequences from

21  the virus." *Id.* § 2(j).

22       As a result, the findings conclude, "[a]ccess to affordable family health benefits is central

23  to achieving the goals of the QSP" because "[p]rotecting the health of employees and their

24  families is important to the City's proprietary interests as owner and operator of the Airport,

25  including its interest in attracting and retaining high-quality employees whose work impacts safety

26  and security, protecting the community and the traveling public from the spread of COVID-19,

27  and restoring public confidence in the safety of air travel." *Id.* § 2(k).

28       There are two options to comply with the HAO.  Employers can either offer health plan

benefits meeting certain enhanced requirements to each Covered Employee and their dependents, or make monetary contributions for the Covered Employee to a City fund (the "City Option" program).  HAO § 3 (amending S.F. Admin. Code § 12Q.3(d)).  The City Option requires employers who do not offer the requisite health plan to pay $9.50 per employee per hour into a Health Access Program ("HAP") account established under Section 14.2 of the San Francisco Administrative Code.  HAO § 3 (amending S.F. Admin. Code § 12Q.3(d)(2)).  Covered Employees can access the money contributed to the City Option program through Medical Reimbursement Accounts ("MRAs").  Docket No. 41-7 ("Cao Decl.") ¶¶ 4–6.

If any employer fails to comply with its obligations under the HAO for Covered Employees, the City can enforce the HAO by:  (1) charging a violator for any amounts that should have been paid into a HAP account along with a simple annual interest rate of 10%, S.F. Admin. Code § 12Q.5(f); (2) requiring a violator to pay the City liquidated damages of up to $100 for each one-week pay period for each employee, S.F. Admin Code § 12Q.5.1(4); (3) canceling any contract the City has with the employer, S.F. Admin. Code § 12Q.5(f)(4); (4) barring the employer from entering into any future contracts with the City for three years, S.F. Admin. Code § 12Q.5(f)(5); and (5) instituting a civil action against the employer, in which the prevailing party will be entitled to all costs and expenses, S.F. Admin. Code § 12Q.5(f)(6).  Separately, for a violation of any requirement of the QSP,  "the Airport Director may elect to impose a fine equal to $1,000 per violation / employee, per day."  Docket No. 41-5 at 84.  This provision has been in effect since 2000, although in 2016 the provision was amended to increase the fine from $200 to $1,000.  *See* Ogletree Decl., Ex. 2 at 10 (2000 QSP provision); *id.*, Ex. 5 at 4 ¶ 5 (2016 proposed revisions to the QSP).

On March 19, 2021, the Commission and the airlines chose not to execute new 10-year LUAs due to the complications from the COVID-19 pandemic and instead agreed to "modifications" of their prior 2011 LUAs.  Docket No. 42-3 ("2021 LUAs").  The modifications, among other things, include (1) the extension of the contract term for two years to 2023; and (2) the reservation of the rights of the City and the Signatory Airlines with respect to any legal

1   challenges involving the HAO.  *Id.*[2]

2   B.   Procedural History

3   On March 31, 2021, ten days after the HAO went into effect on March 21, 2021, A4A filed

4   its Complaint against the City and the San Francisco Office of Labor Standards Enforcement

5   ("OLSE"), alleging that three federal statutes preempt the HAO and that the HAO violates the

6   Contracts Clauses of the state and federal constitutions.  *See* Compl.  On April 26, 2021, the City

7   filed its answer to the Complaint.  Docket No. 24.  On August 3, 2021, the Court agreed to the

8   parties' proposal that the case should be bifurcated to first resolve on summary judgment the

9   threshold issue to A4A's preemption claims—the City's market participant defense.  Docket No.

10  36.  On August 13, 2021, A4A voluntarily dismissed OLSE as a defendant.  Docket No. 38.

11  On December 31, 2021, the City filed its motion for summary judgment and A4A filed its

12  cross-motion for partial summary judgment on the market participant issue.  *See* MSJ; MPSJ.  The

13  motion hearing took place on March 17, 2022.

## II.   LEGAL STANDARD

15  Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment

16  [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and

17  the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is

18  genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.

19  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).  "The mere existence of a

20  scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could

21  reasonably find for the [nonmoving party]."  *Id.* at 252.  At the summary judgment stage, evidence

22  must be viewed in the light most favorable to the nonmoving party and all justifiable inferences

23  are to be drawn in the nonmovant's favor.  *See id.* at 255.

24  Where a defendant moves for summary judgment based on an affirmative defense (*i.e.*, an

25  issue on which it bears the burden of proof), the defendant must establish "all of the essential

26

27  _____

28  [2] A4A requests that the Court take judicial notice of the 2021 modification to the LUAs.  Docket No. 42-4.  The City does not oppose.  Because the contract is in the public record, the Court GRANTS A4A's request for judicial notice.  *See* Fed. R. Evid. 201(b).

United States District Court
Northern District of California

1   elements of the . . . defense to warrant judgment in [its] favor." *Martin v. Alamo Cmty. College*

2   *Dist.*, 353 F.3d 409, 412 (5th Cir. 2003) (internal quotation marks and emphasis omitted); *see also*

3   *Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1177 (9th Cir. 2006) (noting that a

4   defendant bears the burden of proof at summary judgment with respect to an affirmative defense).

### III.      DISCUSSION

6          Before deciding whether a federal law preempts a state or local statute, courts must

7   evaluate whether the preemption doctrine applies.  The Supreme Court has held that generally

8   "pre-emption doctrines apply only to state [or local] regulation." *Bldg. & Constr. Trades Council*

9   *of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.* ("*Boston Harbor*"), 507

10  U.S. 218, 227 (1993).  In other words, federal law generally preempts state or local government

11  action that has "the force and effect of law." *Am. Trucking Associations, Inc. v. City of Los*

12  *Angeles, Cal.* ("*ATA*"), 569 U.S. 641, 649–50 (2013).  But "[w]hen a state or local government

13  buys services or manages property as would a private party, it acts as a 'market participant,' not as

14  a regulator, and [courts] presume that its actions are not subject to preemption." *Airline Serv.*

15  *Providers Ass'n v. Los Angeles World Airports* ("*LAX*"), 873 F.3d 1074, 1079 (9th Cir. 2017).

16  "The law has traditionally recognized a distinction between regulation and actions a state takes in

17  a proprietary capacity—that is to say, actions taken to serve the government's own needs rather

18  than those of society as a whole." *Cardinal Towing & Auto Repair, Inc. v. City of Bedford, Tex.*,

19  180 F.3d 686, 691 (5th Cir. 1999).

20         At issue here is whether or not the City acted as a market participant or as a regulator when

21  it enacted the HAO.  If the market participant defense applies then A4A's preemption claims are

22  precluded.  A4A makes two arguments to assert that the market participant defense fails.  First,

23  A4A asserts that the City acted as a regulator because the HAO has civil and criminal penalties,

24  which are unique governmental functions.  Second, it asserts that the City cannot meet its burden

25  under the *Cardinal-Towing* two-prong test to show that it acted as a market participant.  For the

26  reasons discussed below, the Court concludes that the HAO does not have any enforcement

27  mechanisms that are unique governmental functions and that the City met its burden under both

28  independent prongs of the *Cardinal-Towing* test.

United States District Court
Northern District of California

A.      Whether the City Acted as a Regulator

A4A firsts asserts that a government entity acts as a regulator and not a market participant when it threatens criminal or civil penalties to coerce compliance with its goals.  Docket No. 47 ("Opp. MSJ") at 2.

1.      Criminal Penalties

There is no dispute that the threat of criminal penalties is a unique governmental function and would make the City a regulator, not a market participant, when enacting the HAO.  But the parties disagree about whether the HAO has criminal penalties.

