UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AIRLINES FOR AMERICA,<br><br>Plaintiffs,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>Defendants. | Case No.  21-cv-02341-EMC<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS**<br><br>Docket No. 76 |

## I.     INTRODUCTION

Plaintiff Airlines for America ("A4A") filed this action against Defendant City and County of San Francisco (the "City") alleging that San Francisco's Healthy Airport Ordinance ("HAO") is preempted by three federal statutes and that the HAO violates the Contracts Clauses of the state and federal constitutions. Dkt. 1 ("Complaint" or "Compl."). A4A is a trade organization whose member airlines include Alaska Airlines, Inc.; American Airlines, Inc.; Delta Air Lines, Inc.; FedEx Corporation; Hawaiian Airlines, Inc.; JetBlue Airways Corp.; Southwest Airlines Co.; and United Airlines, Inc. *Id.* ¶ 17. The HAO requires airlines at San Francisco International Airport ("SFO" or "Airport") to "either provide [certain employees] with minimum health benefits, or pay money on behalf of those workers to a City-administered health care reimbursement fund (the "City Option" or "City Fund")." Dkt. 76 at 2.

Now pending before the Court is the City's partial motion to dismiss three of A4A's claims and A4A's request for monetary relief for lack of associational standing. Dkt. 76 (Defendant's Partial Mot. to Dismiss). The three A4A claims at issue include alleged preemption by the

Employee Retirement Income Security Act of 1974 ("ERISA"), violation of the Contracts Clause of the United States Constitution, and violation of the Contracts Clause of the California Constitution. Dkt. 1. For the following reasons, the Court **DENIES** the City's partial motion to dismiss.

## II.   BACKGROUND

### A.   Factual Background

The City owns and operates San Francisco International Airport ("SFO" or the "Airport"). In 1970, San Francisco created the San Francisco Airport Commission ("Commission") to operate and oversee SFO. Compl. ¶ 45; Dkt. 24 ("Answer") ¶ 45. The Commission is in "charge of the construction, management, supervision, maintenance, extension, operation, use and control of all property, as well as the real, personal and financial assets which are under the Commission's jurisdiction." S.F. Charter § 4.115. The City manages SFO as a self-sustaining enterprise fund department and the City's taxpayers do not fund the airport. Dkt. 41-4 ("Kone Decl.") ¶ 9. SFO competes with Oakland International Airport and San Jose International Airport for domestic service in the Bay Area. Dkt. 41-3 ("Bumen Decl.") ¶ 5.

In 1999, the City introduced the Quality Standards Program ("QSP") at SFO, which establishes contractual requirements for employers at the Airport, including minimum hiring and compensation standards for certain covered employees providing services to the Airport. Dkt. 41-5 ("Ogletree Decl.") ¶ 3 & Ex. 1. Under the QSP, "Covered Employees" are defined as employees who: (1) "require the issuance of an Airport badge with Airfield Operations Area ("AOA") access and work in and around the AOA in the performance of their duties"; or (2) "are directly involved in passenger and facility security and/or safety, including but not limited to checkpoint screening, passenger check-in, skycap and baggage check-in and handling services, custodial services, and AOA perimeter control." *Id.*, Ex. 5 at 82. Since 1999, the QSP has expanded to cover various airline employees, and its requirements have also expanded to include specified standards for safety, health, hiring, training, equipment, compensation, and benefits for Covered Employees. *See id.*, Exs. 2, 4, & 5. In 2009, the City amended the QSP to incorporate the City's Health Care Accountability Ordinance ("HCAO"), set forth in San Francisco Administrative Code Chapter

12Q, which requires employers to offer to their Covered Employees certain minimum medical insurance coverage. *Id*., Ex. 3 at 54.