The Supreme Court has held that "[c]ontractual commitments resulting not from ordinary bargaining . . . but instead from the threat of criminal sanctions manifest the government *qua* government, performing its prototypical regulatory role."  *ATA*, 569 U.S. at 651.  In *ATA*, Los Angeles's Board of Harbor Commissioners ("BHC"), which runs the Port of Los Angeles ("Port") pursuant to a municipal ordinance, devised a "concession agreement" to govern the relationship between the Port and any trucking company seeking to operate on its premises in order to address the community's concerns about safety, congestion, and air pollution.  *Id.* at 644–45.  The BHC amended the Port's ordinance to provide that no terminal operator will permit access to the Port unless the trucking company is registered under the concession agreement and that any violation of the provision is a misdemeanor, which is punishable by a fine of up to $500 or a prison sentence of up to six months.  *Id.* at 645.  The Ninth Circuit originally held that the provisions of the concession agreement at issue did not "have the force and effect of law" and therefore were not preempted because they were not regulatory but rather were "designed to address a specific proprietary problem—the need to increase the community good-will necessary to facilitate Port expansion."  *Id.* at 647 (alterations and internal quotation marks omitted).  The Supreme Court reversed and concluded that the Port's actions were regulatory because the Port "chose a tool to fulfill those goals which only a government can wield:  the hammer of the criminal law" and thus the ordinance could be preempted by federal law.  *Id.* at 651.  Although the Port's requirements were contained in contracts between the Port and the trucking companies, the contracts were not "the result merely of the parties' voluntary commitments" because the BHC "aimed to require

8

United States District Court
Northern District of California

1  parties who access Port land" to enter into concession agreements with the Port by imposing a

2  criminal penalty.  *Id.* at 650.  As a result, the contract functioned "as part and parcel of a

3  governmental program wielding coercive power over private parties, backed by the threat of

4  criminal punishment."  *Id.*

5         In this case, unlike the ordinance in *ATA*, neither the HAO nor any related ordinance

6  provides that violations can lead to criminal enforcement.  *See* Docket No. 41-6 ("HAO").  A4A

7  asserts, however, that the HAO has criminal penalties because it is an ordinance and under

8  California law, violating any city or county ordinance is a misdemeanor.  MSJ Opp. at 6.

9  Specifically, section 25132(a) of the California Government Code recites:  "Violation of a county

10  ordinance is a misdemeanor unless by ordinance it is made an infraction.  The violation of a

11  county ordinance may be prosecuted by county authorities in the name of the people of the State

12  of California, or redressed by civil action."  Cal. Gov. Code § 25132(a).  Similarly, section

13  36900(a) provides the same but for violations of city ordinances.  *See id.* § 36900(a).  The City

14  contends that these statutory provisions are only implicated when a local ordinance itself expressly

15  calls for criminal enforcement.  Docket No. 49 ("Reply MSJ") at 5.

16         Thus, the question is whether under Sections 25132(a) and 36900(a), every violation of

17  any local ordinance constitutes a misdemeanor.  A4A asserts that the statutes are unambiguous,

18  and therefore there is no need for further construction.  Opp. MSJ at 13; *California Fed. Sav. &*

19  *Loan Assn. v. City of Los Angeles*, 11 Cal. 4th 342, 343 (1995) ("When statutory language is clear

20  and unambiguous, there is no need for construction, and courts should not indulge in it.").  "When

21  a natural reading of the statutes leads to a rational, common-sense result, an alteration of meaning

22  is not only unnecessary, but also extrajudicial," however, "well-accepted rules of statutory

23  construction caution [] that statutory interpretations which would produce absurd results are to be

24  avoided."  *Arizona State Bd. For Charter Sch. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1008 (9th

25  Cir. 2006) (internal quotation marks omitted).

26         In this case, to accept A4A's interpretation would produce absurd results, such as no

27  California city or county could enact any ordinance that would be subject only to civil

28  enforcement.  Reply MSJ at 2.  Every municipal ordinance would be criminalized.  Notably, the

California Attorney General also characterized the proposition that A4A advances—that these statutory provisions should be taken literally "to mean that every conceivable violation of any ordinance constitutes a misdemeanor"—as unreasonable. *The Honorable Ronald L. MacMillen*, 60 Cal. Op. Att'y Gen. 83, 1977 WL24859, at *4 (1977). The Attorney General explained:

> "It does not seem reasonable that the Legislature in enacting Government Code section 25132 in 1975 intended thereby to make the violation of every outstanding and future county ordinance in California a criminal offense, regardless of the purpose of the ordinance or the intent of the board of supervisors adopting the ordinance. Accordingly, upon both reason and authority, we conclude that Government Code sections 25132 and 36900 makes the violation of a city or county ordinance either a misdemeanor or an infraction only when the violation is declared to be a misdemeanor or infraction by express ordinance language."

*Id.* at *6.[3]

Although an Attorney General's opinion is not binding, it "is entitled to considerable weight." *Cty. of San Diego v. State of California*, 15 Cal. 4th 68, 103 (1997). And where the legislature has subsequently amended the statutory provisions, it is presumed that it had the opinions of the Attorney General and that it would have corrected the language if the Attorney General opinions misconstrued the law. *California Assn. of Psychology Providers v. Rank*, 51 Cal. 3d 1, 17 (1990), *as modified on denial of reh'g* (Sept. 20, 1990). "In the absence of controlling authority, [an Attorney General's opinion] is persuasive because [the court] presume[s] that the Legislature was cognizant of the Attorney General's construction of [the statutory provision] and would have taken corrective action if it disagreed with that construction." *Cty. of San Diego*, 15 Cal. 4th at 104. In this case, both sections of the Government Code have been amended repeatedly, as recently as September 24, 2021; the absence of changes to the language in light of the aforementioned Attorney General opinion indicates that the Attorney General's

---

[3] Contrary to A4A's argument, the subsequent opinion of the Attorney General Capizzi does not contradict the *MacMillen* opinion. *See* Opp. MSJ at 14. The *Capizzi* opinion concluded that a county could enforce a smoking ban in county-owned buildings located within unincorporated territory under § 25132(a) without further discussion. *See Honorable Michael R. Capizzi*, 74 Ops. Cal. Atty. Gen. 211, 1991 WL 495486, at *2 (1991). It did not consider whether the county would need to use express ordinance language to declare its intent to make a violation a crime, as the *MacMillen* opinion concluded. Reply MSJ at 3 n.3.

United States District Court
Northern District of California

1  opinion is persuasive.[4]  MSJ at 16–17.

2      Moreover, all the cases on which A4A relies to assert that the violation of every local

3  ordinance is a misdemeanor by default, are consistent with the City's contention that Sections

4  25132(a) and 36900(a) are implicated only when a local ordinance expressly calls for criminal

5  enforcement.  *See Great Western Shows, Inc. v. County of Los Angeles*, 27 Cal. 4th 853, 865, 872

6  (2002) (holding that a gun control ordinance, which expressly "prohibits and punishes as a

7  misdemeanor 'the sale of firearms and/or ammunition on County property'" was not preempted by

8  state law, "given that the violation of a County ordinance is a misdemeanor" under § 25132(a));

9  *People v. Minor,* 96 Cal. App. 4th 29, 37–39 (2002) (holding that § 25132, which "govern[s]

10  enforcement of county penal ordinances" did not authorize the county to recover its law

11  enforcement costs related to a criminal suit against the defendant who was found guilty of

12  violating nuisance ordinances, which expressly provided that violations were infractions or

13  misdemeanors); *Sahab v. Baca*, 2014 WL 102410, at *8 (C.D. Cal. Jan. 8, 2014) (rejecting a due

14  process claim related to a violation of a tax code because the "express language" of the Los

15  Angeles Municipal Code, which contained a general provision making any violation of the Code a

16  misdemeanor unless explicitly made an infraction, and § 36900(a) provided the defendant notice

17  of potential criminal penalties).

18      In addition, the Ninth Circuit and California Supreme Court have recognized that certain

19  California ordinances only provided for civil enforcement without criminal penalties.  *See, e.g.*,

20  *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1281 (9th Cir. 2017) (noting that a violation of a San

21  Francisco ordinance that "is civil and contains no criminal provisions or penalties" "cannot result

22  in a criminal penalty."); *Prime Gas, Inc. v. City of Sacramento*, 184 Cal. App. 4th 697, 709 (2010)

23  (holding that a Sacramento ordinance was not duplicative of state laws because state laws "make it

24  a criminal offense" to sell tobacco products to minors, while the local ordinance only "suspends or

25  _____

26  [4] The two cases on which A4A relies to show that courts have rejected Attorney General opinions as unpersuasive, are inapposite because they involved statutes that were amended by the

27  Legislature before the Attorney General rendered the opinion.  *See People v. Garth*, 234 Cal. App. 3d 1797, 1800 (1991) (legislation last amended in 1984; Attorney General's Opinion rendered in 1990); *Cty. of Fresno v. Clovis Unified Sch. Dist.*, 204 Cal. App. 3d 417, 421, 424 (1988)

28  (legislation enacted in 1976 with no subsequent amendment; AG opinion rendered in 1986).

United States District Court
Northern District of California

revokes a local tobacco retailer license").

Accordingly, the Court holds that the HAO does not have criminal penalties and therefore A4A's argument that the City acted as a regulator on this ground fails.

2.   Civil Penalties

a.   Whether the Threat of Civil Penalties Alone Precludes the Market Participant Defense

A4A also asserts that the HAO's civil penalties render the Ordinance a regulatory action. The parties dispute whether the threat of civil penalties alone precludes the market participant defense.  In *ATA*, the Supreme Court held that "when the government employs such a coercive mechanism, available to no private party, it acts with the force and effect of law, whether or not it does so to turn a profit." *ATA*, 569 U.S. at 651–52.  A4A asserts that such coercive mechanisms include civil sanctions.  MPSJ at 13.  The City responds that there is no binding authority stating that civil penalties alone preclude the market participant defense.  Docket No. 44 ("Opp. MPSJ") at 9.  The question under *ATA* remains—whether the HAO uses any enforcement mechanisms, civil or otherwise, that are unavailable to private parties, thereby making it a regulation.