In 2010, the City, through the Commission, entered into two-dozen Lease and Use Agreements ("LUAs") for ten-year terms starting in 2011 ("2011 LUAs") with different airlines, including all of the members of A4A. Answer ¶ 47. These LUAs obligate each signatory airline to pay substantial amounts to SFO for their use of terminal and airfield facilities and in turn it obligates the City to manage and operate the Airport to use "commercially reasonable efforts" to maximize non-airline revenues. Kone Decl. ¶¶ 5, 6. When each of the member airlines entered into their new LUAs effective July 1, 2011, they agreed to comply with SFO's Rules and Regulations, which included the QSP and the HCAO. Bumen Decl. ¶ 13 & Ex. 1 § 1001. Importantly, the member airlines agreed to "comply fully with and be bound by all of the provisions" of the HCAO, "as set forth in San Francisco Administrative Code Chapter 12Q, including the remedies provided, and implementing regulations, as the same may be amended from time to time." *Id*., Ex. 1 § 1813A. Neither A4A nor any of its member airlines have ever challenged the QSP or HCAO until A4A commenced this action. *Id.* ¶ 13.

In November 2020, the City's legislative branch, the Board of Supervisors (the "Board") enacted the Healthy Airport Ordinance ("HAO" or the "Ordinance"), which amends the HCAO, Chapter 12Q of the Administrative Code, to create additional standards for minimum medical insurance coverage to be offered to Covered Employees under the QSP. Dkt. 41-6 ("Powell Decl.") at 4–18 ("HAO"). Specifically, the HAO requires certain SFO employers to (1) offer at least one "platinum" healthcare plan, meaning a plan that provides a level of coverage designed to provide benefits that are actuarially equivalent to at least 90% of the full actuarial value of the benefits provided, HAO § 1(a); (2) cover all services described in the California Essential Health Benefit Benchmark Plan, HAO § 3 (amending S.F. Admin. Code § 12Q.3(d)(1)(A)); (3) offer these plans to all Covered Employees as well as each employee's spouse and dependents, HAO § 3 (amending S.F. Admin. Code § 12Q.3(d)(1)); and (4) absorb 100% of the plans' costs, with no cost-sharing between employer and employee, HAO § 3 (amending S.F. Admin. Code § 12Q.3(d)(1)(A)).

3

The City amended the HAO in 2021, and it went into effect on March 21, 2021. Powell Decl. at 20–25 ("Amended HAO") § 1(c). The Amended HAO permits employers to offer additional, specified healthcare plans. *Id.* § 2 (amending S.F. Admin. Code § 12Q.3(d)). Section 5 of the Amended HAO also states that "[i]n undertaking the adoption and enforcement of this ordinance, the City is undertaking only to promote the general welfare." *Id.* § 5.

The HAO's findings acknowledge that an "average of nearly 58 million people normally travel through the Airport each year." HAO § 2(a). It also states that the implementation of the QSP successfully assisted in the recruitment of high-quality employees and the reduction of employee turnover" by 34% thereby improving the safety and security at the Airport. *Id.* § 2(c). The HAO explains that the "individual health benefits provided to QSP-covered employees are critical to the health, well-being, and financial security of those employees," and that "health benefits not only enhance QSP employee recruitment and retention and reduce employee absences; employee access to health care also reduces the spread of infectious disease." *Id.* § 2(e). The HAO notes that "some QSP-covered employees do not receive health benefits because their CBA [collective bargaining agreement] waives the health benefit requirement" and "escalating health care costs are undermining the effectiveness of these health benefits for QSP-covered employees." *Id.* § 2(g). Because the Airport employees, including those who work for airlines, are an essential workforce during the coronavirus disease of 2019 ("COVID-19") pandemic, the HAO states that employees "working at the Airport who perform services that directly impact safety and/or security at the Airport are at considerable risk of contracting and spreading COVID-19 due to the nature of their work duties." *Id.* § 2(h). The findings also acknowledge that "[m]any Airport workers are people of color, who may be especially vulnerable to contracting COVID-19 and to suffering greater health consequences from the virus." *Id.* § 2(j).

As a result, the findings conclude, "[a]ccess to affordable family health benefits is central to achieving the goals of the QSP" because "[p]rotecting the health of employees and their families is important to the City's proprietary interests as owner and operator of the Airport, including its interest in attracting and retaining high-quality employees whose work impacts safety and security, protecting the community and the traveling public from the spread of COVID-19,

4

and restoring public confidence in the safety of air travel." *Id.* § 2(k).