Although the Ninth Circuit has concluded that a government entity acted as a regulator when it threatened civil penalties, it has not expressly held that civil penalties alone preclude the market participant defense.  In *Hydrostorage, Inc. v. N. California Boilermakers Loc. Joint Apprenticeship Comm.*, 891 F.2d 719 (9th Cir. 1989), the Ninth Circuit examined a California statute that imposed certain conditions "upon contractors and subcontractors who perform contracts awarded by the state."  *Hydrostorage*, 891 F.2d at 721–23, *abrogated on other grounds as stated in Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1044 (9th Cir. 2007).  For willful noncompliance of the conditions, the statute imposed civil penalties and debarment from bidding on public works contracts for one year.  *Id.*  The court held that the statute "is aimed at regulating contractors who work on public contracts" because "[t]he state's involvement does not end with the awarding of the contract."  *Id.* at 730.  It pointed out that a division of a state agency "monitors and enforces violations" of the statute and therefore the statute "amounts to regulation, not merely 'market participation.'"  *Id.*  The court's holding did not

12

depend solely on the availability of civil penalties.

In an en banc decision, the Ninth Circuit held that two provisions of a California statute, which forbid employers who receive a certain amount of state funds from using those funds to assist, promote or deter union organizing, "are regulatory measures that fall outside the market participant exception." *Chamber of Com. of U.S. v. Lockyer*, 463 F.3d 1076, 1080, 1085 (9th Cir. 2006), *rev'd sub nom. on other grounds Chamber of Com. of U.S. v. Brown*, 554 U.S. 60 (2008). The court reached this conclusion by applying the *Cardinal Towing* test, under which courts examine whether the "nature of the expenditure is essentially proprietary" or whether "the scope of the expenditure" is narrow, in that it "lack[s] the effect of broader social regulation" and "reflects a state's interest in the efficient procurement of goods or services." *Id.* at 1084.  Under the first prong of the *Cardinal Towing* test, the court concluded that the "statute on its face does not purport to reflect California's interest in the efficient procurement of goods and services" because its preamble "makes clear that the legislation's purpose is to prevent 'state funds and facilities' from being used to subsidize an employer's attempt to influence employee choice about whether to join a union." *Id.*  Under the second prong, the court concluded that the statute does not "have a narrow scope or other element indicating that the statute is unrelated to broader regulation" because "the statute by design sweeps broadly, applying to all employers in California who accept any state grant or program funds in excess of $10,000." *Id.* at 1084–85.  The court also pointed out that the provisions are related to "broader regulation" because the statute "provi[ded] for civil penalties and permit[ted] private parties to file civil actions against employers who violate the statute." *Id.*  As a result, the Ninth Circuit held that the statute was regulatory and not protected by the market participation exception. *Id.* at 1084.

The Supreme Court later reversed the Ninth Circuit and found that the challenged statute was preempted by the National Labor Relations Act; it affirmed that "[i]t is beyond dispute that California enacted [the challenged statute] in its capacity as a regulator rather than a market participant" because it was "neither 'specifically tailored to one particular job' nor a 'legitimate response to state procurement constraints or to local economic needs.'" *Chamber of Com.*, 554 U.S. at 66, 70.  The Supreme Court, however, did not discuss whether the provision for civil

United States District Court
Northern District of California

1    penalties supported the conclusion that California was not a market participant.  Nonetheless, the

2    Ninth Circuit's holding did not depend solely on the availability of civil penalties.

3          In *Engine Manufacturers*, the Ninth Circuit reviewed six state agency rules that required

4    operators of vehicle fleets "to choose vehicles meeting specified emissions standards or containing

5    specified alternative-fuel engines when adding to their fleets."  *Engine Mfrs.*, 498 F.3d at 1035.  It

6    held that the rules' provisions such as "criminal sanctions and fines" do not "preclude the

7    application of the market participant doctrine."  *Id.* at 1048.  *Engine Mfrs.* is no longer good law

8    because in *ATA*, the Supreme Court held that coercive mechanisms that are unavailable to private

9    parties, such as the threat of criminal sanctions, constitute regulatory action.  *ATA*, 569 U.S. at

10   651–52.

11         Although the *ATA* court did not discuss the threat of civil penalties, the California Supreme

12   Court held in *Friends of the Eel River v. N. Coast R.R. Auth.*, 3 Cal. 5th 677 (2017) that the use of

13   a civil enforcement mechanism that was only available to the government precluded the

14   application of the market participant doctrine.  *Friends of the Eel River*, 4 Cal. 5th at 738–39.  The

15   statute at issue, the California Environmental Quality Act, used a system of government

16   proceedings as an enforcement mechanism, which the court concluded was "not a tool 'that the

17   owner of an ordinary commercial enterprise could mimic.'"[5]  *Id.* (quoting *ATA* 569 U.S. at 651).

18   The kind of enforcement mechanism unique to government is not present here.

19         Other circuits have held that the threat of civil penalties precludes the market participant

20   defense.  For example, in *Tri-M Group, LLC v. Sharp*, 638 F.3d 406 (3d Cir. 2011), the Third

21   Circuit reviewed a Delaware "regulatory scheme for the training and compensation of apprentices

22   on construction projects" for public and private employers both in and outside of Delaware, which

23   imposed, among other things, a "civil penalty of not less than $1,000 nor more than $5,000 for

24   each violation."  *Tri-M Group*, 638 F.3d at 412, 425.  The City contends that *Tri-M* does not hold

25

26   [5] The *Friends of the Eel River* court also rejected the plaintiff's reliance on *Engine Manufacturers* and found the case irrelevant because "that decision permitted state control over the state's own
27   internal purchasing decisions, but did not extend to permitting regulation of private third parties." *Id.*  Likewise, in this case, the issue is not the City's own internal purchasing decisions but the
28   application of the HAO on private third parties.  As a result, notwithstanding the *ATA*'s holding superseding its decision, *Engine Manufacturers* is inapplicable to the facts here.

United States District Court
Northern District of California

that civil penalties alone precludes a market participant defense because the court addressed the issue of civil sanctions only after it had already concluded that the law reached beyond Delaware's proprietary interests.  Opp. MPSJ at 9.  To the contrary, the Third Circuit independently relied on the use of civil sanctions to conclude that the scheme was regulatory.  *Tri-M Group*, 638 F.3d at 425.  It explained that "[a]nother factor distinguishes the instant statutory regime from those that reflect mere market participation by private actors:  the potential civil penalty threatened by the State for failure to comply with the prevailing wage conditions."  *Id.*  The court acknowledged that because "the state relies on its coercive power to effectuate compliance with contractual provisions," such as its "ability to impose civil penalties upon out-of-state contractors," "it distinguishes itself from a truly private actor, which must rely on contractual remedies to remedy breaches."  *Id.* at 425–26.

In reaching this conclusion, the Third Circuit relied on the Ninth Circuit's decision in *Lockyer* as well as a Second Circuit decision in *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 438 F.3d 150 (2d Cir. 2006).  In *United Haulers*, the Second Circuit held that "[a] government entity acts as a market regulator when it employs tools in pursuit of compliance that no private actor could wield, such as the threat of civil fines, criminal fines and incarceration." *United Haulers*, 438 F.3d at 157.  Similarly, in *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751 (4th Cir. 2018), the Fourth Circuit held that the "criminal and civil sanctions" of various West Virginia laws, which limited the reimbursement rates of air ambulance companies, count "as action having the force and effect of law."  *Air Evac EMS*, 910 F.3d at 755, 769.  Because the terms of the deal did not reflect "agreements freely made, based on needs perceived by the contracting parties at the time," the court concluded that the market participant defense did not apply.  *Id.* at 768–69.

The City points out, however, that *United Haulers* and *Air Evac EMS* do not stand for the proposition that civil penalties alone preclude a market participant defense.  Likewise, *Lockyer* also does not stand for this proposition.  Nonetheless, the City has not cited any authority that suggests the threat of civil penalties is not enough to preclude the market participant defense. Docket No. 48 ("Reply MPSJ") at 4.  It also does not dispute the *ATA*'s central holding that the

1    use of coercive mechanisms that are not available to private parties constitute regulatory action.

2    As a result, the central question remains—whether the HAO uses any enforcement mechanisms

3    that are unavailable to private parties.

                          b.     <u>Whether the HAO Coerces Compliance Through Civil Penalties</u>

5         First, the parties dispute whether the HAO obligations are regulatory because they were

6    not voluntarily undertaken through contract negotiations and were instead imposed by legislation.