There are two options to comply with the HAO. Employers, including airlines, can either offer health plan benefits meeting certain enhanced requirements to each Covered Employee and their dependents or make monetary contributions for the Covered Employee to a City fund (the "City Option" program). HAO § 3 (amending S.F. Admin. Code § 12Q.3(d)). The City Option requires employers who do not offer the requisite health plan to pay $9.50 per employee per hour into a Health Access Program ("HAP") account established under Section 14.2 of the San Francisco Administrative Code. HAO § 3 (amending S.F. Admin. Code § 12Q.3(d)(2)). Covered Employees can access the money contributed to the City Option program through Medical Reimbursement Accounts ("MRAs"). Docket No. 41-7 ("Cao Decl.") ¶¶ 4–6.

If any employer fails to comply with its obligations under the HAO for Covered Employees, the City can enforce the HAO by: (1) charging a violator for any amounts that should have been paid into a HAP account along with a simple annual interest rate of 10%, S.F. Admin. Code § 12Q.5(f); (2) requiring a violator to pay the City liquidated damages of up to $100 for each one-week pay period for each employee, S.F. Admin Code § 12Q.5.1(4); (3) canceling any contract the City has with the employer, S.F. Admin. Code § 12Q.5(f)(4); (4) barring the employer from entering into any future contracts with the City for three years, S.F. Admin. Code § 12Q.5(f)(5); and (5) instituting a civil action against the employer, in which the prevailing party will be entitled to all costs and expenses, S.F. Admin. Code § 12Q.5(f)(6). Separately, for a violation of any requirement of the QSP, "the Airport Director may elect to impose a fine equal to $1,000 per violation / employee, per day." Dkt. 41-5 at 84. This provision has been in effect since 2000, although in 2016 the provision was amended to increase the fine from $200 to $1,000. *See* Ogletree Decl., Ex. 2 at 10 (2000 QSP provision); *id.*, Ex. 5 at 4 ¶ 5 (2016 proposed revisions to the QSP).

On March 19, 2021, the Commission and the airlines chose not to execute new 10-year LUAs due to the complications from the COVID-19 pandemic and instead agreed to "modifications" of their prior 2011 LUAs. Dkt. 42-3 ("2021 LUAs"). The modifications, among other things, include (1) the extension of the contract term for two years to 2023; and (2) the

5

1    reservation of the rights of the City and the Signatory Airlines with respect to any legal challenges

2    involving the HAO.  *Id.*

### B. Procedural Background

On March 31, 2021, ten days after the HAO went into effect on March 21, 2021, A4A filed its Complaint against the City and the San Francisco Office of Labor Standards Enforcement ("OLSE"), alleging that three federal statutes preempt the HAO and that the HAO violates the Contracts Clauses of the state and federal constitutions.  *See Compl.*  The three federal statutes asserted as a basis for preemption are the Airline Deregulation Act of 1978, the Employee Retirement Income Security Act of 1974 (ERISA), and the Railway Labor Act.  On April 26, 2021, the City filed its answer to the Complaint.  Dkt. 24.  On August 3, 2021, the Court agreed to the parties' proposal that the case should be bifurcated to first resolve on summary judgment the threshold issue to A4A's preemption claims—the City's market participant defense.  Dkt. 36.  On August 13, 2021, A4A voluntarily dismissed OLSE as a defendant.  Dkt. 38.

On December 31, 2021, the City filed its motion for summary judgment and A4A filed its cross-motion for partial summary judgment on the market participant issue.  *See* Dkts. 41, 42.  On April 5, 2022, the Court granted the City's motion.  Dkt. 52.  On September 20, 2023, A4A appealed to the Ninth Circuit.  Dkt. 58.  On August 29, 2023, the Ninth Circuit reversed and remanded the Court's decision, finding that the City was acting as a regulator, not a market participant, when it enacted the HAO and thus not subject to the market participant exception to federal preemption.  *See Airlines for Am. v. City & Cnty. of San Francisco,* 78 F.4th 1146 (9th Cir. 2023).