7    *See* Opp. MSJ at 17; Reply MSJ at 8.   Specifically, A4A asserts that the HAO has coercive

8    enforcement mechanisms because the City unilaterally imposed the following through legislation:

> "(i) charge a violator for any amounts that should have been paid
> into a HAP account, together with an onerous interest rate; (ii)
> assess penalties of $100 per week per employee; (iii) cancel any
> contract the City has with the employer; (iv) bar the employer from
> entering into any future contracts with the City for three years; and
> (v) institute a civil action against the employer, in which the
> prevailing party will be entitled to all costs and expenses."

13    S.F. Admin. Code §§ 12Q.5(f), 12Q.5.1.(4).   But as explained below, these are not coercive

14    mechanisms unilaterally imposed because A4A members voluntarily agreed to these requirements

15    when they chose to extend their LUAs for another two years.   *See infra* Part III.B.1.a; Reply MSJ

16    at 9; Bumen Decl. ¶ 12.   The City did not coerce A4A, or any airline, to agree to these terms.   The

17    airlines have the choice to do business elsewhere.   Reply MSJ at 9; Docket No. 42-2 ("Joint

18    Statement of Undisputed Facts") ¶ 4.   Though this fact is not necessarily determinative, it is

19    relevant—virtually every case finding regulatory conduct involves imposition of conditions by

20    legislative fiat, not by contract.   *See, e.g.*, *supra* Part III.A.2.a.

21         The alleged civil penalties here are functionally equivalent to ordinary commercial contract

22    terms wherein contract parties may agree to certain consequences for breach.   Opp. MPSJ at 7.

23    For example, that the City can charge "the Contracting Party for any amounts that the Contracting

24    Party should have paid to the City for hours worked . . . together with simple annual interest of

25    10%," S.F. Admin. Code § 12Q.5(f)(1), is equivalent to expectation damages, a normal

26    contractual remedy.   *Id.*   Expectation damages are intended "to give the injured party the benefit of

27    his bargain and insofar as possible to place him in the same position he would have been in had

28    the promisor performed the contract."   *Coughlin v. Blair*, 41 Cal. 2d 587, 603 (1953).   Contrary to

United States District Court
Northern District of California

A4A's argument, the 10% annual interest rate is not "onerous" but is "the default prejudgment interest rate for breach-of-contract claims under California law."  Opp. MPSJ at 7; *see* Cal. Civ. Code § 3289(b).  Similarly, the remedy of canceling the lease for a violation of the HCAO, S.F. Admin. Code § 12Q.5(f)(4), is another normal contractual remedy.  The LUAs state that an HCAO violation is a material breach, Bumen Decl., Ex. 1 § 1813(D), and under California law "[t]he general rule is that if the breach is a material breach, it may give grounds for the non-breaching party to cancel the contract."  *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1289 n.12 (9th Cir. 2009).  As for the debarment remedy, S.F. Admin. Code § 12Q.5(f)(5), courts have acknowledged that contractual parties have "as a further incentive to good performance, the implicit threat of refusing to renew the contract if performance is unsatisfactory."  *LAX*, 873 F.3d at 1091 (Tallman, J., dissenting) (quoting *Metro. Milwaukee Ass'n of Com. v. Milwaukee Cty.*, 431 F.3d 277, 280 (7th Cir. 2005)).  Any private party can decide not to do business with a breaching party.  And the City's ability to bring a civil action against the contracting party to pursue remedies where the "prevailing party shall be entitled to all costs and expenses, including reasonable attorney's fees" is also a common contractual remedy.  S.F. Admin. Code § 12Q.5(f)(6).  It is well-established that a private business can institute a civil action for a breach of contract and parties "may validly agree that the prevailing party will be awarded attorney fees incurred in any litigation between themselves, whether such litigation sounds in tort or in contract."  *Santisas v. Goodin*, 17 Cal. 4th 599, 608 (1998).  In sum, these provisions are ordinary contract remedies, not civil penalties.

Second, the parties dispute whether the Civil Option is itself a penalty.  Under the City Option, employers are required to pay $9.50 per employee per hour into an account established under Section 14.2 of the S.F. Administrative Code.  HAO § 3 (amending S.F. Admin. Code § 12Q.3(d)(2)).  The City asserts that the City Option is not a civil penalty but is equivalent to a valid alternative performance provision in a commercial contract, *i.e.*, the alternative to providing healthcare plans pursuant to the HAO requirements.  MSJ at 18.  A "true alternative performance" is "an alternative that provides a rational choice between two reasonable possibilities."  *Grand Prospect Partners, L.P. v. Ross Dress for Less, Inc.*, 232 Cal. App. 4th 1332, 1358 (2015).  A4A

United States District Court
Northern District of California

United States District Court
Northern District of California

1   contends that the City Option is not a true alternative to providing healthcare for their employees

2   because Chapter 14 of the S.F. Administrative Code does not permit airline employees to access

3   the payments that airlines make into the HAP accounts, the Medical Reimbursement Accounts

4   ("MRAs").  Opp. MSJ at 18.  Although the City does not dispute that A4A is correct under the

5   literal interpretation of Chapter 14, it persuasively demonstrates that the proper interpretation

6   when reading the HAO and Chapter 14 together is that airline employees can access the money in

7   the MRAs.  MSJ at 19.

8        In 2001, the City enacted the Health Care Accountability Ordinance ("HCAO"), codified

9   as Chapter 12Q of the San Francisco Administrative Code.  The HCAO requires City "Contracting

10  Parties" to offer adequate health benefits to their "Covered Employees" or make comparable

11  payments to the Department of Public Health ("DPH").  S.F. Admin. Code §§ 12Q.3(a)-(c).  The

12  Health Care Security Ordinance ("HCSO"), enacted five years later as Chapter 14 of the

13  Administrative Code, is a separate ordinance.  The HCSO obligates employers throughout the City

14  to make minimum hourly health care expenditures for their employees or exercise the City Option

15  and contribute to the City Fund for DPH to establish MRAs to reimburse HCSO-covered

16  employees for certain health care expenditures.  *See id.* §§ 14.2–14.3.  Because the benefits

17  required by the HCAO are more generous than those required by the HCSO, and "Contracting

18  Parties" covered by the HCAO do not contribute to the City Fund, the HCSO defined "Covered

19  Employee" to exclude "persons who are 'Covered Employees'" as that term is defined in the

20  HCAO "if the Employer meets the requirements set forth in Section 12Q.3 [*i.e.*, the HAO] for

21  those employees."  *Id.* § 14.1(b)(4).

22       In 2020, the enacted HAO amended the HCAO to carve out the employees already covered

23  by the Airport's QSP—defined as "San Francisco Airport Service Employees"—and insert a new

24  subsection "(d)" in Section 12Q.3 specifying the enhanced benefits the Airport Service Employees

25  must be offered.  *Id.* § 12Q.2.16.  Section 12Q.3(d) requires employers of Airport Service

26  Employees to either provide specified health insurance plans or exercise the City Option and

27  contribute to the City Fund on the employee's behalf in the same manner as an employer covered

28  by the HCSO.  *Id.* § 12Q.3(d).  As a result, under the literal interpretation of the HCSO, airport

employees whose employers contribute money to the MRAs under the HAO cannot access money from those accounts.  MPSJ at 8–9.

The City does not dispute this.  It admits that when the Board enacted the HAO, it did not amend the HCSO to provide explicitly that DPH is authorized to make payments to Airport Service Employees under Section 14.2(g).  MSJ at 19.  But this is the only reasonable way to interpret the HCSO.  This interpretation is consistent with the HAO's purpose to provide better healthcare access to Airport Service Employees.  *Id.*  Further, nothing in Section 14.2 purports to bar DPH from making payments from MRAs consistent with the HAO.  *Id.*  To bar employees from accessing MRAs would be an absurd result and "[i]t is well-settled that where two provisions of the law appear to conflict, reconciliation should be sought so as to give effect to both." *California Corr. Officers' Ass'n v. Bd. Of Admin.*, 76 Cal. App. 3d 786, 791 (1978).  It is clear that the City is in fact making payments to Airport Service Employees from the MRAs under the HAO.  Cao Decl. ¶¶ 5–6.  For example, two airlines that are members of A4A, FedEx Corporation and Hawaiian Airlines, have elected to comply with the HAO by exercising the City Option.  *Id.* ¶ 6.  DPH's financial records show that employees of these airlines along with at least 13 other employers have received medical reimbursements from their MRAs totaling more than $3 million. *Id.*  A4A asserts that because "DPH does not track whether City Option payments are made under the HCSO or the HAO," *id.*, there is no evidence that the City makes payments to the employees.  Opp. MSJ at 19.  A4A, however, does not produce any evidence that the City does *not* make such payments.  Thus, there is no genuine dispute that the City makes payments to employees from the MRAs under the HAO.  Accordingly, the City Option is not a civil penalty.