On June 12, 2024, the Court granted the parties' stipulation of dismissal with prejudice of A4A's claim for a violation of the Airline Deregulation Act of 1978.  Dkt. 71.  Consequently, the remaining claims include preemption by ERISA and the Railway Labor Act as well as violations of the Contracts Clause of the U.S. and California constitutions.

On July 29, 2024, the City filed the instant partial motion to dismiss certain of A4A's claims and request for monetary relief.  Dkt. 76.  The motion challenges A4A's standing as to its request for monetary relief as well as claims regarding ERISA preemption and violations of the

6

Contracts Clause of the California and U.S. Constitutions.

## III. LEGAL STANDARD

To assert associational standing, a party must show "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *see also AlohaCare v. Hawaii*, 572 F.3d 740, 747 (9th Cir. 2009) (stating the same).

"[T]he associational standing test's third prong is a prudential [rather than constitutional] one." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc*., 517 U.S. 544, 555 (1996). That is, "the third prong of the associational standing test is best seen as focusing on …matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution." *Id.* at 557.

## IV. DISCUSSION

The City argues that A4A lacks associational standing to bring certain of its claims and to seek monetary relief on behalf of its member airlines. Dkt. 84 at 6 (Defendant's Reply). The City does not dispute A4A's ability to establish the first and second prongs of the *Hunt* test. Instead, the City asserts that A4A cannot satisfy the third prong as to the claims and request for monetary relief at issue "because each requires the participation of A4A's member airlines in the lawsuit." Dkt. 76 at 4 (Defendant's Mot.).

For the following reasons, A4A has associational standing to assert its claims regarding ERISA preemption and violations of the state and federal Contracts Clauses as well as to request monetary relief.

### A. Employee Retirement Income Security Act of 1974 (Preemption)

A4A argues that the HAO "violates ERISA's preemption provision because it will force airlines that operate at SFO to establish new ERISA plans, or to alter or terminate existing ERISA plans to separately pay certain benefits that the HAO requires." Dkt. 1 at 29.

In *Gobeille v. Liberty Mutual Insurance Company*, the Supreme Court identified two

categories of state laws that ERISA preempts:

> [First,] ERISA pre-empts a state law if it has a **'reference to'** ERISA plans. To be more precise, where a State's law acts immediately and exclusively upon ERISA plans or where the existence of ERISA plans is essential to the law's operation, that 'reference' will result in pre-emption. Second, ERISA pre-empts a state law that has an impermissible **'connection with'** ERISA plans, meaning a state law that governs a central matter of plan administration or interferes with nationally uniform plan administration.

577 U.S. 312, 319–20 (2016) (internal citations omitted, emphasis added).

A4A asserts that it has associational standing to assert its ERISA preemption claims under both categories.

### 1. **'Reference To' Challenge**

29 U.S.C. § 1144(a) prohibits any state or local law that "relate[s] to any employee benefit plan" under ERISA. Regarding this provision of the ERISA preemption clause, the City concedes that A4A has associational standing to pursue "a facial challenge based solely on the text of the HAO." Dkt. 84 at 15. Here, A4A does not assert an as-applied challenge, and it is hard to conceive of any such challenge under the "reference to" prong which turns on the language of the challenged law and not on particular facts. Hence, the challenge is facial.

### 2. **'Connection With' Challenge**

As stated, ERISA also preempts "a state law that has an impermissible 'connection with' ERISA plans, *i.e.*, a law that governs, or interferes with the uniformity of, plan administration." *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319-20 (2016).