Third, the parties dispute whether the fines in the HCAO and QSP are "civil fines" or common contractual liquidated damages.  "California courts have defined [liquidated damages] as an amount of compensation to be paid in the event of a breach of contract, the sum of which is fixed and certain by agreement."  *Chodos v. W. Publ'g Co.*, 292 F.3d 992, 1002 (9th Cir. 2002).  "The amount set as liquidated damages must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained.  In the absence of such relationship, a contractual clause purporting to predetermine damages must be construed

1    as a penalty." *Ridgley v. Topa Thrift & Loan Ass'n*, 17 Cal. 4th 970, 977 (1998).

2            The HCAO allows the City to seek "liquidated damages of up to one hundred dollars

3    ($100) for each one-week pay period for each employee" for non-compliance.  S.F. Admin. Code

4    § 12Q.5.1(4).  This provision is found in the section titled "Additional Contract Requirements;

5    Liquidated Damages" and has been in the HCAO since it was first enacted in 2001.  *See id.*

6    Contrary to A4A's assertion, this requirement applies to the airlines through their LUAs and is

7    thus contractually based.  Bumen Decl., Ex. 2 at 84–85.  A4A asserts that the City has not shown

8    that this provision was reasonable and that the City cannot make such a showing because the

9    provision applies "regardless of the nature, size, scope, or timeframe of the given contract."  Opp.

10   MSJ at 19–20 (citing S.F. Admin. Code § 12Q.5.1).  But the LUAs also adopt the provision of the

11   HCAO stating that the prescribed liquidated damages are a reasonable estimate of the harm that

12   would be caused by violations of the HCAO.  Bumen Decl. ¶ 12 & Ex. 1 § 1813.  Moreover, "if in

13   particular circumstances, the imposition of prescribed liquidated damages would be penal, the

14   clause will not be enforced—and that [is] why it is not a penalty."  Reply MSJ at 11.  The City and

15   the airlines were free to argue that imposing liquidated damages would be reasonable or

16   unreasonable, just as parties to private commercial contracts with similar terms are free to do so.

17   *See ATA*, 569 U.S. at 650.

18           Similarly, the challenged QSP remedies provision is also a liquidated damages provision.

19   The provision is titled "Fines" and states, "If a Covered Employer defaults with respect to any

20   requirement of the Program, the Airport Director may elect to impose a fine equal to $1,000 per

21   violation / employee, per day."  Docket No. 41-5 at 84.  A4A asserts that these are "civil fines"

22   and not liquidated damages because liquidated damages must be "fixed and certain by agreement,"

23   *Chodos*, 292 F.3d at 1002, and here the provision states that "[s]uch fine amount may be increased

24   from time to time at the discretion of the Airport Director."  Docket No. 41-5 at 84.  But again, the

25   airlines voluntarily agreed to this term in their 2011 and 2021 LUAs when it agreed to comply

26   with the QSP and its remedies.  Bumen Decl., Ex. 1, § 1001; *id.* Ex. 2; *see infra* Part III.B.1.a.

27   And they have never challenged this provision.  Bumen Decl. ¶ 13.  As with the HCAO provision,

28   A4A's argument that this term is a penalty and not liquidated damages "can be raised in a

20

challenge to a civil enforcement action" and if A4A succeeds the provision will not be enforced.[6] Reply MSJ at 9.  Like any other contractual provision establishing liquidated damages, amounts assessed are subject to challenge as unreasonable.  *Cf. United States v. O. G. Innes Corp.*, 203 F. Supp. 60, 62 (S.D.N.Y. 1962) ("[e]ven were the liquidated damage provisions here in question held to impose a penalty, as the defendant contends, the defendant is not entitled to a dismissal; in that circumstance the court would refuse to enforce it as invalid and relegate the plaintiff to a claim for its actual damage. The essential nature of the claim would still remain one for the recovery of damages flowing from a breach of contract.").

Accordingly, the Court concludes that the HAO does not contain any coercive mechanisms that is unique to government acting in a regulatory factor, and thus a market participant defense is not precluded thereby.

B.     Whether the City Acted as a Market Participant

A4A asserts that the City's market participant defense separately fails because the City does not satisfy its burden under the two-prong test, first articulated in *Cardinal Towing*, which determines whether a state or local government is acting as a market participant or as a regulator. MPSJ at 17.  The first question under *Cardinal Towing* is, was the challenged governmental action "undertaken in pursuit of the efficient procurement of needed goods and services, as one might expect of a private business in the same situation?"  *LAX*, 873 F.3d at 1080 (internal quotation marks omitted).  The second question is, "does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than [to] address a specific proprietary problem?"  *Id.* (internal quotation marks omitted).  "If the answer to either question is 'yes,' the governmental entity is acting as a market participant." *Id.*  When the government seeks to apply the market participant defense to preemption, it bears the burden of showing the exception applies.  *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1024 (9th Cir. 2010).

The City contends that the HAO is intended to further increase the safety and efficiency of

---

[6] A4A does not assert that the liquidated damages of $1,000 per employee per day are unreasonable.  Reply MSJ at 10.

United States District Court
Northern District of California

United States District Court
Northern District of California

the Airport by expanding Covered Employees' access to health benefits to reduce employee turnover by recruiting and retaining high-quality employees.  HAO § 2(e); *see also* HAO § 2(c) (relying on a finding in Docket No. 41-2 ("Aspilla Decl.") ¶ 7 & Ex. 1 (a report by the Labor Center at the University of California, Berkeley entitled "The Impact of Wages and Turnover on Security and Safety in Airport:  A Review of the Literature")).  The HAO would also help restore public confidence in the safety of air travel because access to adequate healthcare is key to reducing the spread of infectious disease and maintaining a healthy workforce.  HAO § 2(h),(k); Kone Decl. ¶¶ 7–8.  According to the City, these purposes further its proprietary interest in the commercial success of the Airport.  MSJ at 10.  "If airport operations are disrupted or made inefficient through high rates of turnover among employees of companies operating at the Airport, or if the public loses confidence in the safety of air travel, SFO will attract fewer passengers and lose all of the revenues they would have generated."  *Id.* at 10–11.  A4A asserts that the City did not act as a market participant when it enacted the HAO, but for the following reasons, the City satisfies its burden under the *Cardinal Towing* test.

### 1.   Efficient Procurement of Goods and Services

The first prong of the *Cardinal Towing* test asks whether the City enacted the HAO "in pursuit of the efficient procurement of needed goods and services, as one might expect of a private business in the same situation."  *LAX*, 873 F.3d at 1080 (internal quotation marks omitted).  A4A asserts that the City fails to meet its burden because it imposed the HAO through legislation, a mechanism that is unavailable to private parties, and the City did not pursue a proprietary interest in enacting the HAO.  MPSJ at 18; Reply MPSJ at 10.

### a.   Whether the City Used Proper Means to Enact the HAO

The HAO has "the force and effect of law" if it "refe[rs] to binding standards of conduct that operate irrespective of any private agreement."  *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 282 (2014).  A4A argues that because "the City imposed on the airlines—in the middle of their lease agreements—new terms that the airlines vehemently opposed and to which they did not agree," the HAO has the force and effect of law.  Reply MPSJ at 9.

However, the HAO's requirement that companies offer employees certain minimum health

benefits is a requirement that a private airport operator could impose on its business partners through a contract term, similar to the labor peace agreements in *LAX* and the pre-hire agreements in *Boston Harbor*.  MSJ at 12.  In *LAX*, the Ninth Circuit reviewed Los Angeles's licenses with third-party businesses that imposed certain contractual conditions, such as requiring service providers to enter a labor peace agreement with any employee organization that requested one.[7] *LAX*, 873 F.3d at 1077.  The labor peace agreement required "binding and enforceable provisions that prohibit picketing, boycotting, stopping work, or any other economic interference."  *Id.* (internal quotation marks omitted).  The Ninth Circuit concluded that Los Angeles was acting as a market participant under the first prong of the *Cardinal Towing* test when it added this contractional condition because "[i]f a private entity operated LAX, that entity would have a pressing interest in avoiding strikes, picket lines, boycotts, and work stoppages."  *Id.* at 1080.  And "[t]hose interests are not any less pressing simply because the City rather than a private business operates the airport . . . ."  *Id.*