A4A alleges that the HAO forces airlines to modify ERISA plans or collective bargaining agreements ("CBAs"), in violation of the ERISA preemption clause. *See* Dkt. 83 at 16. The City argues that such a claim runs afoul of the third prong of the *Hunt* test because it requires individualized proof from the member airlines regarding the member airlines' health plans and respective CBAs. *See* Dkt. 84 at 15-16. Relying on *N.H. Motor Transp. Ass'n v. Rowe,* 448 F.3d 66, 72 (1st Cir. 2006), A4A responds that it can prevail on its claim if it "can show that the HAO effectively coerces even one airline to adopt a specific scheme of coverage." Dkt. 83 at 24. Under A4A's theory, A4A need only demonstrate that ERISA preempts the HAO as to one member

8

1    airline to show that ERISA preempts the HAO as to all member airlines.

2    Based on A4A's theory and the reasoning in *Rowe*, A4A has associational standing to
3    bring its ERISA preemption claim on behalf of its members. While *Rowe* does not bind the Court,
4    the reasoning in the case is instructive. There, the First Circuit held that trade associations
5    representing air and motor carriers had associational standing to allege that the Federal Aviation
6    Administration Authorization Act ("FAAAA") preempted certain provisions of a Maine tobacco
7    delivery law. *Rowe*, 448 F.3d 66 (1st Cir. 2006), aff'd, 552 U.S. 364, 128 (2008). The *Rowe* court
8    sought to protect the purpose of the FAAAA which is to "encourag[e] uniformity in carrier
9    regulation." *Id.* at 73. The court reasoned that judging preemption "on a carrier-specific basis"
10   would result in a "'patchwork' of state laws applying to some carriers and not to others, depending
11   on which carriers proceeded to litigation." *Id.* (quoting H.R. CONF. REP. 103-677, 86, 1994
12   U.S.C.C.A.N. 1715, 1758). Such a result would "undermine" the purpose of the FAAAA. *Rowe*,
13   448 F.3d at 73. Thus, the Court held that "if a state law is preempted as to one carrier, it is
14   preempted as to all carriers." *Id.* at 72.

15   Just as the FAAAA exists to encourage uniformity in carrier regulation, ERISA exists to
16   ensure the "uniformity of" ERISA "plan administration." *Gobeille*, 577 U.S. 312, 320.
17   Consequently, "depending on which carriers proceed[] to litigation" and judging preemption "on a
18   carrier-specific basis" would frustrate the purpose of the preemption clause. *Rowe*, 448 F.3d at 73.
19   Therefore, a uniform determination regarding ERISA preemption best preserves the purpose of
20   ERISA because it would be untenable for ERISA preemption to apply to one airline and not
21   another.

22   Applied here, A4A may rely on a theory that "if [the HAO] is preempted as to one carrier,
23   it is preempted as to all carriers." *Id.* at 72. Proving such a theory poses no associational standing
24   issues related to individualized proof because A4A's claim would require participation from only
25   one member airline. *See Hunt,* 432 U.S. at 343 (holding that a party lacks association standing to
26   bring a claim if doing so would "require[] the participation of individual members in the lawsuit").
27   Therefore, A4A has associational standing to pursue its ERISA preemption claim under the
28   'connection with' provision of ERISA. *See Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319-

9

20 (2016) (internal citations omitted).

The Court recognizes that "representational standing may be improper in a particular case because of some hardship imposed on a defendant in conducting discovery." *Rowe*, 448 F.3d at 73. To mitigate any discovery-related hardship on the City, the Court modified the scheduling order and adopted the City's proposed schedule from the parties' January 14, 2025 joint case management statement. *See* Dkt. 97. Further, the parties are ordered to meet and confer on their discovery disputes and submit a joint statement within two weeks of this order. In the meet and confer, A4A is to identify its 'test' case for the single member airline it intends to use to prove its 'connection with' argument. Additionally, A4A is to identify any documents it intends to rely on to prove its claims and A4A shall ensure the expeditious production of these documents to the City. A4A must cooperate in obtaining relevant documents in the possession of its constituent members and facilitate the production of such documents.

Accordingly, the Court **DENIES** the City's motion to dismiss this claim.