The court rejected the plaintiffs' argument that Los Angeles had "not directly participated in the market and has instead dictated contract terms to others who do" and found instead that the city does "participate directly in a market for goods and services" because airports "are commercial establishments . . . [that] must provide services attractive to the marketplace" and therefore the city is a "proprietor of a commercial enterprise."  *Id.* at 1081.  It recognized that "[i]f the City operates the airport poorly, fewer passengers will choose to fly into and out of LAX, fewer airlines will operate from LAX, and the City's business will suffer."  *Id.*  The court observed that because airports are becoming increasingly privatized internationally, they compete with private modes of transportation such as cars, trains, or buses, and the "Supreme Court and other federal appellate courts have recognized the inherently competitive and commercial nature of

---

[7] The City requests that the Court take judicial notice of excerpts from A4A's affirmative brief in *LAX*.  Docket No. 44-1.  A4A does not oppose.  A4A also requests that the Court take judicial notice of the United States' amicus curiae brief in *Airline Service Providers Ass'n v. Los Angeles World Airports*, No. 17-1183, before the Supreme Court.  Docket No. 42-4.  The Supreme Court denied review.  *See Airline Serv. Providers Ass'n v. Los Angeles World Airports*, 139 S. Ct. 2740 (2019).  The City does not oppose.  Because these briefs are matters of the public record, the Court **GRANTS** these requests for judicial notice.  *See* Fed. R. Evid. 201(b).

airport operations."[8]  *Id.* at 1081–82.  Likewise, in this case, the City contends that the HAO "is no more unilateral than the standardized terms of the airport license agreements found to be proprietary in *LAX*."  Opp. MPSJ at 11.  As in *LAX*, the City has a proprietary interest in the commercial success of the Airport and to further that interest, it enacted the HAO in order to reduce employee turnover and restore public confidence in the safety of air travel.  MSJ at 11.  It should be noted that the HAO follows a history of the City's efforts to ensure effective and efficient operation of SFO via the QSP introduced in 1999 and the HCAO in 2009.

In *Boston Harbor*, the Supreme Court held that a state agency acted as a market participant when it required the winning contractor for its harbor cleanup project to agree to a labor agreement that included "union recognition, compulsory union dues or equivalents, and mandatory use of union hiring halls, prior to the hiring of any employees."  *Boston Harbor*, 507 U.S. at 230.  The Court concluded that the state agency acted as a private party because "[t]o the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity *as purchaser* should be permitted to do the same."  *Id.* at 231 (emphasis in original).  The Court also emphasized that contractors "who do not normally enter such [prehire] agreements are faced with" the same choice as they would have with a private purchaser:  "[t]hey may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a project labor agreement."  *Id.*  The same reasoning applies here.  Because the airlines have the choice they would have with a private entity—to not conduct business at the Airport if they do not agree with the HAO—the City is a market participant.  Opp. MPSJ at 11–12.

A4A asserts that these cases are distinguishable because they concern contracts and not legislation like the HAO.  Specifically, because "the City imposed on the airlines—in the middle of their lease agreements—new terms that the airlines vehemently opposed and to which they did not agree," the HAO did not give A4A the same choice it would have had it contracted with a private party.  Reply MPSJ at 9.

---

[8] The Ninth Circuit's reasoning in *LAX* directly refutes A4A's argument that because the City owns SFO "the City necessarily acts in a way no private party ever could."  MPSJ at 24.

United States District Court
Northern District of California

United States District Court
Northern District of California

To the contrary, courts have applied the market participant defense to legislation. In *Cardinal Towing & Auto Repair, Inc. v. City of Bedford, Tex.*, 180 F.3d 686 (5th Cir. 1999), the city of Bedford passed an ordinance directing that the city's non-consensual police tows be handled by the sole recipient who had contracted with the city. *Cardinal*, 180 F.3d at 689. The Fifth Circuit concluded that under the first prong, the "ordinance and contract specifications had an obvious connection to the City's narrow proprietary interest in its own efficient procurement of services"—"[s]electing a single company to perform the City's tows clarified responsibility, minimized administrative confusion, and allowed for the setting and easy supervision of a unitary quality standard for that particular work for the City." *Id.* at 693. The court held that the city was not "doing anything else other than setting specifications that would insure the efficient performance of the contract with the City for City police tows," such as advancing general societal goals. *Id.*

In a factually similar case, *Allied Constr. Indus. v. City of Cincinnati*, 879 F.3d 215 (6th Cir. 2018), Cincinnati enacted an ordinance "to provide guidelines for selecting the 'lowest and best bidders' on certain projects of the 'Department of Sewers.'" *Allied Constr.*, 879 F.3d at 217. "The Ordinance's preamble noted that it was enacted, in part, to 'ensure efficient use of taxpayer dollars, minimize waste, and promote worker safety and fair treatment of workers.'" *Id.* The ordinance listed fifteen factors to consider, two of which were challenged: whether the bidder contributes to their employees' healthcare and retirement funds. *Id.* at 218, 222. The Sixth Circuit found persuasive the city's evidence "that many private parties utilize criteria similar to those that the City used in the Ordinance," *e.g.*, "certain standards for labor safety, training, and wages." *Id.* at 222. The court held that a "municipality might reasonably conclude that a contractor who provides these benefits is less likely to experience significant employee turnover, improving the stability and overall quality of a project" and that this was "consistent with the City's stated goal to find contractors who are committed to the City's 'safety, quality, time, and budgetary concerns.'" *Id.*

In reaching this conclusion, the court rejected the plaintiff's argument "that the inclusion of these project demands in a bidding ordinance, rather than through individual piecemeal

agreements [*e.g.*, contracts], transforms the action from proprietary to regulatory." *Id.* at 223.  It explained that "[f]or the purposes of the market-participant doctrine, this is a distinction without a difference.  Regardless of whether the preference is embodied in a bidding ordinance or an after-bid agreement, the City is acting as would a private party by seeking a contractor that meets certain specifications, aimed towards the efficient procurement of its own goods and services." *Id.* (citation omitted).  As in *Boston Harbor*, the court noted that "contractors opposed to these Ordinance specifications have a choice:  they may alter their usual mode of operation or seek business elsewhere by declining to bid on these particular City projects." *Id.*

A4A maintains that these cases are distinguishable because the City "did not offer, and the airlines did not agree to, any terms" and instead the "City simply enacted the HAO, imposing extracontractual requirements using its police powers."  Reply MPSJ at 9.  For example, in *GSW, Inc. v. Long Cty., Ga.*, 999 F.2d 1508 (11th Cir. 1993), the Eleventh Circuit declined to apply the market participant defense to a county who had passed an ordinance changing the contractual terms after the contract had been agreed to.  *GSW*, 999 F.2d at 1514–15.  The county had entered into an agreement with a waste disposal facility that did not have any geographic restrictions on the origin of the waste and authorized the company to accept waste from outside of the county.  *Id.* at 1510.  Afterwards, the county passed a resolution limiting the transportation of refuse to waste generated within 150 miles of the county.  *Id.*  The county sought assurances from the company to, among other things, limit the origin of the waste in accordance with the resolution, but the company refused.  *Id.*  The county viewed the company's response as a material breach and rescinded its contract.  *Id.*

The Eleventh Circuit held that the county did not act as a market participant because it "did not impose its restriction during the bargaining process before the contract was signed." *Id.* at 1514.  Because the company "was subject to an alleged resolution and to a series of demands imposed after the contract" and "at that point, it could not decline to participate without losing its investment and the amount it had paid for the rights under the contract," the county acted as a regulator.  *Id.* at 1515.  As the City points out, the *GSW* court distinguished *White v. Massachusetts Council of Construction Employees*, 460 U.S. 204 (1983), where the Supreme

26

Court had applied the market participant defense to a challenged executive order that required at least half of the workforce used to complete all construction projects funded in whole or part by city funds must be comprised of city residents. *Id.*; *see White*, 460 U.S. at 1043. The *GSW* court distinguished *White*, because in *White*, the city order "included the workforce restriction in the city's notice for bids, so the contracting company was aware of the condition if it decided to bid and could elect not to participate in a sale under that requirement." *GSW*, 999 F.2d at 1515.