B. **Contracts Clause (state and federal)**

The Contracts Clause of the U.S. Constitution states that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. The Contracts Clause of the California Constitution provides that a "law impairing the obligation of contracts may not be passed." Cal. Const. art. I, § 9. The Contracts Clauses are "[t]he same provision, in substance." *Robinson v. Magee*, 9 Cal. 81, 82-83 (1858).

A4A alleges that the HAO violates the Contracts Clauses because it "substantially impairs A4A's members' collective bargaining agreements with their employees." Dkt. 1 at 30. It requires modification of their CBAs (a contract) with employees. A4A argues that proving these claims does not require individualized proof from its member airlines. The City argues that whether the HAO substantially impairs a fundamental aspect of its contractual relationship with its employees and affects key terms of its member airline's collective bargaining agreement ("CBA") depends on the terms of the relevant CBA "and whether and to what extent the HAO's requirements impair the airline's ability to comply with the CBA." Dkt. 84 at 17.

In the January 23, 2025 hearing on the City's partial motion to dismiss, A4A stated that its

10

1    Contracts Clause claims concern a showing of a qualitative, rather than financially quantitative, impairment of existing contracts. Dkt. 99 at 35-36 (Hearing Tr. at 35:20-36:16) That is, A4A's claims concern whether the HAO substantially impairs A4A's members' CBAs and does not seek to quantify that magnitude of financial impairment. In the hearing, A4A noted that the member airlines CBAs are publicly available. *Id.* at 16 (Hearing Tr. at 16:13). Under this particular theory to which A4A has committed, the Contracts Clause claims do not require individualized proof of e.g., the magnitude of the financial impact under a particular CBA. Therefore, A4A has associational standing to bring these claims as characterized by A4A on behalf of its member airlines.

## C. Monetary Relief

A4A seeks an order that the City "disgorge to A4A or A4A's member airlines any fees, contributions, fines, penalties, or other monetary payments which Defendants have collected or received from A4A's members pursuant to the HAO." Dkt. 1 at 32.

The City contends that calculating the disgorgement amount requires individualized proof from each member airline regarding 1) the number of covered employees, 2) the hours those employees worked, and 3) the amounts employees withdrew from the City fund for health expenses. Dkt. 84 at 7. Conversely, A4A argues that such disgorgement does not require individualized proof because the City possesses records of "how much has been paid into the City fund and by whom." Dkt. 83 at 29.

While many courts have found that claims for monetary relief involve individualized proof, there is no "*per se* rule against granting an association standing to seek money damages." *United Union of Roofers, Waterproofers, & Allied Trades No. 40 v. Ins. Corp. of Am.*, 919 F.2d 1398, 1400 (9th Cir. 1990). Determining whether a party has associational standing to seek monetary relief on behalf of its members depends on whether "individual…members will have to participate at the proof of damages stage." *Id.* If "it is clear that individual…members will have to" do so, then the party does not have associational standing to seek monetary relief for its members because the party would be unable to "overcome the third hurdle placed before it by Supreme Court precedent" in *Hunt*. *Id.*

11

Here, calculating the disgorgement amount will not require complicated individualized proof from each member airline. This calculation is a simple accounting question involving identifying the airlines that have deposited money into the City fund, how much they have each deposited, and how much those airline employees have withdrawn. Allowing A4A to bring this claim on behalf of its members does not impose a discovery-related hardship on the City because the City possesses the information necessary to calculate the disgorgement figure. Thus, because the third prong of the *Hunt* test is a prudential one that "focus[es] on …matters of administrative convenience and efficiency," A4A has associational standing to seek such disgorgement from the City based on the deposits and withdrawals from the City fund. *United Food,* 517 U.S. 557. Therefore, the Court **DENIES** the City's motion to dismiss as to this claim.

## V.  CONCLUSION

For the aforementioned reasons, the Court **DENIES** the Defendant's partial motion to dismiss certain of Plaintiff's claims and its request for monetary relief. Should A4A deviate from its stated theories or should the City face actual hardship in obtaining the discovery it needs, the Court may revisit the associational standing issue.

**IT IS SO ORDERED**.

Dated: February 25, 2025

_____
EDWARD M. CHEN
United States District Judge