The first *Cardinal* prong analysis therefore turns in part on whether A4A had the same choice that a private party would have had when the HAO went into effect. *See* MPSJ at 18; Opp. MPSJ at 12. A4A asserts that the City "enacted the HAO in the middle of the airlines' 10-year lease agreements with the Airport," thereby forcing the airlines to comply with the HAO "irrespective of any private agreement" they had with the City or with their own workers. Reply MPSJ at 9.[9] A4A's factual assertion is off point. Although the City enacted the HAO in November 2020, it did not go into effect until March 21, 2021. *Before* the HAO went into effect, on March 19, 2021, A4A and other airlines agreed to modify their prior LUAs, extending the contract term until 2023 and reserving the right to challenge the HAO on legal grounds. Docket No. 42-3. The LUAs include a provision where the contracting airlines agrees to comply with the HCAO and its future amendments, *e.g.*, the HAO. Bumen Decl., Ex. 1 § 1813(A) ("Unless exempt, Airline agrees to comply fully with and be bound by all of the provisions of the Health Care Accountability Ordinance (HCAO), as set forth in San Francisco Administrative Code

---

[9] A4A emphasizes the fact that the City and not the Commission enacted the HAO, to assert that the conduct is regulatory. MPSJ at 18. It asserts that "if the Airport had any meaningful involvement, the HAO likely would not have passed, because Airport personnel, including the Airport Director, pushed back against the law, noting the substantial costs it would impose on the Airport and SFO employers" and "questioning whether it was 'the right time' for the HAO, given the ongoing COVID-19 pandemic." MPSJ at 18. Although the Airport Director raised proprietary concerns about the timing of the HAO and its potential impact on the costs of doing business at SFO, he supported the family coverage that the HAO would require. *See* Docket No. 42-3 ("Faigen Decl."), Exs. C & J. "There is no evidence that the Airport Director actually opposed the HAO or that he was authorized by the Airport Commission to do so." Opp. MPSJ at 4. Moreover, the City is the entity that owns and operates the Airport. More to the point, the specific public legislative body generating the requirements at issue is irrelevant as "the conduct being regulated . . . is the proper focus of concern." *Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 289 (1986); *see also Big Country Foods*, 952 F.2d at 1179 (state statute governing subdivisions' procurement practices was proprietary).

1    Chapter 12Q, including the remedies provided, and implementing regulations, as the same may be

2    amended from time to time.").  The airlines could have refused to extend the LUAs if they did not

3    want to risk being subjected to the HAO.  Before the LUAs extension, A4A and the other airlines

4    were aware of the HAO and the LUA provision that requires them to comply with the HAO.

5    Thus, by agreeing to extend their LUAs, they voluntarily agreed to comply with the HAO even

6    though they had the choice to "seek business elsewhere." *Allied Constr.*, 879 F.3d at 223.

7    Consequently, the HAO does not have the force and effect of law because it does not constitute

8    "binding standards of conduct that operate irrespective of any private agreement." *Ginsberg*, 572

9    U.S. at 282.  Instead, it applied as a result of an agreement.

10                           b.      Whether the City Acted to Advance a Specific Proprietary Purpose

11            The next question is whether the City pursued a proprietary interest in enacting the HAO.

12   A4A asserts that the City enacted the HAO as a public-health measure to promote the general

13   welfare instead of to address a specific proprietary problem.  Reply MPSJ at 10.  The City,

14   however, enacted the HAO to increase the safety and efficiency of the Airport by expanding

15   access to health benefits to reduce employee turnover, HAO § 2(e), and to restore public

16   confidence in the safety of air travel, HAO § 2(h),(k).  Both of these purposes are necessary for the

17   City's administration of a self-sustaining commercial enterprise, SFO.  Opp. MPSJ at 14 n.6.

18            A4A first misinterprets the language of the HAO.  It emphasizes the single, uncodified

19   sentence at the end of the 2021 ordinance amending the HAO, which states that "[i]n undertaking

20   the adoption and enforcement of this [amending] ordinance, the City is undertaking only to

21   promote the general welfare."  Amended HAO at 5.  The City explains that this boilerplate

22   language is "often included in City enactments to make clear that they do not create 'mandatory'

23   duties that could create third-party beneficiaries empowered to sue the City for failure to ensure

24   compliance with the ordinance's terms."  Opp. MPSJ at 13; MSJ at 11 n.10.  Moreover, the

25   language did not appear in the original 2020 Ordinance, HAO § 3 and thus supports the City's

26   contention that this single sentence does not undermine the thrust of HAO and its original

27   findings.  Opp. MPSJ at 13.

28            A4A also cherry picks certain sections of the HAO to assert that the City enacted the HAO

United States District Court
Northern District of California

28

to address "escalating health care costs" for those who have been "disproportionately impacted by COVID-19" and not to address a specific proprietary problem. *See* HAO §§ 2(g), (j).  When the HAO's findings are read in their full context, however, its proprietary intent is made clear. Historically, the City used the QSP's "compensation and benefit standards to assist in the recruitment of high-quality employees and the reduction of employee turnover" among specific groups of employees who can affect airport safety and security.  A4A has never asserted the QSP was not established out of the City's concerns as proprietor of SFO.  HAO §§ 2(c)-(d).  By 2020, due in part to "escalating health care costs," the QSP became insufficient for some covered employees and with the COVID-19 pandemic, providing adequate healthcare access became essential to reduce employee turnover and restore public confidence in air travel.  *Id.* § 2(e)-(k). While conditions changed, the core purpose and function of the QSP—and then as amended by the HAO—remained the same.

Second, A4A argues the City's response to a single interrogatory proves the City was "performing its prototypical regulatory role."  MPSJ at 24–25.  The interrogatory sought the City's "purpose(s) or motivation(s) for enacting the Health Airport Ordinance"  MPSJ at 20.  The City declined to offer the views of individual members of the Board but did not withhold any documents on the basis of legislative privilege.  Docket No. 42-3 ("Faigen Decl."), Ex. X at 4–5; Docket No. 45 ("Lee Decl.") ¶¶ 7–8.

A4A relies on *Kaahumanu v. County of Maui*, 315 F.3d 1215 (9th Cir. 2003), where the Ninth Circuit determined whether county council members could invoke legislative immunity.  In its analysis, the court explained that "an action is legislative by considering four factors: (1) whether the act involves ad hoc decision-making, or the formulation of policy; (2) whether the act applies to a few individuals or to the public at large; (3) whether the act is formally legislative in character; and (4) bears all the hallmarks of traditional legislation."  *Kaahumanu*, 315 F.3d at 1220 (internal quotation marks omitted).  A4A asserts that by invoking legislative privilege, the City conceded that it acted in its regulatory capacity.  MPSJ at 20.  But *Kaahumanu* does not discuss the distinction between regulatory legislation from proprietary enactments; it only discussed the distinction between legislation and administrative or executive acts.  *Kaahumanu*, 315 F.3d at

1219.  Moreover, there is no dispute that the HAO is legislation and as established above,

legislation can be proprietary.  *See, e.g.*, *Cardinal*, 180 F.3d at 689 (holding that a city ordinance

was proprietary); *Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist.*, 952 F.3d 1173,

1175, 1179 (9th Cir. 1989) (holding state procurement statute was proprietary).

Third, A4A asserts that the City has adduced no *evidence* to carry its burden that it enacted

the HAO to address a specific proprietary problem.  MPSJ at 20–21.  It points out that "[f]rom

more than 30,000 pages the City produced, not one document even remotely suggests that the City

enacted the HAO to further the proprietary interests it identifies in its Motion."  *Id.* at 21.  It

emphasizes that "[e]ven the declarations the City submitted with its Motion do not support its

argument because no one can say under penalty of perjury that the City had any proprietary

interests in mind when it passed the HAO."  *Id.*  According to A4A, the HAO is a "politically

expedient legislation designed to benefit a certain class of employees and further the general

welfare."  *Id.*  It emphasizes that "the labor unions who benefit from the HAO wrote both the

legislation and its purported findings."  *Id.* at 22 (citing Docket No. 42-3 at 66 ("Ex. O"); *id.* at 68

("Ex. P"); *id.* at 70 ("Ex. Q") (emails from labor unions showing that they helped to draft the

findings)).

But, in preemption cases, courts "look[] primarily to the objective purpose clear on the face

of the enactment, not to allegations about individual officials' motivations in adopting the policy."

*Bldg. Indus. Elec. Contractors Ass'n v. City of New York* ("*BIECA*"), 678 F.3d 184, 191 (2d Cir.

2012); *see also LAX*, 874 F.3d at 1089 n.1 (Tallman, J., dissenting) ("To be clear, examining a

challenged policy's purpose does not involve an investigation into policymakers' 'subjective

reasons for adopting a regulation or agreement'") (quoting *Johnson*, 623 F.3d at 1026).  Courts

"will not search for an impermissible motive where a permissible purpose is apparent . . . ."

*BIECA*, 678 F.3d at 191 (collecting cases).  The Ninth Circuit has also rejected the same argument

that A4A makes here—that the fact that labor unions lobbied for the provision at issue

demonstrates a pro-union motivation for its adoption—and held that "such motive does not matter

to the preemption analysis."  *LAX*, 873 F.3d at 1082 n.7.  As established above, the City has

demonstrated how the HAO has a permissible proprietary purpose based on the HAO's findings,

United States District Court
Northern District of California

30

1    its operation, and its reference to existing legislation.  Reply MSJ at 13.

2          Moreover, none of the cases on which A4A relies to show that courts looked at "record

3    evidence" when evaluating a market participant defense, suggests that the Court should demand

4    evidence from the City to support its policy.  *See Cardinal Towing*, 180 F.3d at 694 (examining

5    only the ordinance and the city's contract specifications in determining that they had an "obvious

6    connection to the City's narrow proprietary interest."); *see Olympic Pipe Line v. City of Seattle*,

7    437 F.3d 872, 874–76, 881–82 (9th Cir. 2006) (not examining the government decisionmakers'

8    subjective intent but looking to terms of proposed franchise agreement, history of pipeline

9    operations, and city's course of dealing with pipeline operator); *Associated Builders &*

10   *Contractors, Inc. v. City of Seward*, 966 F.2d 492, 493–98 (9th Cir. 1992) (examining the course

11   of government's labor negotiations); *Boston Harbor*, 507 U.S. at 220–24, 232 (examining the

12   government's thought only for the fact that the state agency "acted on the advice of" its outside

13   project manager).

14         The Court concludes that the City satisfied its burden in showing that it acted as a market

15   participant under the first prong of the *Cardinal Towing* test.

16         2.    <u>Narrow Scope</u>

17         Turning to the other independent basis for determining that the City acted as a market

18   participant, courts ask under prong two of the *Cardinal Towing* test, "does the narrow scope of the

19   challenged action defeat an inference that its primary goal was to encourage a general policy

20   rather than [to] address a specific proprietary problem?"  *LAX*, 873 F.3d at 1080 (internal

21   quotation marks omitted).  The market-participant "doctrine is not carte blanche to impose any

22   conditions that the State has the economic power to dictate, and does not validate any requirement

23   merely because the State imposes it upon someone with whom it is in contractual privity."

24   *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 97 (1984).  "A state does not act within the

25   market participant exception when its actions significantly affect markets other than the market in

26   which it is a participant by imposing conditions on parties with whom it contracts."  *United*

27   *Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 625 (5th Cir. 2010).  In short, the reach of the

28   legislation or policy at issue indicates whether it is in fact tailored to the City's proprietary intent.

United States District Court
Northern District of California

United States District Court
Northern District of California

A4A asserts that the City cannot satisfy the second prong of the *Cardinal Towing* test because it did not narrowly pursue a proprietary objective.  MPSJ at 19.  As established above, the City pursued the following proprietary interest when enacting the HAO—the "efficiency, security, and public confidence in air travel by increasing hiring standards and reducing turnover and absenteeism among employees that can affect safety and security at the Airport."  Opp. MPSJ at 13; *see supra* Part III.B.1.b.  The City contends that the HAO, like the labor peace provision in *LAX*, is narrowly tied to a specific proprietary problem because it does not apply to all of the City's contractual relationships, does not announce a broad regulatory policy, and does not have spillover effects outside of the airport.  MSJ at 12 (citing *LAX*, 873 F.3d at 1082–83).  The Ninth Circuit in *LAX* held that the decision to adopt the labor peace agreement term was narrowly tied to a specific proprietary problem:  "service disruptions at LAX, which the City manages as proprietor."  *LAX*, 873 F.3d at 1082.  The court pointed out that nothing in the text of the provision or in the allegations suggest that the provision "will be enforced throughout the rest of the City's jurisdiction" or "will hamper service providers' operations elsewhere."  *Id.*  "Rather, the nature of the businesses at issue—services performed at LAX—by definition allows for natural divisions between work for the City and work for private parties:  A job is either performed at LAX or it is not, and a strike or other disruption either occurs at LAX or it does not."  *Id.* at 1083.

Similarly, the HAO does not apply to all City contracts but only applies to employers that provide services to the Airport.  HAO § 3.  In fact, it does not even apply to all airport employees but only to those who have been defined as "Covered Employees" under the QSP, approximately 35–40% of the private employees providing services to the Airport.  *Id.*; *see also* Aspilla Decl. ¶ 4.  Further, the HAO does not have spillover effects outside the Airport because it applies only to employees whose work is directly connected to SFO operations.  The narrow focus of the HAO demonstrates that it is not a broad regulatory policy.

A4A challenges these arguments on three grounds.  It first asserts that "the HAO does little, if anything, to protect the traveling public."  *Id.*  According to A4A, providing no-cost health insurance to airport workers and their dependents does not protect or restore the confidence of the traveling public as it "does not require vaccination, mask-wearing, or any kind of cleaning or air

32

purification" in protecting the public from COVID-19.  *Id.* at 22.  In other words, contrary to the government action in *LAX*, the purposes of the HAO "could be achieved by other means," which suggests that the preventing the spread of COVID-19 is not the objective of the HAO.  *LAX*, 874 F.3d at 1083.  But the purpose of the HAO is not solely to prevent the spread of COVID-19 but to enhance the safety and security at the airport as well as restore public confidence in air travel.  Moreover, providing healthcare to airline workers' relatives and dependents furthers the City's proprietary interest because if employees have better benefits, there will be reduced turnover, which will enhance the safety and security of the airport.[10]  Moreover, it can hardly be disputed that assuring critical airport workers and their families have access to quality health care (including testing, treatment, and vaccinations) can help prevent to spread of COVID-19 at SFO and enhance the safety of the thousands of passengers who pass through each day.

A4A also asserts that the HAO is both overinclusive and underinclusive and therefore the City's failure to apply the HAO's requirements "uniformly" shows that the HAO pursues a regulatory goal.  Opp. MSJ at 24.  For example, the HAO purports to narrowly target the employees related to the "safety and security at the Airport" but it does not apply to concessionaries, police officers, or firefighters.  *Id.*  The HAO also purports to restore public confidence in the safety of air travel but it applies to workers whose primary job duties do not involve interacting with the traveling public, such as mechanics and baggage handlers.  *Id.*  A4A argues that the only way to understand this overinclusivity and underinclusivity is to acknowledge that the unions dictated the HAO's scope without regard to the City's purported proprietary concerns.  *Id.*; Docket No. 42-3 at 68 ("Ex. P") (email from labor union stating "with regard to the definition of San Francisco Airport Service Employees, our primary goal was to ensure that all workers in the Unite HERE and SEIU-USWW bargaining units are covered.  That is why we both

---

[10] A4A also asserts that "if San Francisco forces airlines to provide free healthcare to union workers at SFO, with no option to waive or contract around that requirement then . . . the union workers at every other airport will have to pay more in healthcare premiums to compensate for the shortfall."  Opp. MSJ at 25 (citing a sample nationwide collective bargaining agreement that set healthcare cost-sharing limits on an aggregate, nationwide basis).  But the document that A4A cites is unauthenticated and does not justify a finding that the HAO "forces non-SFO union workers to subsidize SFO workers' free healthcare," *id*.  Reply MSJ at 1 n.2.

1    referenced the QSP and included a list of covered vocations.").

2         The underinclusiveness of the HAO supports the City's argument, however, because the

3    second *Cardinal Towing* inquiry addresses "[c]oncerns about overbreadth," not

4    underinclusiveness.  *LAX*, 875 F.3d at 1084.  The narrow focus of the HAO shows that it is

5    tailored to a specific proprietary problem.[11]  A4A's overbreadth argument also fails because it

6    selectively reads the HAO's intent to only be restoring public confidence in air travel.  In fact,

7    HAO's purpose is also to improve the safety, security, and efficiency of SFO by retaining

8    high-quality employees, such as mechanics and baggage handlers.  Opp. MPSJ at 17.

9    Furthermore, even if A4A could demonstrate some imperfection in the fit between the HAO's

10   methods and its goals, "evidence that an alternative strategy could more effectively or cheaply

11   accomplish the same goals 'bears only on whether [a state or local government] made a good

12   business decision, not on whether it was pursuing regulatory, as opposed to proprietary goals."

13   *LAX*, 873 F.3d at 1084.

14        Accordingly, the Court concludes that the City has satisfied its burden in proving that it

15   acted as a market participant when it enacted the HAO under the second prong of the *Cardinal*

16   *Towing* test.

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25

26   _____

27   [11] The City pursues its proprietary interest in the safety and security of the Airport by
     accommodating these employees through other means as well.  A4A does not dispute that the City
     directly controls the pay and benefits of police and firefighters through more direct means.  Docket
     No. 46 ("Ruckelshausen Decl.") ¶ 6.  And for concessionaries, the food, beverages, and goods that
28   they sell are subject to TSA-regulated security protocols.  *Id.* ¶ 5.

United States District Court
Northern District of California

**IV.    CONCLUSION**

For the reasons explained above, the Court **GRANTS** the City's motion for summary judgment and **DENIES** A4A's motion for partial summary judgment.

This order disposes of Docket Nos. 41 and 42.  The Clerk of Court is instructed to enter Judgment and close the case.


**IT IS SO ORDERED**.


Dated: April 5, 2022

_____
EDWARD M. CHEN
United States District Judge